**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KEVIN BRYAN ST. JOHN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ISLAMIC REPUBLIC OF IRAN; IRANIAN MINISTRY OF INTELLIGENCE AND SECURITY; and IRANIAN ISLAMIC REVOLUTIONARY GUARD CORPS,<br><br>Defendants. | Civil Action No. 23-2333 (BAH)<br><br>Judge Beryl A. Howell |

# AMENDED MEMORANDUM OPINION

This action, brought by 95 plaintiffs, arises out of the June 25, 1996, bombing by Hezbollah of the Khobar Towers apartment complex in Dhahran, Saudi Arabia, which housed United States military personnel. *See* First Am. Compl. ("FAC") at 5, ECF No. 9.[1] The bombing killed nineteen U.S. Air Force personnel and injured hundreds more, including injuring the thirty-four servicemember plaintiffs in this case. FAC ¶ 153. The plaintiffs in this case also include the immediate family members both of the thirty-four injured servicemember plaintiffs and of other servicemembers who were injured in the bombing and were previously awarded compensatory damages in other cases arising out of the Khobar Towers bombing. *See id.* at 5. Based on allegations that defendants, the Islamic Republic of Iran ("Iran"), Iranian Islamic Revolutionary Guard Corps ("IRGC"), and Iranian Ministry of Intelligence and Security ("MOIS"), "provide[d] sponsorship, material support, and resources to Hezbollah," and thereby enabled Hezbollah to

[1] The ninety-sixth plaintiff named in the First Amended Complaint, Nicole Marie Van Name, voluntarily dismissed her claims without prejudice prior to the filing of the instant motion. Not. of Voluntary Dismissal re: Nicole Van Name, ECF No. 41.

"carry[] out large-scale terrorist attacks, like the attack on Khobar Towers," *id.* ¶¶ 125, 127; *see also, e.g.*, *id.* ¶ 130 (noting that Judges in this District have found that "the Khobar Towers bombing was planned, funded, and sponsored by senior leadership in the government of the Islamic Republic of Iran, the IRGC had the responsibility and worked with Saudi Hezbollah to execute the plan, and the MOIS participated in the planning and funding of the attack" (quoting *Rimkus v. Islamic Republic of Iran* ("*Rimkus I*"), 575 F. Supp. 2d 181, 195 (D.D.C. 2008)), plaintiffs seek damages for their injuries suffered as a result of the attack under the terrorism exception to the Foreign Sovereign Immunities Act's ("FSIA") conferral of immunity on foreign sovereigns, 28 U.S.C. § 1605A. Plaintiffs complied with the FSIA's requirements for effectuating service on sovereign defendants, but defendants have failed to enter an appearance or otherwise defend against this action. *See* 28 U.S.C. § 1608(a)(4); Return of Service/Aff., ECF No. 27; Clerk's Entry of Default as to MOIS, ECF No. 29; Clerk's Entry of Default as to Iran, ECF No. 30; Clerk's Entry of Default as to IRGC, ECF No. 31.

Plaintiffs now seek the entry of default judgment against defendants as to liability and damages. Pls.' Mot. for Default J. as to Liability & Damages & Entry of Final J. ("Pls.' Mot."), ECF No. 42; Pls.' Mem. in Supp. of Mot. for Default J. ("Pls.' Mem."), ECF No. 42-1. For the reasons detailed below, plaintiffs' motion is granted in part and denied in part.

## I. BACKGROUND

Prior decisions of this Court have found Iran liable for the Khobar Towers bombing. *See, e.g.*, *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40 (D.D.C. 2006) (Lamberth, J.); *Est. of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229 (D.D.C. 2006) (Lamberth, J.); *Rimkus v. Islamic Republic of Iran* ("*Rimkus II*"), 750 F. Supp. 2d 163 (D.D.C. 2010) (Lamberth, C.J.); *Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) (Howell, C.J.); *Schooley*

*v. Islamic Republic of Iran*, No. 17-cv-1376 (BAH), 2019 WL 2717888 (D.D.C. June 27, 2019) (Howell, C.J.); *Aceto v. Islamic Republic of Iran*, No. 19-cv-464 (BAH), 2020 WL 619925 (D.D.C. Feb. 7, 2020) (Howell, C.J.); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (BAH), 2020 WL 3606273 (D.D.C. July 2, 2020) (Howell, C.J.); *Blank v. Islamic Republic of Iran*, No. 19-cv-3645 (BAH), 2021 WL 3021450 (D.D.C. July 17, 2021) (Howell, C.J.); *Ackley v. Islamic Republic of Iran*, No. 20-cv-621 (BAH), 2022 WL 3354720 (D.D.C. Aug. 12, 2022) (Howell, C.J.); *Mustard v. Islamic Republic of Iran*, No. 21-cv-163 (BAH), 2023 WL 1778193 (D.D.C. Feb. 6, 2023) (Howell, C.J.); *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) (Howell, J.); *Thole v. Islamic Republic of Iran*, No. 23-cv-793 (BAH), 2024 WL 2208208 (D.D.C. May 16, 2024) (Howell, J.); *Est. of Johnson v. Islamic Republic of Iran*, No. 23-cv-1689 (BAH), 2024 WL 3225954 (D.D.C. June 28, 2024) (Howell, J.); *Breezee v. Islamic Republic of Iran*, No. 23-cv-3392 (BAH), 2025 WL 2719250 (D.D.C. Sept. 24, 2025) (Howell, J.). In several of those cases, MOIS and IRGC were also named as defendants and found liable for the attack as "division[s] of the state of Iran." *Blais*, 459 F. Supp. 2d at 53; *see also, e.g.*, *Heiser I*, 466 F. Supp. 2d at 255; *Rimkus II*, 750 F. Supp. 2d at 169; *Akins*, 332 F. Supp. 3d at 33 (finding Iran and IRGC, the only two listed defendants, liable); *Schooley*, 2019 WL 2717888, at *3; *Christie*, 2020 WL 3606273, at *3; *Gration*, 2023 WL 5221955, at *3.

In *Blais* and *Heiser I*, the Court heard evidence and witness testimony about the connection between these same three defendants and the attack on the Khobar Towers. *See Blais*, 459 F. Supp. 2d at 46 n.4, 48-49; *Heiser I*, 466 F. Supp. 2d at 250. In *Heiser I* alone, the plaintiffs' examination of witnesses, including seven expert witnesses, and presentation of other evidence took 17 days. *See* 466 F. Supp. 2d at 250.[2] Other cases, including *Rimkus*, *Akins*, and *Schooley*, have concluded

[2] The expert witnesses in *Heiser I* were: (1) Louis Freeh, the former director of the Federal Bureau of Investigation ("FBI"); (2) Dr. Patrick Clawson, a scholar of Middle Eastern politics who has frequently provided

that judicial notice of the findings of fact in *Blais* and *Heiser I* was appropriate, *see Rimkus II*, 750 F. Supp. 2d at 173; *Akins*, 332 F. Supp. 3d at 9-11; *Schooley*, 2019 WL 2717888, at *2, and plaintiffs here request that this Court "take judicial notice of the records and proceedings from prior related cases before the District Court for the District of Columbia, wherein the same Iranian Defendants were held liable for providing material support and resources to support the [Khobar Towers] [a]ttack," including *Akins*, 332 F. Supp. 3d 1; *Schooley*, 2019 WL 2717888; *Blais*, 459 F. Supp. 2d 40; *Heiser I*, 466 F. Supp. 2d 229; *Rimkus II*, 750 F. Supp. 2d 163; *Christie*, 2020 WL 3606273; and *Gration*, 2023 WL 5221955. Pls.' Mot. to Take Judicial Not., for Entry of Def. J. as to Liability, to Submit Documentary Evidence Under Seal & to File a Redacted Version on Public Dkt. ("Pls.' Jud. Not. Mot.") at 8, ECF No. 40.[3]

Rule 201 of the Federal Rules of Evidence authorizes a court to "judicially notice" adjudicative facts that are "not subject to reasonable dispute because" they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b).[4] In this District, Rule 201 has been applied frequently to take judicial notice of factual

---

expert testimony regarding Iran's involvement in sponsoring terrorism; (3) Dr. Bruce Tefft, a founding member of the CIA's Counterterrorism Bureau and regular consultant on issues of terrorism; (4) Dale Watson, the former deputy counterterrorism chief of the FBI, *see Heiser I*, 466 F. Supp. 2d at 260-65, 263 n.18; (5) Dr. Thomas Parsons, a medical examiner, *see id.* at 268; (6) Dr. Dana Cable, a licensed psychologist and expert on the grief process, *see id.* at 269-70; and (7) Dr. Herman Miller, an economic consultant, *see id.* at 273-74.

[3] As described *infra* in Part I.D, plaintiffs' Motion to Take Judicial Notice, refiled at ECF No. 40, after this case was transferred to the undersigned, is titled "Plaintiffs' Motion to Take Judicial Notice of Evidence in Related Prior Cases, for Entry of Default Judgment as to Liability, to Submit Documentary Evidence Under Seal, and to File a Redacted Version on Public Docket," confusingly encompassing not just a Motion to Take Judicial Notice but also separate requests for both default judgment as to liability and to file documents under seal, even though those separate requests are also requested in other pending motions or granted by the Judge previously assigned to this case, respectively. To the extent that the Motion to Take Judicial Notice also covers other requests, those requests are denied as moot since they are duplicative and are addressed in the separate motions.

[4] "[A]djudicative facts are simply the facts of the particular case." *Nat'l Org. for Women v. Soc. Sec. Admin.*, 736 F.2d 727, 737 n.95 (D.C. Cir. 1984) (Robinson, J., concurring) (quoting FED. R. EVID. 201, Advisory Committee Note). The Rule does not govern judicial notice of "legislative fact[s]," FED. R. EVID. 201(a), which are "those which have relevance to legal reasoning and the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body," *Nat'l Org. for Women*, 736 F.2d at 737 n.95 (quoting FED. R. EVID. 201, Advisory Committee Note).

evidence developed in other FSIA proceedings "involving the same conduct by the same defendants," *Akins*, 332 F. Supp. 3d at 11, "even when those proceedings have taken place in front of a different judge," *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 191 (D.D.C. 2017) (citing *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 54 (D.D.C. 2009)). Using judicial notice in this way avoids "the formality of having that evidence reproduced" in each new case. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 7 (D.D.C. 2011) (quoting *Rimkus II*, 750 F. Supp. 2d at 172)); *see also Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 50 (D.D.C. 2012) (finding courts permitted "in subsequent related cases to rely upon the evidence presented in earlier litigation" (internal quotation marks and citation omitted)); *Est. of Botvin v. Islamic Republic of Iran*, 873 F. Supp. 2d 232, 237 (D.D.C. 2012) (Lamberth, C.J.) (taking "judicial notice of the evidence presented in the earlier cases").

Importantly, taking judicial notice of prior findings "does not conclusively establish the facts found" as to the instant case. *Foley*, 249 F. Supp. 3d at 191. Instead, "based on judicial notice of the evidence presented in the earlier cases[,] . . . courts may reach their own independent findings of fact." *Anderson v. Islamic Republic of Iran*, 753 F. Supp. 2d 68, 75 (D.D.C. 2010) (Lamberth, C.J.); *see also Rimkus II*, 750 F. Supp. 2d at 172 ("[C]ourts in FSIA litigation have adopted a middle-ground approach that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them."). The D.C. Circuit has endorsed the use of judicial notice to establish facts in FSIA terrorism cases. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049, 1051 (D.C. Cir. 2014) (finding that plaintiffs had "met their burden of producing evidence 'satisfactory to the court'" to establish subject matter jurisdiction under the FSIA, where the only evidence linking

North Korea to the victim's disappearance was a South Korean court's conviction of a North Korean agent, of which the district court had taken judicial notice).

Persuaded that this approach is both "efficient and sufficiently protective of the absent defendants' interests," *Akins*, 332 F. Supp. 3d at 11, plaintiffs' request to take judicial notice of the evidence presented in *Akins*, *Schooley*, *Blais*, *Heiser I*, *Rimkus II*, *Christie*, and *Gration* is granted. *See Akins*, 332 F. Supp. 3d at 11 (stating that "factual evidence developed in other cases involving the same conduct by the same defendants is admissible and may be relied upon in this case"); Pls.' Jud. Not. Mot. (requesting judicial notice be taken of the "records and proceedings" in these seven cases). The evidence regarding the Khobar Towers bombing is summarized below, followed by an overview of the procedural history of this case.

**A. The Attack on Khobar Towers**

"The Khobar Towers was a residential complex in Dhahran, Saudi Arabia, which housed the coalition forces charged with monitoring compliance with [United Nations] security council resolutions." *Blais*, 459 F. Supp. 2d at 47. Shortly before 10:00 pm on June 25, 1996, "a large gasoline tanker truck" drove up to the Khobar Towers complex and parked "alongside the perimeter wall." *Heiser I*, 466 F. Supp. 2d at 252; *see also* FAC ¶ 150. After parking, the driver of the truck "jumped out, ran into a waiting car that had pulled up near the truck, and sped off." *Heiser I*, 466 F. Supp. 2d at 252; *see also* FAC ¶ 150. Although security guards stationed near the top of one of the towers, Building 131, "started to give warnings about the unusual vehicle location," the truck exploded "within about 15 minutes." *Heiser I*, 466 F. Supp. 2d at 252. The blast "sheared off the face of Building 131," *id.*, and "shattered windows in virtually every building in the compound and in surrounding buildings up to a mile away," FAC ¶ 150. Investigations of the attack "determined that the force of the explosion was the equivalent of 20,000 pounds of

TNT," which the U.S. Department of Defense described as "the largest non-nuclear explosion ever up to that time." *Heiser I*, 466 F. Supp. 2d at 252.

**B. Defendants' Role in the Attack**

The U.S. Department of State has designated Iran as a state sponsor of terrorism since January 19, 1984. *Blais*, 459 F. Supp. 2d at 47; *see also, e.g.*, *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 77 (D.D.C. 2018); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism [https://perma.cc/VF4X-JQU4] (last visited Mar. 13, 2026). "[T]he IRGC is a non-traditional instrumentality of Iran," serving as "the military arm of a kind of shadow government answering directly to the Ayatollah and the mullahs who hold power in Iran." *Blais*, 459 F. Supp. 2d at 47. The MOIS is a "political subdivision" of Iran's government. *Schooley*, 2019 WL 2717888, at *68.

Prior proceedings have found that Iran, in part via its government entities IRGC and MOIS, planned and supported the Khobar Towers bombing. Both Ayatollah Ali Khamenei, the Supreme leader of Iran at the time of the attack, and Iran's Minister of Intelligence and Security, the head of MOIS, "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The truck bomb used in the attack was "assembled" at a base in Lebanon's Bekaa Valley, which base was "jointly operated by the IRGC and by the terrorist organization known as Hezbollah." *Id.* The individuals who carried out the bombing drove the bomb from this base to Dhahran and called themselves "Saudi Hezbollah." *Id.*

These factual findings are based in part on testimony provided by four key expert witnesses in *Blais* and *Heiser I*, including Louis Freeh, who served as the director of the FBI at the time of the bombing, and Dale Watson, who served as the deputy counterterrorism chief of the FBI at the same time. The testimony of both Freeh and Watson in *Heiser I* was based on their oversight of

the FBI's "massive and thorough investigation of the attack," which investigation involved "over 250 agents." *Id.*; *see also id.* at 260-62 (describing the testimony of Freeh and Watson and the basis for each expert's knowledge of the incident).[5] Based on information gathered in their investigations, both Freeh and Watson testified to their conclusions that "Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing carried out by Saudi Hezbollah." *Id.* at 264; *see also Blais*, 459 F. Supp. 2d at 48.

Additional expert testimony was provided in *Heiser I* by Dr. Patrick Clawson, who based his opinions on "his involvement on a Commission investigating the bombing, his top-secret security clearance, his discussions with Saudi officials," and "his academic research on the subject." 466 F. Supp. 2d at 262. According to Clawson, "the government of Iran, MOIS, and IRGC were responsible for the Khobar Towers bombing, and . . . Saudi Hezbollah carried out the attack under their direction." *Id.* at 253. This opinion was also supported by Dr. Bruce Tefft, a former founding member of the CIA's counterterrorism bureau, who testified, based on "publicly available sources that were not inconsistent with classified information known to him from his time at the CIA and from his security clearances since that time," that there was "no question" that Iran and IRGC "were responsible for planning and supporting the attack on the Khobar Towers" and specifically that the attack "wouldn't have happened without Iranian support." *Id.* at 254.

**C. The Instant Plaintiffs**

The ninety-five plaintiffs in this lawsuit include thirty-four servicemembers who suffered "serious physical and emotional injuries" as a result of the Khobar Towers bombing and fifty-five

---

[5] During this investigation, the FBI interviewed six members of Saudi Hezbollah, each of whom admitted "their complicity in the attack on Khobar Towers, and admitted that senior officials in the Iranian government provided them with funding, planning, training, sponsorship, and travel necessary to carry out the attack on the Khobar Towers." *Heiser I*, 466 F. Supp. 2d at 253. This investigation ultimately resulted in an indictment, returned by a grand jury in Alexandria, Virginia, "against 13 identified members of the pro-Iran Saudi Hezbollah organization." *Id.* at 252.

of their immediate family members, as well as six immediate family members of other servicemembers awarded damages in two previous actions arising out of the attack on the Khobar Towers. Pls.' Mot. at 2 (explaining that five family member plaintiffs are immediate family members of an injured servicemember who was a plaintiff in *Gration*, 2023 WL 5221955, and one is the immediate family member of an injured servicemember who was a plaintiff in *Schooley*, 2019 WL 2717888). Each of the thirty-four servicemember plaintiffs and associated family members are described below, followed by the plaintiffs who are family members of servicemembers awarded damages in *Gration* and *Schooley*.

**1. Servicemember Kevin Bryan St. John**

On June 25, 1996, Kevin Bryan St. John was a First Lieutenant Flight Commander in the U.S. Air Force, deployed in Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Colonel Kevin Bryan St. John ("St. John Decl.") ¶ 5, ECF No. 36-1 at 2. At the time of the bombing, he was in his dorm room with the windows open. *Id.* ¶ 6. When the bomb detonated, he was "blasted . . . across the room and slammed . . . into the wall, along with furniture and other debris." *Id*. The metal and wire from the window screen "struck . . . and shredded his face." *Id*. As a result of the blast, his face was "pouring" blood, but he focused his efforts on "evacuating others from the building." *Id.* ¶ 7. Following the bombing, he worked "around the clock" to set up triage stations, "establish a command post and a reception area for the FBI agents" to do forensic investigations, and search for human remains. *Id.* ¶¶ 7, 8, 10. St. John was awarded was an Air Force Achievement Medal for his actions following the attack. *Id.* ¶ 11.

Since the bombing, St. John has "lower back pain, neck pain, hearing loss, persistent tinnitus," and PTSD. *Id.* ¶¶ 17-18. He experiences "bouts of rage" and is always on high alert because he "lost faith in the certainty of [his] safety." *Id.* ¶ 18. His emotional state led him to

"abuse alcohol." *Id*. His psychological injuries strained his relationships with family and friends as he has developed a "complete mistrust of others." *Id.* ¶ 16. One of his parents, Toni St. John, attests that when he returned after the accident, he was "edgy and hyper-cautious" and "very quiet at times and quick to anger at other times." *Id.*, Ex. G, Witness Statement of Toni St. John ¶ 7, ECF No. 36-1 at 38. He has been rated 60% disabled by the U.S. Department of Veteran Affairs ("VA"), including 50% for PTSD with anxiety and depression and 10% for bilateral tinnitus. St. John Decl. ¶ 18; *id.*, Ex. E, St. John VA Disability Rating, ECF No. 36-1 at 17.

**2. Servicemember John Charles Young II**

On June 25, 1996, John Charles Young II was a Senior Airman in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of John Charles Young II ("Young Decl.") ¶ 4, ECF No. 36-1 at 41. When the bomb detonated, Young was lying in his dorm bed under an open window. *Id.* ¶ 6. The "blast wave threw [him] across the room." *Id*. He got up and exited the building barefoot, walking across glass shards on the floor. *Id.* ¶ 6. He suffered from a "large gash on [his] left shin" and was "covered in lacerations from glass shards" on his feet. *Id.* ¶¶ 7, 8. Following the bombing, Young helped triage others and clean up the complex. *Id.* ¶¶ 7, 9. He received a Certificate of Appreciation for his actions following the attack. *Id.* ¶ 9.

After returning home, Young could "never forget the horrific images and overwhelming emotions from that day." *Id.* ¶ 14. He developed a cyst on his brain, "severe sleep issues," anxiety, and PTSD. *Id.* ¶ 13. He struggled with "unhealthy" behaviors such as "excess" "drinking" and "avoid[ing] people." *Id.* ¶ 11. His wife and children must be careful "not to startle" him, because of his PTSD. *Id.* ¶ 13. His father attests that these psychological effects have continued to impact Young's life. *Id.*, Ex. G, Witness Statement of John C. Young, Sr., ECF No. 36-1 at 61. Young

received a combined 90% disability rating from the VA, including 50% for PTSD and 50% for sleep apnea. Young Decl. ¶ 13; *id.*, Ex. F, Young VA Disability Rating, ECF No. 36-1 at 57.

**3. Servicemember James Elliott Kegan and Four Family Members**

On June 25, 1996, James Elliott Kegan was a Technical Sergeant in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Estate of James Elliott Kegan via Ralph Michael Kegan ("R. Kegan First Decl.") ¶ 8, ECF No. 36-1 at 65. Kegan passed away in 2022 and is represented by his estate, of which his son, Ralph Michael Kegan, has been appointed the personal representative. *Id.* ¶¶ 6-7. When the bomb detonated, James Kegan was using the restroom. *Id.* ¶ 11. The bomb's blast "blew him across the room" into the wall before he "dropped into the bathtub." *Id*. He suffered a torn aorta and many lacerations, including serious gashes to his genitals, knees, and feet. *Id.* ¶¶ 11-12. Fellow servicemembers found him in the bathtub, stemmed the bleeding, and carried him out. *Id.*, Ex. H, Witness Statement of Michael Goff ¶ 6, ECF No. 36-1 at 86; *id.*, Ex. I, Witness Statement of Cecil B. Dills ¶ 6, ECF No. 36-1 at 90. Kegan was awarded a Purple Heart for his injuries from the attack. *Id.* ¶ 11.

Kegan experienced serious medical complications upon his return. His torn aorta led to a "kidney dissection," "numerous grafts[,] and aortic stents to repair the damage." *Id.* ¶ 16. When his kidney eventually failed, "it was determined that because of all the stents, grafts, and damage he previously endured as a result of his injuries from the bombing," he was unable to receive a new kidney. *Id.* ¶ 17. As a result, he had "to spend the rest of his life on dialysis," which he found "devastat[ing]." *Id*. In addition to these physical problems, he suffered from "nightmares, tinnitus, hearing loss, anxiety, and relentless survivor's guilt." *Id.* ¶ 18. Kegan's health slowly deteriorated until he ultimately passed away in 2022. *Id.* ¶ 20. Kegan received a combined 70% disability

rating from the VA, including 70% for PTSD. *Id.* ¶ 18; *id.*, Ex. K, Kegan VA Disability Rating, ECF No. 36-1 at 95.

Four of Kegan's family members—his sons Ralph Michael Kegan and James Paul Kegan, and stepdaughters Carolyn Louise Cline and Katherine Ann Hunt—are also plaintiffs in this case. Ralph Kegan learned of the attack shortly after his fifteenth birthday. Decl. of Ralph Michael Kegan ("R. Kegan Second Decl.") ¶¶ 9, ECF No. 36-1 at 110. When he learned of the bombing "the thought of losing [his] dad so close to his birthday weighed heavily on [him]." *Id.* Upon seeing his father in the hospital for the first time, Ralph was "brought to tears" by the sight of his father's suffering. *Id.* ¶ 10. Ralph "gave up [his] career to care for hi[s] [father] full-time." *Id.* ¶ 20. After the bombing, Ralph experienced the "lasting impacts of trauma" and was "made aware of the fragility of life" causing him to "isolate [him]self and stay[] home where [he] felt safest." *Id.* Ralph lived with his father and carried the "weight of his [father's] pain" as he watched his father "deteriorate" until his death. *Id.* ¶ 21.

James Kegan was sixteen when the attack occurred and was filled with "so much angst and concern" for his father. Decl. of James Paul Kegan ("J. Kegan Decl.") ¶¶ 6, ECF No. 36-1 at 155. When he visited his father in a U.S. hospital, he immediately noticed his father's injuries, which were "painful for [him] as a young boy to see." *Id.* ¶ 7. Along with the physical injuries, James noticed a "stark change in his [father's] demeanor." *Id*. His father became "detached" and would "burst into defense mode." *Id.* ¶ 9. As he grew older, James became a "full-time caretaker[]" for his father and felt the financial and emotional strain of his father's deteriorating health conditions. *Id.* ¶ 11. James suffers from "sleeplessness, anxiety, and depression." *Id.* ¶ 12.

Carolyn Cline was seventeen when the attack occurred. Decl. of Carolyn Louise Cline ("Cline Decl.") ¶ 3, ECF No. 36-1 at 164. When she first learned of the attack, she was

immediately "overwhelmed with worry" and was "frightened for [her stepfather's] safety." *Id.* ¶ 5. She and her mother had lived with Kegan since she was nine years old, and he "took great care of [them], . . . and was always there for them." *Id.* ¶¶ 3, 8. Upon her stepfather's return from Dhahran, he "was always in a bad mood, and had a short temper," and she "felt like [she] was a disappointment to him." *Id.* ¶ 9. Consequently, the "close family bond [they] once . . . shared . . . deteriorated." *Id.* ¶ 10. Carolyn suffers from "depression, anxiety, sleep issues, and separation anxiety" because of the attack and its consequences. *Id.* ¶ 11.

Katherine Hunt was thirteen at the time of the attack, and "fear overtook [her] emotions" when she heard that her stepfather had been injured. Decl. of Katherine Ann Hunt ("Hunt Decl.") ¶ 5, ECF No. 36-1 at 174. Prior to the attack, Katherine lived with Kegan beginning when she was eight and thought of Kegan as her "father," who played a large role in her upbringing and was a "positive and steady presence in [her] family." *Id.* ¶¶ 3, 7. Following the attack, Kegan's demeanor changed as he "isolate[d] himself" and got into "fight[s] often" in the household. *Id.* ¶ 10. This led Katherine to develop "depression, anxiety, and sleep issues that have followed [her] throughout [her] life." *Id.* ¶ 11. She was left with a "lingering sense of loss for the life and moments [she] should have had with a loving and devoted family." *Id.* ¶ 13.

**4. Servicemember Todd Scott Rafaiani and Three Family Members**

On June 25, 1996, Todd Scott Rafaiani was an Airman First Class in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Todd Scott Rafaiani ("Rafaiani Decl.") ¶ 6, ECF No. 36-1 at 184. When the bomb detonated, he was lying in bed before the blast "hurled [him] from [his] bed and slammed [him] to the ground." *Id.* ¶ 7. He got up and started running out of the building while glass shards "shredded [his] feet." *Id.* Upon

arriving at the triage center, he saw "countless, gruesome wounds [that] will forever remain in [his] memory. *Id.* ¶ 8.

Following the attack, Rafaiani felt himself "trapped in a cycle of relentless tension and exhaustion." *Id.* ¶ 11. He suffers from bilateral tinnitus, "major depressive disorder with anxious distress," "episodes of panic," memory issues, and "disturbances in motivation." *Id.* ¶¶ 15-16. His relationship with family and friends suffered as he began to "isolat[e] himself" and "dread[] the thought of interaction." *Id.* ¶ 12. His conditions made it "challenging [for him] to function independently and effectively," and he struggled to maintain a job, leading him to eventually "file for bankruptcy." *Id.* ¶¶ 13, 16. Salvatore Capaccio, who served with Rafaiani and knew him prior to the attack, attests to these effects on him. *Id.*, Ex. D, Witness Statement of Salvatore Capaccio ¶¶ 9-12, ECF No. 36-1 at 196. Rafaiani received a combined 70% disability rating from the VA for his "major depressive disorder with anxious distress directly linked to [his] military service." Rafaiani Decl. ¶ 16; *id.*, Ex. F, Rafaiani VA Benefits Letter, ECF No. 36-1 at 206.

Three of Rafaiani's family members—his parents Frances Kay Rafaiani and Lawrence Eugene Rafaiani, and his sister Leslie Marie Core—are also plaintiffs in this lawsuit. When Frances first heard from her son after the attack, she "could not stop shaking" and "went numb." Decl. of Frances Kay Rafaiani ("F. Rafaiani Decl.") ¶ 6, ECF No. 36-1 at 211. When Todd returned home, Frances felt that "his turmoil cast a shadow" over her life, "breaking apart" her family. *Id.* ¶ 13. Todd's "sorrow became [her] sorrow because [she] grieved watching him struggle." *Id.* ¶ 14. She sought out therapy to cope but "the scars from that period run deep and linger to this day." *Id.* ¶ 15. Frances still feels "helpless," and seeing how her son's life has been impacted "is one of the hardest things [she has] ever faced." *Id.* ¶¶ 17, 18. She "grieve[s] for him every day of [her] life." *Id.* ¶ 19.

When Lawrence Rafaiani heard about the attack from his son, "the weight of all of it left [him] shaking in tears." Decl. of Lawrence Eugene Rafaiani ("L. Rafaiani Decl.") ¶ 6, ECF No. 36-1 at 223. Lawrence and Todd once had a "solid, loving relationship," but following the attack, Todd "often erupted in frustration and anger" which "made it hard for [Lawrence] to be around him." *Id.* ¶¶ 9, 11. The attack "shattered [his] steady, close-knit family and changed [him] forever." *Id.* ¶ 12. As a result, Lawrence "struggled at work" and "could not focus." *Id*. He lives with "anxiety and constant sadness," which he took up smoking to handle. *Id*. Lawrence "mourn[s] the loss of the relationship [he] had with Todd before the Attack." *Id*.

When Leslie Core heard of the attack, she felt "physically sick" at the news. Decl. of Leslie Marie Core ("Core Decl.") ¶ 6, ECF No. 36-1 at 234. The next day, she begged her congressman over the phone to bring her brother home and the "worry consumed [her] as [she] waited for his safe return." *Id.* ¶ 7. Once Todd returned home, Leslie immediately noticed his "new demeanor" was "quiet and distant." *Id.* ¶ 8. "Before the Attack, he was outgoing, vibrant, playful and goofy, so the changes in him were obvious." *Id*. He began avoiding family gatherings, which changed the "warmth and togetherness" that the family once felt. *Id*. "Because of Todd's injuries and the Attack, [Leslie] ha[s] also suffered both physically and psychologically." *Id.* ¶ 12. She experiences "extreme skepticism, tight stress in [her] chest, and ongoing sleep issues." *Id*.

**5. Servicemember Norman Edward Brown**

On June 25, 1996, Norman Edward Brown was an Airman First Class in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Norman Edward Brown ("N. Brown Decl.") ¶ 5, ECF No. 36-1 at 245. On the night of the bombing, Brown was sitting in a parked bus facing Building 131 of the Khobar Towers that was scheduled to take him to his job in an airfield off the base. *Id.* ¶ 6. When the bomb detonated, Brown was "slammed

into the window frame" by "pressure all around [him]" and "knocked unconscious." *Id*. When he regained consciousness, Brown was lying on the ground outside of the bus and his "face and body were shredded from glass shrapnel." *Id*. He walked into Building 131, which was destroyed, and was surrounded by "panicked voices, and people . . . running by [him] with blood all over them." *Id*. ¶¶ 6-7. Brown assisted with evacuating injured people from the building. *Id.* ¶ 7. Brown received an Armed Forces Expeditionary Medal and the Air Force Outstanding Unit Award for his actions following the attack. *Id.* ¶ 9.

Brown's "hearing did not return for a several days," and he had "nightmares," "migraines," and "panic attacks." *Id*. ¶¶ 8, 11. He suffered from PTSD, "migraines, anxiety, depression, [and] nightmares." *Id.* ¶ 15. He "could not tolerate large groups of people," "began to drink and use drugs to self-medicate," and was hospitalized twice for attempting suicide. *Id.* ¶ 12. His "wife eventually divorced" him, as did his second wife, and both his daughters "refuse[] to see [him]." *Id.* His relationship with his parents also "suffered." *Id.* ¶ 14; *see id.*, Ex. G, Witness Statement of Joseph E. Brown ¶ 9, ECF No. 36-1 at 286 (Brown's father discussing Brown's efforts to isolate himself from family). Brown received a combined 100% disability rating from the VA for his physical and psychological injuries. *Id.* ¶ 15; *id.*, Ex. F, N. Brown VA Disability Rating, ECF No. 36-1 at 277.

**6. Plaintiff Vincent Bruce Jobson and Two Family Members**

On June 25, 1996, Vincent Bruce Jobson was an Airman First Class in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Vincent Bruce Jobson ("Jobson Decl.") ¶ 5, ECF No. 36-1 at 290. At the time of the bombing, Jobson was talking to a friend outside of Building 131 before he was thrown "about twelve feet" and hit by "flying debris." *Id.* ¶ 7. The blast caused "a sharp pain in [his] lower spine." *Id*. When he was seen by a

medic, an object was removed from his shoulder which caused "intense pain." *Id.* ¶ 10. In the days that followed, Jobson could not sleep and was traumatized by the events "seared into [his] memory." *Id.* ¶ 12. Jobson received a Purple Heart for the injuries he sustained during the attack. *Id.* ¶ 10.

After returning home, Jobson was "constantly agitated" and "plagued by flashbacks and nightmares." *Id.* ¶ 16. He "became totally irrational," leading him to "abandon[] [his] wife and [her] son," whom he had adopted, and "beg[i]n abusing alcohol." *Id*. After the birth of his second son, he "got . . . help" and "started trade school," but nonetheless "struggl[ed] to connect with others, including [his] new wife and son," and eventually got divorced from his second wife. *Id.* ¶ 17. Although he eventually remarried his first wife and reconnected with his first son, he "never got to see him grow up, and . . . was not there for him for his formative years." *Id*. ¶ 18. Jobson still suffers from "grief, survivor's guilt, and flashbacks" from the attack. *Id.* ¶ 21. He has not been assigned a disability rating by the VA.

Two of Jobson's family members—his first wife Virginia Houde Jobson, whom he remarried after divorcing his second wife, and his adoptive son Krystopher Houde Schofield—are also plaintiffs in this lawsuit. When Virginia Jobson first heard of the bombing, she was "terrified and panicked" because she knew her husband was there. Decl. of Virginia Houde Jobson ("V. Jobson Decl.") ¶ 6, ECF No. 36-1 at 309. She was "relieved" to learn that Vincent had survived the attack and was "incredibly happy" to have him home. *Id*. ¶¶ 6-7. Upon his return, however, Vincent was "a changed man." *Id.* ¶ 7. He became "uncharacteristically hypersensitive and hyperaware," and struggled with insomnia, an "explosive temper," and nightmares. *Id*. Virginia's life became "very difficult" because she had "no idea how to help him cope with his trauma" and depended on him for an income. *Id*. ¶ 8. Eventually, Vincent left Virginia and her son, whom

Vincent had legally adopted, which caused her life to fall into "shambles." *Id.* ¶ 9. Virginia had to send her son to live with his biological father while she "g[o]t back on her feet." *Id.* She mourned the life "Vincent[] and [she] should have had together." *Id.* ¶ 10. The two remarried in 2018 and now "work together to . . . manage . . . the residual psychological injuries he sustained in the Attack." *Id.* ¶ 11.

Krystofer Schofield was three years old when the bombing occurred and was not told about the incident until he was older. Decl. of Krystofer Houde Schofield ("Schofield Decl.") ¶ 7, ECF No. 36-1 at 321. Before the bombing, Krystofer had many "happy memories of [his] life with Vincent," who had married Krystopher's mother and adopted him when he was two years old and was "a substantial male figure in [his] life." *Id.* ¶ 7. When Jobson returned, Krystofer was told Jobson "could not be with [them] anymore" due to "an accident." *Id.* ¶ 8. Krystopher felt "discarded, unwanted and unloved." *Id.* After he was sent to live with his biological father, an "emotional barrier" formed between Krystopher and his mother as well. *Id.* ¶ 9. As he grew older and learned of the attack, Krystofer's "feelings of anger and resentment converted to sympathy and sadness that [he] did not have the father-son relationship that [he] so desired growing up." *Id.* ¶ 11. His life has been significantly impacted by the loss of "an entire irreplaceable childhood with Vincent as [his] father." *Id.* He continues to suffer from "severe abandonment feelings," "a difficulty in [his] own romantic life" because of insecurity, and a "never-ending fear of losing the people [he] love[s]." *Id.* ¶ 13.

**7. Servicemember Leonard Dixon Jr.**

On June 25, 1996, Leonard Dixon, Jr., was a Senior Airman in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Leonard Dixon Jr. ("Dixon Decl.") ¶ 5, ECF No. 36-1 at 335. On the night of the bombing, he was working as a

security guard, when he heard that a truck was parked near the complex and "initiated evacuation procedures." *Id.* ¶ 6. When the bomb detonated, the glass doors around him "blew out" and "knocked [him] to the ground." *Id.* After coming to his senses, he continued working at his security post. *Id.* ¶ 7. "Chaos surrounded" him "all night and into the next day" because "people were coming in needing medical attention" and he feared another attack. *Id.* ¶¶ 7-8. When he returned to his quarters the next day, he "saw glass embedded in the walls" and his "closet and air conditioning unit were lying on [his] bed." *Id.* ¶ 9. He was awarded an Air Force Commendation Medal, an Armed Forces Expeditionary Medal, and a Certificate of Appreciation for his efforts following the attack. *Id.* ¶ 12.

When Dixon returned to the United States, he felt "cold and distant" from his wife, whom he "married right after [he] returned home." *Id.* ¶ 14. To cope, Dixon "turn[ed] to alcohol," which strained his once "close" relationships with his wife, mother, and siblings. *Id.* ¶¶ 14-15. This time was so "hard on [his] marriage" that they "ultimately divorced," and he "seldom[] speak[s]" to their two children. *Id.* ¶ 14; *see also id.*, Ex. J, Witness Statement of Supatcharin Dixon ¶¶ 12-14, ECF No. 36-1 at 364 (Dixon's ex-wife describing the dissolution of their marriage). He has been diagnosed with PTSD from the attack, which makes him feel "hyper-vigilant," "avoid crowds," experience nightmares, and "struggle with regular employment." *Id.* ¶¶ 16-17. He struggles with "survivor's guilt" and a feeling that he "did not do [his] job well enough" to prevent the attack. *Id.* ¶ 18. He received a combined 100% disability rating from the VA for injuries from the attack including PTSD and tinnitus. *Id.* ¶ 17; *id.*, Ex. H, Dixon VA Benefits Letter, ECF No. 36-1 at 358.

**8. Servicemember Bobby Gene Castleman, Jr.**

On June 25, 1996, Bobby Gene Castleman, Jr., was a Technical Sergeant in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Bobby

Gene Castleman, Jr. ("Castleman Decl.") ¶ 5, ECF No. 36-2 at 2. On the night of the bombing, he was in his dorm room standing next to a locker when the "blast wave threw [him] into the locker, breaking the door" and "slam[ing]" him to the floor, knocking him "unconscious." *Id.* ¶ 6. When he came to, he was "hobbling on one leg" trying to help with rescue efforts, including by helping carry "several" "injured airmen" out of a damaged building, until he eventually "collapsed from [his] injuries and exhaustion." *Id.* ¶¶ 6-7. He was treated for headaches, "excruciating pain in [his] back and left hip," "black eyes[,] and severe bruising and the left side of [his] body and face." *Id.* ¶ 8. Castleman was awarded an Air Force Commendation Medal and an Air Force Achievement Medal for his actions following the attack, *id.* ¶ 6, as well as a Purple Heart for his injuries, *id.* ¶ 8.

During the months following the attack, Castleman experienced PTSD, "nightmares, anxiety, panic attacks, uncontrollable fear, and extreme distrust of everything around [him]." *Id.* ¶ 10. He "stopped socializing," "did not see any of [his] . . . family members for years," and he and his then-wife divorced. *Id.* ¶ 13. He was diagnosed with "lumbar spine degenerative disc disease to [his] L4-L5" and "has sciatic nerve damages to [his] legs and hips." *Id.* ¶ 8. He underwent "eight months of physical therapy for [his] injuries, but the pain and physical limitations from the injuries have never resolved." *Id*. Activities he once enjoyed, like horseback riding, became "too painful," which made him feel like "a part of [him]self was gone." *Id.* ¶ 14. He received a combined 90% disability rating from the VA for his injuries from the attack. *Id.* ¶ 15; *id.*, Ex. H, Castleman VA Disability Rating, ECF No. 36-2 at 34; *id.*, Ex. I, Witness Statement of Stephanie Castleman, ECF No. 36-2 at 40 (statement from Castleman's wife, whom he married in 2007, attesting that his physical and psychological injuries persist to this day).

**9. Servicemember Christopher Dale Sample and One Family Member**

On June 25, 1996, Christopher Dale Sample was a Senior Airman in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Christopher Dale Sample ("Sample Decl.") ¶ 6, ECF No. 36-2 at 44. When the bomb detonated, he was talking to his sergeant just inside the entrance to his dormitory before the doors "bl[ew] inwards shooting shattered glass right at [him], lacerating [his] body." *Id.* ¶ 7. While exiting the building, he inhaled "large amounts of dust and debris" and witnessed "the most gruesome destruction and devastation imaginable," including "every one of the deceased servicemembers['] bodies" and "people with deep, severe wounds and broken limbs with bones protruding." *Id*. He did not receive any medical treatment, which "resulted in scarring." *Id.* ¶ 8. He received an Armed Forces Expeditionary and Certificate of Appreciation for his actions following the attack. *Id.* ¶ 9.

Once Sample returned home, he suffered from "anxiety," "depression," suicidal thoughts, loss of his "ability to manage stressful situations," and "nightmares." *Id.* ¶ 13. He "self-medicated with alcohol for many years" to handle the "vivid images of the wounded and dead." *Id*. His trauma "creat[ed] a lot of tension in [his] marriage," and he has been "unable to hold a job for long." *Id.* ¶ 14. Sample feels that he "will never forget the images and sense of loss [he] witnessed that awful day." *Id.* ¶ 17. Sample was rated 70% disabled by VA for his injuries stemming from the attack. *Id.* ¶ 15; *id.*, Ex. G, Sample VA Disability Rating, ECF No. 36-2 at 64.

Sample's wife, Kathrine Elizabeth Sample, is also a plaintiff to this lawsuit. She first heard of the bombing through the radio and "was in shock" and "so scared" until she was finally able to contact her husband later that night. Decl. of Kathrine Elizabeth Sample ("K. Sample Decl.") ¶ 8, ECF No. 36-2 at 67. Prior to the attack, Kathrine's marriage with Christopher was a "healthy, loving relationship" in which they shared a "sense of humor," were "very social," and "enjoyed outdoor activities" together. *Id.* ¶ 6. After he returned home, she "immediately noticed some

changes in him." *Id.* ¶ 9. Her "once life-of-the-party husband" was now "withdrawn and distant." *Id*. He "developed a temper," and she "bore the brunt" of the "abuse," despite "knowing that [she] did not do anything to cause it." *Id.* ¶¶ 9-10. She balanced the "exhausting" responsibilities of "work[ing] full time at [her] job" and "tak[ing] care of Chris." *Id.* ¶¶ 10-11. She "lost [her] easy fun-loving lifestyle, a healthy marriage, traveling, socializing, friendships, being outdoorsy, and financial stability." *Id.* ¶ 11.

**10. Servicemember Jason Alexander Umberger and One Family Member**

On June 25, 1996, Jason Alexander Umberger was a Senior Airman in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Jason Alexander Umberger ("Umberger Decl.") ¶ 6, ECF No. 36-2 at 78. When the bomb detonated, Umberger was walking outside and was "thrown backwards to the ground by an unexpected blast wave." *Id.* ¶ 7. He "instantly felt a sharp pain in [his] right arm" caused by shrapnel that pierced his skin and "cuts and scrapes all around that." *Id*. Umberger "conducted triage on others" and eventually treated himself by "debriding, cleaning, and bandaging the deep lacerations on [his] right arm." *Id.* ¶ 9. Following the attack, he "helped guard the destroyed building until the Federal Bureau of Investigation arrived." *Id.* ¶ 10. He received an Armed Forces Expeditionary Medal for his actions following the attack. *Id.*

After the attack, Umberger has suffered from "PTSD, mixed anxiety depressive disorder, irritable bowel syndrome, functional gastrointestinal disorder, migraines, hypersomnia, insomnia, fibromyalgia, fatigue, chronic body pain, sleep apnea, and breathing issues." *Id.* ¶ 15. Compared to before the attack, when he was "social" and "enjoy[ed] his life," after returning home he "stopped trusting everyone" and "keep[s] [his] head on a swivel." *Id.* ¶¶ 13-14. He "do[es] not have any friends," and he and his wife divorced "because of the behaviors [he] . . . developed."

*Id.* ¶ 12. He also "lost the motivation" to pursue the career he aspired to, and "instead settled for a simpler, but lower paying, job." *Id.* ¶ 16. He received a combined VA disability rating of 100% from his injuries resulting from the bombing. *Id.* ¶ 15; *id.*, Ex. F, Umberger VA Disability Rating, ECF No. 36-2 at 97.

Umberger's brother, Christopher Malcolm Umberger, is also a plaintiff in this lawsuit. Prior to the bombing, Christopher and Jason had an "extremely close" relationship and enjoyed spending "much of [their] time together." Decl. of Christopher Malcolm Umberger ("C. Umberger Decl.") ¶ 8, ECF No. 36-2 at 104. When Christopher heard of the attack, he "panicked" and "dreadfully feared for [his] brother's safety" until he heard that he was alive. *Id.* ¶ 6. When Jason finally returned home nearly three years later, Christopher noticed that he was "uncharacteristically reclusive" and "struggled emotionally." *Id.* ¶ 10. Their "relationship began to deteriorate" as they "struggled to find anything in common." *Id.* ¶ 13. Christopher now "spend[s] several days a week at [Jason's] house so he is not alone," helping him manage grocery shopping, yard work, and doctor's appointments. *Id.* ¶ 14. Christopher feels "cheated out of the special relationship that two brothers can share." *Id.*

**11. Servicemember Michael Roy Manibusan and One Family Member**

On June 25, 1996, Michael Roy Manibusan was an Airman First Class in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Michael Roy Manibusan ("Manibusan Decl.") ¶ 6, ECF No. 36-2 at 114. When the bomb detonated, Manibusan was standing outside the patrol vehicle he operated and was "hurled . . . to the ground" by the blast wave. *Id.* ¶ 7. Manibusan helped secure the area and searched buildings for injured people, helping "carry many injured servicemembers out of the buildings and to safety." *Id.* ¶¶ 9-10. For several days following the attack, he worked "for twenty hours a day" and some days "did

not sleep at all." *Id.* ¶ 12. He received an Armed Forces Expeditionary Medal and a Superior Performer Certificate for his actions following the attack, *id.*, the latter of which states that his actions "sav[ed] hundreds of lives," *id.*, Ex. D, Manibusan Enlisted Performance Report, ECF No. 36-2 at 125.

Since returning home, Manibusan has suffered from "painful flashbacks," anxiety, "survivor's guilt," "los[ing] [his] temper quickly," hypervigilance, PTSD, and chronic back pain. Manibusan Decl. ¶¶ 13, 15-16. His conditions make him "unable to perform daily tasks" and destroyed his "hopes and dreams for [his] future." *Id.* ¶¶ 14-15. He has "completely isolated [him]self from [his] family," and "do[es] not interact with anyone except [his] wife and children, and only from the confines of [his] bedroom." *Id.* ¶ 18. He is also "unemployable," which had created "financial burdens" for his wife. *Id.* Manibusan "miss[es] the person [he] was before the attack" but has been "[un]able to move on with [his] life." *Id.* ¶¶ 17, 19. The VA has assigned him a combined disability rating of 100% from injuries sustained in the attack. *Id.* ¶ 16; *id.*, Ex. H, Manibusan VA Disability Rating, ECF No. 36-2 at 137.

Manibusan's wife, Jennifer Carreon Manibusan is also a plaintiff in this lawsuit. Decl. of Jennifer Carreon Manibusan ("J. Manibusan Decl.") ¶ 3, ECF No. 36-2 at 139. At the time of the bombing, Jennifer and Michael were "engaged to be married" and "had been together as a couple for approximately three years." *Id.* ¶ 6. Michael's brother, Thomas Manibusan, attests that they had been engaged for one-and-a-half years at the time of the attack, that Michael "could not wait to marry [Jennifer]," and that they "shared bank accounts" and were "the functional equivalent of spouses." *Id.*, Ex. D, Witness Statement of Thomas Manibusan ¶¶ 6, 9-10, ECF No. 36-2 at 150. They married in February 1998. J. Manibusan Decl. ¶ 6. Prior to the bombing, Jennifer and Manibusan were "inseparable" and he was "kind, social, respectful[,] and family-oriented." *Id.* ¶

10. When Jennifer first heard of the attack, she "feared for Michael's life" and felt "distraught and panicked." *Id.* ¶ 7. When he returned home, he "was constantly on-edge," often angry, and "became uncharacteristically quiet and reserved." *Id.* ¶¶ 9, 11. She "used to work to help provide for the family" but had to quit "to take care of Michael" and "raise[] [their] children almost entirely alone." *Id.* ¶ 13. Jennifer feels as though she has "lost [her husband] emotionally," and "it hurts [her] to see him suffer." *Id.* ¶ 14.

**12. Servicemember Erica Marie Belcher and Three Family Members**

On June 25, 1996, Erica Marie Belcher was an Aircrew Life Support Technician deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Erica Marie Belcher ("E. Belcher First Decl.") ¶ 10, ECF No. 36-2 at 153. She was in her room when the bomb detonated, and "fell to the floor" from the blast. *Id.* ¶ 11. When she got up and exited the building, she saw "[p]anicked and bloodied people . . . running about" and "fear[ed] another attack." *Id.* ¶ 12. She went to the triage center where she "assisted in collecting first aid supplies to treat the injured servicemembers." *Id.* ¶ 13. In the days following the attack, she saw "[b]loody outlines of victims[,] . . . bloody footprints," and "[f]ragments of body parts." *Id.* ¶ 18. Erica received an Armed Forces Expeditionary Medal and an Air Force Achievement Medal for her efforts following the attack. *Id.* ¶ 14.

After returning home, Erica "felt different." *Id.* ¶ 19. Prior to the attack, she had been "free-spirited" and "extroverted" and enjoyed "socializing," especially with "friends and family." *Id.* ¶ 20. After the attack, she "isolated herself" while simultaneously feeling "terrified of losing [her] family and friends." *Id.* ¶ 19. "[A]ll [she] really want[s] is to stay at home and be left alone." *Id.* ¶ 21. She suffers from "PTSD, anxiety, and depression," and still has tinnitus from the attack,

leading the VA to rate her as 60% disabled. *Id.* ¶ 29; *id.*, Ex. O, E. Belcher VA Disability Rating, ECF No. 36-2 at 215.

Three of Erica's family members—her mother Yolanda Mazzara, her brother Michael Joseph Mazzara, and her sister Susan Angela Jones—are also plaintiffs in this lawsuit. When Yolanda Mazzara first heard about the bombing, "her heart sank" and "[f]ear overtook [her] as [she] watched footage of the crumbling buildings and the devastation on the [TV] screen." Decl. of Yolanda Mazzara ("Y. Mazzara Decl.") ¶ 6, ECF No. 36-2 at 222. She "cried the entire time" waiting for her daughter to call, and "[w]ith the passage of each day, [her] hopes that she survived diminished" until she heard from her a week later. *Id.* ¶ 7. When Erica returned home, Yolanda quickly noticed that "Erica was behaving differently from her regular self." *Id.* ¶ 9. Before the attack, "Erica was an outgoing, friendly, and active person," and the two had a "close relationship." *Id.* ¶ 10. After the attack, Erica was "reclusive" and "withdrawn." *Id.* ¶ 13. She "resists [her mother's] efforts to connect with her," and Yolanda "do[es] not know what to do or how to help." *Id*. ¶¶ 13-14. Yolanda now suffers from anxiety, depression, insomnia, and high blood pressure. *Id.* ¶ 15.

When Michael Mazzara first saw the bombing on TV, he "was shocked and in utter disbelief at what [he] was watching" and "terrified" for his sister. Decl. of Michael Joseph Mazzara ("M. Mazzara Decl.") ¶ 6, ECF No. 36-2 at 233. While waiting for information about Erica's safety, he came "hysteric[al]" and "cried [him]self to sleep every night" until he heard she was okay. *Id.* ¶ 7. When Erica finally returned home, she was no longer her "high-spirited and social" self. *Id.* ¶ 10. Before the attack, Michael and Erica "spent a lot of time together and enjoyed [their] close relationship," but after the attack, "she was withdrawn and distant." *Id.* ¶¶ 9-10. Erica became "quick to anger" and "guarded" which made Michael feel like he was "bugging her" by

being around her and that "[his] sister [did] not care enough to spend time with [him]." *Id.* ¶ 12. Michael feels "robbed of a lifetime of happiness and shared experiences with Erica and [his] family" as a result of the attack. *Id.* ¶ 15.

When Susan Jones first saw the bombing on TV, she "was shocked to the point of numbness." Decl. of Susan Angela Jones ("Jones Decl.") ¶ 6, ECF No. 36-2 at 244. The next week, while she waited for news about her sister, she "was so consumed by grief and fear that it affected [her] ability to function normally." *Id.* ¶ 7. When Erica finally returned home, Susan noticed that "she was uncharacteristically quiet and distant." *Id.* ¶ 9. Before the attack, Erica's "fun and bubbly personality" "filled the room." *Id*. Erica and Susan were "very close" and "spent a lot of time together." *Id.* ¶ 10. Susan looked up to Erica as a "mentor." *Id*. After the bombing, Erica "distanced herself from [Susan] and the rest of [their] family." *Id.* ¶ 12. Susan "lost the wonderful and fulfilling relationship with her sister," "mentor," and "trusted confidante in life." *Id.* As a result, Susan has developed depression, anxiety, and insomnia. *Id.* ¶ 14.

**13. Servicemember John Thomas Belcher**

On June 25, 1996, John Thomas Belcher was a Staff Sergeant in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of the Estate of John Thomas Belcher via Erica Marie Belcher ("E. Belcher Second Decl.") ¶ 10, ECF No. 36-2 at 255. John passed away in 2018 and is represented by his widow, Erica Belcher, who has been appointed as the personal representative of his estate in Colorado and who is also a servicemember plaintiff in her own right in this case. *Id.* ¶¶ 7-9.[6] At the time of the attack, John was in bed in his dormitory, and he sustained an "open laceration to his head caused by broken and shattered glass." *Id.* ¶¶ 14-15. He "tended to his own wounds as the medical triage center was overwhelmed." *Id.*, Ex. J,

[6] Erica Belcher seeks damages only in her own right as a servicemember, not as the spouse of John Belcher. *See* Pls.' Mem. at 68.

Witness Statement of James M. Silvi ¶ 7, ECF No. 36-2 at 283. Despite this injury, he "carried deceased fellow servicemembers' bodies out of buildings" and "help[ed] wounded servicemembers." E. Belcher Second Decl. ¶¶ 14-15. John received an Armed Forces Expeditionary Medal and a Certificate of Appreciation for his efforts following the bombing. *Id.* ¶ 15.

When John returned home, he and his then-wife divorced, and he "stayed in touch" with Erica, since they had served together and had both been affected by the attack. *Id.* ¶ 22. They married in 1998, and the marriage was initially characterized by "mutual respect, shared experiences, and deep affection." *Id.* ¶ 22. John's "personality continued to change" in the aftermath of the attack, however, and he eventually "preferred staying home," "began drinking alcohol frequently," and became "angry." *Id.* ¶ 23. He suffered from PTSD, anxiety, depression, and "suicidal ideations" related to the attack, and was rated 100% disabled by the VA due to PTSD alone. *Id.* ¶ 24; *id.*, Ex. M, J. Belcher VA Disability Rating, ECF No. 36-2 at 291. He and Erica had two sons together, but Erica eventually "no longer felt safe with John" after he attempted to "smother [her] with a pillow when [she] was sleeping." E. Belcher Second Decl. ¶ 28. Erica left with their sons, and despite efforts to have a family member stay with John at all times, while John was "left alone" at home one day, Erica and their sons found him "seizing from a prescription drug overdose," and he passed away a few days later. *Id.*

**14. Plaintiff Patrick William O'Connor, Jr. and One Family Member**

On June 25, 1996, Patrick William O'Connor, Jr., was a Buck Sergeant in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Patrick William O'Connor, Jr. ("O'Connor Decl.") ¶ 6, ECF No. 36-2 at 324. When the bomb detonated, O'Connor was sitting on the couch watching a movie and dove behind the couch to avoid the blast.

*Id.* ¶ 7. O'Connor left the building and saw people running around "wild with fear." *Id.* ¶ 8. He was assigned to provide security for the complex and felt that he was "desperately and futilely trying to maintain some sense of control of an uncontrollable situation," leaving him "physically and mentally exhausted." *Id.* ¶¶ 9-10. In the aftermath of the attack, he saw "[s]pattered blood coat[ing] the ground and walls" and "[b]loody handprints [on] the walls." *Id.* ¶ 11. He received an Air Force Commendation Medal for his work following the attack. *Id.*

When O'Connor returned home, he "carri[ed] the weight of the experience on [his] back" and struggled with depression, anxiety, insomnia, and PTSD. *Id.* ¶ 14-15. He was also diagnosed with a concussion and traumatic brain injury ("TBI") from the blast wave. *Id.* ¶ 15. While before the attack he had been "outgoing and carefree," he now "dislike[s] crowds," is "reclusive," and his "social circles of deteriorated." *Id.* ¶¶ 16-17. He experiences "panic attacks," especially after the birth of his child, and feels "controlling and overprotective" because of his "overwhelming desire" to protect his child from danger. *Id.* ¶ 18. He has been rated 60% disabled by the VA for his injuries from the attack. *Id.* ¶ 15; *id.*, Ex. F, O'Connor VA Disability Rating, ECF No. 36-2 at 353.

O'Connor's brother, Ryan Charles O'Connor is also a plaintiff in this case. Ryan's relationship with his brother was "very close," and the two were "best friends" through their lives. Decl. of Ryan Charles O'Connor ("R. O'Conner Decl.") ¶ 9, ECF No. 36-2 at 355. When Ryan learned of the bombing, he was "filled with . . . distress" and "gripped" by "fear." *Id.* ¶ 6. When Ryan reconnected with Patrick, he immediately noticed "[h]is demeanor had changed." *Id.* ¶ 7. Their "conversations, once so full of connection, had immediately become fragmented and strange." *Id.* ¶ 8. These changes were "painful to witness," and they "saw less and less of each other." *Id.* ¶¶ 10-11. Ryan found himself "constantly adjusting [his] behavior to ensure [he] [did] not inadvertently trigger [Patrick's] anxiety or distress." *Id.* ¶ 14. Ryan continues to put his

"personal health and enjoyment aside . . . , making any sacrifice [he] can to prioritize Patrick's needs, which has taken a toll on [his] mental health." *Id.* ¶ 15. Ryan "now suffer[s] from depression, anxiety, separation anxiety, and consequential acid reflux" as a result. *Id.*

**15. Plaintiff Shawn Berdell Kirkpatrick**

On June 25, 1996, Shawn Berdell Kirkpatrick was an Airman First Class in the U.S. Air Force, deployed to Dhahran, Saudi Arabia, and quartered at the Khobar Towers. Decl. of Shawn Berdell Kirkpatrick ("Kirkpatrick Decl.") ¶ 5, ECF No. 36-2 at 367. At the time of the attack, Kirkpatrick was lying in bed when a "wave of heat" hit him. *Id.* ¶ 6. When he got up to evacuate, he "was barefoot[,] and broken glass shredded [his] feet." *Id.* He noticed an injured friend lying "on the ground bloodied and injured" so "he placed him on a broken door" and carried him out of the building with the help of others. *Id.* Kirkpatrick further assisted with triage, witnessing "horrific, bloody laceration[s]" and other injuries. *Id.* ¶ 7. A fellow servicemember, Glenn Holtkamp, attests to both Kirkpatrick's injuries and his actions following the attack. *Id.*, Ex. G, ECF No. 36-2 at 386. Kirkpatrick eventually self-treated his own injuries. Kirkpatrick Decl. ¶ 7. He received an Air Force Commendation Medal and an Armed Forces Expeditionary Medal for his efforts following the bombing. *Id.* ¶ 8. He also received a Purple Heart for his injuries. *Id.* ¶ 7.

Prior to the attack, Kirkpatrick had been "easy-going and very social," and he was close with his family, who had provided him with a "wonderful childhood." *Id.* ¶ 12. When he returned home, he felt "closed off," "hyper-vigilant," and "short-tempered," and experienced "survivor's guilt." *Id.* ¶¶ 11, 14. He suffers from PTSD, tinnitus, and migraines and received a combined VA disability rating of 60% for his injuries from the attack. *Id.* ¶ 15; *id.*, Ex. H, Kirkpatrick VA Disability Rating, ECF No. 36-2 at 390.

**16. Michael Brent Willis and One Family Member**

On June 25, 1996, Michael Brent Willis was a Staff Sergeant in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Michael Brent Willis ("Willis Decl.") ¶ 6, ECF No. 36-3 at 2. At the time of the attack, he was lying in bed, when "a blast wave shook the building." *Id.* ¶ 7. He saw that a shard of glass had pierced the couch where he had been sitting "moments before," and realized that he "could have been struck and killed." *Id.* ¶ 8. He left his room, though his bare feet became "shredded and bloody from all of the shattered glass," and started to "lead injured people" to the first aid kits and "assess injuries and shield others from . . . danger[]." *Id.* ¶¶ 9-10. He "suffered numerous . . . lacerations and bruising all over [his] body during the rescue operations." *Id.* ¶ 16. For his service after the attack, he received an Air Force Achievement Medal. *Id.* ¶ 12.

Prior to the attack, Willis "enjoyed life and embraced every moment," and "doted over [his] wife and loved [their] marriage." *Id.* ¶ 18. After returning home from Khobar Towers, he has "constant mood swings," his "relationships with family and friends have deteriorated as [he] prefer[s] to be alone," and his "marriage is strained" because of the "changes in [his] demeanor." *Id.* ¶ 19. He suffers from "memory lapses," and has missed "important moments in [his] children's lives" because he does not like leaving the house. *Id.* He struggles "completing tasks and maintaining employment for any significant time." *Id.* ¶ 20. He has PTSD, anxiety, depression, insomnia, and flashbacks and has been rated 100% disabled by the VA. *Id.* ¶ 17; Ex. E, Willis VA Disability Rating, ECF No. 36-3 at 17.

Willis's wife, Shelly Rae Willis, is also a plaintiff in this lawsuit. She heard about the attack from Michael's mother, who had spoken with Michael and knew that he was okay. Decl. of Shelly Rae Willis ("S. Willis Decl.") ¶ 8, ECF No. 36-3 at 25. Nonetheless, Shelly was "overcome

with emotions" and "just wanted to hear his voice for [her]self." *Id.* When they "finally connected" over the phone, Shelly was relieved, but felt "[un]sure how [they] were going to get through the rest of his deployment time." *Id.* ¶ 9. When Michael returned home a few months later, Shelly "noticed an unfamiliar shift in him, both physically and emotionally." *Id.* ¶ 10. He was "clingy" and "constantly wanted to hold [her]," in contrast to the "independent and composed man [she] had always known." *Id.* Physically, in one instance, Michael had to spend 10 days at the hospital awaiting surgery for a brain bleed "possibly aggravated" by the attack, while Shelly was at home on bedrest while pregnant. *Id.* ¶ 11. Prior to the attack, Michael had "lived to make [her] happy" and they had "enjoyed exploring together." *Id.* ¶ 6. The attack "destroyed [their] once harmonious relationship," as Michael "became increasingly withdrawn," "[s]ocial activities . . . became sources of anxiety and tension," and he "[e]ventually stopped agreeing to go [to outings] altogether." *Id.* ¶ 12. Shelly had to "manage everything in the house" once they had children because "Michael would become overwhelmed," leading to Shelly and the children "often walk[ing] on eggshells." *Id.* ¶ 13. She "essentially became a single parent," and has "few friends left to lean on, as most grew weary of [her] endless struggles." *Id.* ¶¶ 15-16. She feels her life is an "unrecognizable echo" of what it used to be. *Id.* ¶ 17.

**17. Terry Fitzgerald Haywood and Two Family Members**

On June 25, 1996, Terry Fitzgerald Haywood was a Senior Airman in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Terry Fitzgerald Haywood ("Haywood Decl.") ¶ 6, ECF No. 36-3 at 37. At the time of the attack, he was in his dormitory kitchen when the explosion "forcefully hurled [him] into a concrete wall headfirst." *Id.* ¶ 7. His "neck and back were in excruciating pain," his "ears were ringing," and he "could not see well." *Id.* Other residents of his dorm helped him evacuate, and once outside

he saw "[p]eople . . . running in all directions, bleeding and crying." *Id.* ¶¶ 8-9. He "help[ed] search buildings," and provided first aid to injured people. *Id.* ¶ 10. For his service following the attack, he received an Air Force Achievement Medal. *Id.* Immediately after the attack, he suffered from "back, neck, [and] head injuries" and "sleep issues" caused by "vivid nightmares." *Id.* ¶ 13.

After returning home, his "life changed drastically for the worse." *Id.* ¶ 15. Prior to the attack, he was "outgoing," "social," "energetic," and "very close with [his] family." *Id.* ¶ 14. Afterward, he was "jumpy and tense," struggled to sleep, and had "crippling" tinnitus. *Id.* ¶ 15. He "could not be around people" and was "hypervigilant." *Id.* He feels "disregard[ed]" by his family and friends and he, "in turn, avoid[s] them." *Id.* ¶ 16. He began abusing alcohol and was eventually convicted for driving under the influence, for which he was "demoted at [his] job," his "once-stellar" military record was "ruined," and he has since been able to find only "entry-level positions." *Id.* ¶ 17. Physically, he has "chronic headaches and migraines that result in nausea and vomiting" and pain in his neck, back, shoulder, and legs. *Id.* ¶ 18. He has been rated as 100% disabled by the VA. *Id.*; *id.*, Ex. F, Haywood VA Disability Rating, ECF No. 36-3 at 69.

Two of Haywood's family members, his half-brother Donald Ardrain Anderson and half-sister Trina Denise Anderson, are also plaintiffs in this lawsuit. Donald Anderson heard about the attack on the news. Decl. of Donald Ardrain Anderson ("D. Anderson Decl.") ¶ 6, ECF No. 36-3 at 76. For two days, he "had no idea if Terry was alive, dead, injured, or safe," until Terry got in touch with their mother and let her know he was okay. *Id.* Prior to the attack, Terry and Donald were "very close," and Donald "looked up to" Terry as a "mentor." *Id.* ¶ 9. When Terry returned home from Saudi Arabia, Donald saw that he "was preoccupied and distant," and "no longer wanted to be . . . around strangers." *Id.* ¶ 8. Their relationship has "deteriorated," and Donald

feels the attack "robbed [him] of the special bond and brotherhood" he and Terry previously shared. *Id.* ¶ 10.

Trina Anderson also saw the attack on the news, and "instantly panicked" and felt "terrified that [she] would never see Terry again." Decl. of Trina Denise Anderson ("T. Anderson Decl.") ¶ 6, ECF No. 36-3 at 86. Even after hearing that Terry had survived, Trina was "unable to . . . return to work for almost a month" because she was so worried about his wellbeing. *Id.* ¶ 7. When Terry returned home, "he seemed very different." *Id.* ¶ 8. Before the attack, they "had a very close relationship," Trina "looked up to him," and Terry "looked out for [her]." *Id.* ¶ 9. Afterward, he seemed "uninterested in engaging with the family," and specifically "did not have any interest in [Trina] anymore." *Id.* ¶¶ 8, 10. Terry never spoke with Trina about the attack, so Trina "took his distancing from [her] personally, as if [she] had done something to push him away." *Id.* ¶ 11. In addition to their damaged relationship, she has ongoing nightmares about the attack. *Id.* ¶ 12.

**18. Mario Jaime Valencia**

On June 25, 1996, Mario Jaime Valencia was a Senior Airman in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Mario Jaime Valencia ("Valencia Decl.") ¶ 5, ECF No. 36-3 at 96. At the time of the attack, he was standing guard outside when a "powerful blast wave struck [him]," "stun[ning]" him. *Id.* ¶ 6. He felt "immeasurable" fear but knew that his "job was to secure the complex." *Id.* ¶ 7. He was instructed to guard the area around the blast site, and "had to request removal of human remains to access [his] post." *Id.* ¶ 9. He saw "pools of blood," "[b]loody hand- and footprints," and "[s]hattered glass," which he found "emotionally and psychologically excruciating." *Id.* He remained at Khobar for several weeks, during which time he "could not shake the feeling of being a walking target." *Id.* ¶ 12. For his service in the hours and weeks following the attack, he received Air

Force Association Exceptional Performer Award, an Air Force Achievement Medal, and a Certificate of Special Congressional Recognition (Exceptional Performer) Award. *Id.* ¶ 13. The latter notes that, in addition to his service following the attack, he was guarding the entrance to Khobar Towers prior to the attack and "thwarted the terrorists from entering the compound, which would have been much more devastating had the bomb been successfully placed closer to the dormitories." *Id.*, Ex. D, Valencia Certificate of Special Congressional Recognition, ECF No. 36-3 at 110.

Upon returning home, he "felt out of place." *Id.* ¶ 16. Before the attack, he had been "outgoing," "energetic," "optimistic" "happy," and "kind." *Id.* ¶ 17. Afterward, he was "engulfed by survivor's guilt," and the attack "replayed repeatedly in [his] mind." *Id.* ¶ 16. He "became irresponsible, disrespectful, and dismissive," and "struggled to maintain employment." *Id.* ¶ 18. He also "fell into a deep depression and became suicidal," leading him to "abus[e] substances" and "spen[d] 45 days in jail for driving under the influence," until he sought help from the VA twenty-five years after the attack. *Id.* ¶ 16. Arnie O'Callaghan, who served with Valencia, attests that Valencia's mental state following the attack was sufficiently worrisome that O'Callaghan contacted the local police where Valencia was living to conduct welfare checks on multiple occasions. *Id.*, Ex. I, Witness Statement of Arnie O'Callaghan ¶ 10, ECF No. 36-3 at 122. The VA has rated Valencia 70% disabled based on his PTSD diagnosis. Valencia Decl. ¶ 20; *id.*, Ex. H, Valencia VA Disability Rating, ECF No. 36-3 at 120.

**19. Travis Keith Butikofer and Eight Family Members**

On June 25, 1996, Travis Keith Butikofer was a Senior Airman in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Travis Keith Butikofer ("Butikofer Decl.") ¶ 6, ECF No. 36-3 at 126. At the time of the attack, he was

watching a movie in his dormitory when the blast "threw [him] through the air," "crashing [him] into a wall," and causing him to lose consciousness. *Id.* ¶ 7. When he came to, though his "legs were throbbing" and "shards of glass [were] embedded in [his] side," he exited the building, providing first aid and helping evacuate to a man "soaked in so much blood that it covered his eyes, blinding him." *Id.* ¶¶ 7-8. Butikofer was evacuated to a hospital where the "deep and bloody slashes" on each leg were stitched up and glass was removed from his body. *Id.* ¶ 8. He felt "on edge and constantly worried" at the hospital and was "isolated" from the other servicemembers being treated there, but eventually took initiative to locate them, collect their families' contact information, and call home for all of them. *Id.* ¶¶ 10-12. He received a Purple Heart for his injuries. *Id.* ¶ 13.

Before the attack, Butikofer "loved to talk, connect, and laugh with others," and was "very driven and dedicated." *Id.* ¶ 15. He was "deeply connected" to his family and "shared a special bond" with his father. *Id.* ¶ 16. After he returned home, he felt "hypervigilant and tense," and "[s]ocializing became unbearable." *Id.* ¶ 17. His "relationships with friends and loved ones suffered," in part because he "completely rejected" his Mormon faith, which "drove a wedge between [his] relationship with [his] father." *Id.* ¶ 18. He also has ongoing physical injuries, including "scars" and "numbness in [his] left thigh." *Id.* ¶ 20. He has been rated 70% disabled by the VA. *Id.* ¶ 22; *id.*, Ex. E, Butikofer VA Disability Rating, ECF No. 36-3 at 143.

Eight of Butikofer's family members—his parents, Sylvia Marie Wilson and Keith Rey Butikofer, sisters Denice Marie Morgan, Rebecca Lyn Jensen, and Megan Marie Sterling, and brothers Bryan Keith Butikofer, Tyler Rey Butikofer, and Tyrel Zachary Jensen—are also plaintiffs to this lawsuit. Sylvia Wilson was at work when she heard about the attack and was "desperate" to know whether Travis was stationed at Khobar Towers. Decl. of Sylvia Marie Wilson ("Wilson

Decl.") ¶ 6, ECF No. 36-3 at 160. Even after he called her, she "had so many questions" about his status and wellbeing and felt "helpless." *Id.* ¶¶ 7, 9. When Travis came home, "something instantly struck [her] as different." *Id.* ¶ 12. Before the attack, he was full of "energy and excitement," and Sylvia and Travis were "very close." *Id.* ¶ 13. Upon his return, he seemed "sad and aged," and was "jumpy" and "hypervigilant." *Id.* ¶ 12. She "wish[es] . . . that [she] could have saved him and protected him." *Id.* ¶ 16. The distress was so great that she resigned her job and was prescribed antidepressants, both of which "led to financial issues." *Id.* ¶ 17. "The trauma from [the attack] lingers with [her] to this day." *Id.* ¶ 18.

Keith Butikofer's "heart plummeted into [his] stomach" when he heard about the attack. Decl. of Keith Rey Butikofer ("K. Butikofer Decl.") ¶ 6, ECF No. 36-3 at 172. Even after hearing that Travis was alive and receiving medical attention, Keith felt that he was "living in a nightmare." *Id.* ¶ 7. When Travis returned home, "the man standing before [Keith] was not the same as before he left for Saudi Arabia." *Id.* ¶ 9. Travis was "clingy," "on edge," and "seemed to crave [Keith's] presence," a "stark contrast from the independent young man who had left for the Air Force." *Id.* ¶ 10. Keith began to "suffer from anxiety, depression, sleepless nights, high blood pressure, and fatigue" and "lost faith in the Air Force," unable to "grasp that our government allowed this Attack to happen." *Id.* ¶ 16.

Denice Morgan heard about the attack from her and Travis's father and felt "utterly helpless[,] . . . not knowing the extent of [her brother's] injuries." Decl. of Denice Marie Morgan ("Morgan Decl.") ¶ 6, ECF No. 36-3 at 184. Before the attack, Denice and Travis had a "close-knit" relationship. *Id.* ¶ 10. After his return home, he was "jumpy, especially around loud or unexpected noises, which made it hard to do any of the spontaneous activities [they] used to enjoy." *Id* ¶ 8. She found the changes in her brother "heartbreaking" and felt that "sadness now

encompassed [their] relationship." *Id.* She feels "overprotective" of him, "perpetually uneasy," and "distrustful of strangers." *Id.* ¶ 11. Having a "sense of safety" feels like "a distant memory now." *Id.* ¶ 12.

Bryan Butikofer was only thirteen years old at the time of the attack, but he felt "afraid and worried about [his] brother." Decl. of Bryan Keith Butikofer ("B. Butikofer Decl.") ¶ 6, ECF No. 36-3 at 195. He felt an "overwhelming sense of relief and happiness" when Travis came home, and "assumed everything would be normal" again. *Id.* ¶ 8. Travis had been Bryan's "role model and friend," "always made time" for Bryan, and was "kind" and "patient." *Id.* ¶ 11. When he returned from Saudi Arabia, Travis was "distant and removed," and to Bryan, "it seemed that Travis just did not want to be with [him]." *Id.* ¶ 9. Their "bond began to disintegrate," and Bryan "felt like [he] was losing [his] brother" and was "very confused and sad." *Id.* ¶ 10.

Tyler Butikofer was twelve at the time of the attack, and "fear and anxiety . . . consumed [him]" when he learned that his brother's housing complex had been attacked. Decl. of Tyler Rey Butikofer ("T. Butikofer Decl.") ¶ 6, ECF No. 36-3 at 206. He was "relieved" to hear that Travis was alive and "excited" for him to come home, but he "quickly . . . sense[d] that something was different" when Travis returned. *Id.* ¶¶ 6-7. Travis had been Tyler's "protector and hero," was "patient with [him]," and "was the person [he] looked up to and admired the most." *Id.* ¶ 9. When he returned, Travis was "jumpier, constantly on edge, and anxious." *Id.* Now, Tyler "worr[ies] about Travis and his well-being daily," and "feel[s] powerless to make it better," which he describes as "one of the hardest parts of [his] journey through life." *Id.* ¶ 11. There is a "void in [their] relationship," though Tyler "love[s] [his] brother deeply, and . . . refuse[s] to give up on him." *Id.* ¶¶ 12-13.

Rebecca Jensen was eight years old at the time of the attack but was "old enough to know something was really wrong" and was "terrified" not knowing whether her brother was "alive, dead, safe, or injured." Decl. of Rebecca Lyn Jensen ("R. Jensen Decl.") ¶ 6, ECF No. 36-3 at 217. She was relieved to hear that he was alive and "could not wait to hug him" when he came home. *Id.* ¶ 8. Travis was Rebecca's "role model," who was "always patient with [her]" and her "favorite" of her five brothers. *Id.* ¶ 10. After the attack, he "never seemed calm or relaxed" and "did not want to spent time with [her] anymore," which made her feel "like [she] had done something to annoy him, which left [her] feeling sad." *Id.* ¶ 11. She "walked on eggshells around him," and "ke[pt] [her] distance from Travis." *Id.* ¶ 12. She also worried that "someone could be taken from [her] in an instant." *Id.* These concerns "caus[ed] [her] severe anxiety and depression," *id.*, exacerbated later by "severe" postpartum depression "fueled by the anxiety [she] had already been carrying" since the attack, *id.* ¶ 15. She feels that the attack "tore through [her] life in ways [she is] still struggling to understand." *Id.* ¶ 16.

Megan Sterling was thirteen at the time of the attack and "assumed the worst" because she "received very little information" about what had happened. Decl. of Megan Marie Sterling ("Sterling Decl.") ¶ 6, ECF No. 36-3 at 229. Even after hearing that her brother was alive, she had a "lingering worry" about his injuries and safety. *Id.* ¶ 7. When he returned home, Megan found the changes in his personality "heartbreaking." *Id.* ¶ 8. Before the attack, she "idolized" Travis because he was "fun, adventurous, kind, and patient." *Id.* ¶ 9. Upon his return, he was "on edge and distant" and became "overprotective" and "hypervigilant." *Id.* ¶¶ 8, 10. Their mother "constantly worried about Travis," who "became her main focus," leaving Megan "feeling abandoned and without a support system." *Id.* ¶ 11. Additionally, her "bond" with Travis "dissipate[d]." *Id.* She suffers from "long-term, suffocating anxiety." *Id.* ¶ 12.

Tyrel Jensen, who was fifteen years old at the time, "panicked" when he heard about the attack and felt "desperate for news" until he heard that his brother was alive but injured. Decl. of Tyrel Zachary Jensen ("T. Jensen Decl.") ¶ 6, ECF No. 36-3 at 240. He was "so happy" for Travis to return home but noticed some "uncharacteristic differences" in his brother, such as "avoid[ing] being around large groups of people." *Id.* ¶¶ 7-8. Prior to the attack, Tyrel "idolized" Travis, and saw him as someone he "could rely on for anything." *Id.* ¶ 9. Now, Tyrel struggles with seeing Travis in "pain" and the "damage left in [the attack's] wake." *Id.* ¶ 10. He also "lost [his] close relationship with [his] mother" because after the attack she "became reclusive and disengaged" and focused on Travis. *Id.* As a result, Tyrel developed "anxiety, depression, and insomnia," along with "low self-esteem." *Id.* ¶ 11.

**20. James Dan Sikes**

On June 25, 1996, James Dan Sikes was a Senior Airman in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of James Dan Sikes ("Sikes Decl.") ¶ 6, ECF No. 36-3 at 251. At the time of the attack, he was watching a movie in his dormitory, when the glass door shattered, and a shard of glass cut his arm and head. *Id.* ¶ 7. Once he oriented himself, he saw that "blood [was] oozing from [these wounds], pooling on the floor in front of [him]." *Id.* His friend helped him exit the building and get to the triage center, where he saw "people with gruesome injuries, others screaming in pain and calling for help." *Id.* ¶ 9. He was taken to a hospital, where the doctors "painfully cleaned and stitched" multiple glass wounds on his head, face, arm, and chest. *Id.* ¶ 10. He received a Purple Heart for his injuries. *Id.*

Prior to the attack, Sikes "found joy in everything," "did not take anything too seriously," and was "always trying to . . . make [others] happy," especially his "family and friends" with whom

he had "strong connections." *Id.* ¶ 13. When he returned home, however, he was "persistently on high alert," and his "easy-going, carefree demeanor disintegrated." *Id.* ¶ 14. He "turned to alcohol to numb the emotional pains and nightmares" and "for seven horrible years . . . needed alcohol just to get through the day." *Id.* ¶ 15. He also struggled to "maintain close relationships with anyone," and his changed demeanor coupled with alcohol abuse "hurt those [he] loved the most." *Id.* ¶ 16. Physically, he has hearing loss, tinnitus, and scarring. *Id.* ¶ 18. He has been rated 80% disabled by the VA due to his injuries from the attack. *Id.*; *id.*, Ex. F, Sikes VA Disability Rating, ECF No. 36-3 at 280.

Five of Sikes's family members—his ex-wife Monica Sanchez Lopez, son Micah Drew Sikes, stepfather Ronald Duane Sikes, and brothers Jerry Lynn Sikes and Lowell Jeffrey Sikes—are also plaintiffs in this lawsuit. Monica Lopez heard about the attack while at work and went home early to wait for any information about her husband, feeling "panicked and distraught." Decl. of Monica Sanchez Lopez ("Lopez Decl.") ¶ 6, ECF No. 36-3 at 289. She felt both "relief and anguish" when he called and told her he was okay but severely injured. *Id.* ¶ 7. When he returned home, he was "perpetually exhausted and sad" and "unable to be alone." *Id.* ¶ 8. Prior to the attack, their "marriage [had been] filled with adventure," their "communication was strong," and they "balanced financial responsibilities." *Id.* ¶ 10. He was "open, honest, . . . compassionate," and "peaceful." *Id.* After the attack, he "withdrew from [her]" and "sought refuge in alcohol," and she felt that many of the "attributes" he previously had "faded away." *Id.* ¶¶ 9, 11. Four years after the attack, they divorced, leaving Monica with "anxiety, depression, helplessness, and sleeping issues." *Id.* ¶ 12.

Micah Sikes was eight years old at the time of the attack and "assume[d] the worst" until his father called and said he was alive. Decl. of Micah Drew Sikes ("M. Sikes Decl.") ¶ 6, ECF

No. 36-3 at 303. Before the attack, James had been "attentive, fun, and easy-going," and they had a "strong father-son relationship." *Id.* ¶ 8. When James returned home, Micah noticed that he was "not the relaxed, calm father [he] knew before the Attack." *Id.* ¶ 7. His father "pulled away from [him]," and at his young age, Micah "felt like [his father] no longer liked [him]." *Id.* ¶ 9. Eventually, James "deserted [Micah] completely," "ceas[ing] all communication," after which Micah developed "separation anxiety, depression, and relentless nightmares," and became "distrusting of others," eventually "using opioids to self-soothe." *Id.* ¶ 10. Even after seeking "help for [his] psychological issues," Micah feels that the attack "shaped [his] entire life." *Id.* ¶ 11.

Ronald Sikes heard about the attack on the news, and his "whole world turned upside down" for several days until he heard from his son. Decl. of Ronald Duane Sikes ("R. Sikes Decl.") ¶¶ 6-7, ECF No. 36-3 at 311. Ronald married James's mother when James was only two months old, and "[b]eing James'[s] father was one of [his] favorite responsibilities in [his] life." *Id.* ¶¶ 3, 9. James was "lively," "enthusiastic," and "good-natured," and they had an "incredibly fulfilling relationship and a strong bond." *Id.* ¶ 9. When James returned home after the attack, he was "distant" and "preferred to be alone," leading to "a separation" between them that left Ronald "heartbroken." *Id.* ¶ 8. Additionally, Ronald "financially support[ed]" James, which "added strain" to Ronald's life and caused his other children to "grow[] distant" from him. *Id.* ¶ 10. The struggle to "help [James] and connect with him" has caused Ronald to "suffer from sleepless nights, relentless anxiety, and deep-seated depression." *Id.* ¶ 12.

Lowell Sikes heard about the attack on the news and "immediately" felt "worr[ied] for [his] brother" and "furious" that the Air Force would not give him more information about what had happened. Decl. of Lowell Jeffrey Sikes ("L. Sikes Decl.") ¶ 6, ECF No. 36-3 at 324. He felt "great relief" to hear that James was alive and "so happy" for him to return home. *Id.* ¶¶ 7-8.

Before the attack, James and Lowell had a "special bond," and Lowell "felt safe when [he] was with [James]." *Id.* ¶ 10. After James came home, he was "uneasy and on edge," and they "spent less time together and communicated . . . less." *Id.* ¶¶ 8-9. James "seemed uninterested in [him]," and Lowell "thought [he] did something to make [James] dislike [him]." *Id.* ¶¶ 9, 12. As a result, Lowell began to "struggle with anxiety and depression" and became "overly concerned" and "fearful." *Id.* ¶¶ 12-13.

Jerry Sikes heard about the attack from a coworker and felt "overwhelmed with fear" until he heard from James. Decl. of Jerry Lynn Sikes ("J. Sikes Decl.") ¶ 6, ECF No. 36-3 at 335. Growing up, Jerry "felt like James'[s] protector, like [he] had a responsibility to shield him from the world," and he "treasured" their connection. *Id.* ¶ 9. After the attack, Jerry noticed "heart-wrenching" changes in James, including that he "reacted to the smallest disturbances with intense fear," had a "vicious" temper, and "never seemed at peace or content." *Id.* ¶ 10. Their "relationship deteriorated" because of these changes. *Id.* Jerry also "found it difficult to trust people," and developed "depression, social anxiety, and frequent nightmares." *Id.* ¶ 11. Medical expenses associated with treatment for these concerns, taking time off from work, and financially supporting James had "financial consequences" for Jerry. *Id.* Although he and James have begun "to mend [their] relationship," he "mourn[s] the time [they] lost." *Id.* ¶ 12.

**21. Richard Kevin Fesenbek**

On June 25, 1996, Richard Kevin Fesenbek was a Staff Sergeant in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Richard Kevin Fesenbek ("Fesenbek Decl.") ¶ 5, ECF No. 36-3 at 346. At the time of the attack, he was in his room, when "the concrete floor rippled like a wave" and he heard a "deafening" ringing in his ears. *Id.* ¶ 6. He could "feel glass shards stabbing through [his] skin" on his feet. *Id.* ¶ 6. He

exited the building, got his bearings, and then "went back into the building knowing that there were people in there that needed help," sustaining further injuries during these efforts. *Id.* ¶ 8. Later, "triage was overwhelmed," so he pulled glass shards out himself and "us[ed] super glue on [his] thighs, shins, chest, and arms to seal the wounds," though he could not do so for his "head or face." *Id.* ¶ 9. Ricky Dunn, who served with him, attests to these injuries. *Id.*, Ex. G, Witness Statement of Ricky N. Dunn, ECF No. 36-3 at 380. Fesenbek received a Purple Heart for his injuries. Fesenbeck Decl. ¶ 9. In the aftermath of the attack, he "helped load coffins for [his] fallen brothers' flight home, a haunting task that [he] will never forget." *Id.* ¶ 10.

He was "deeply grateful" to return home. *Id.* ¶ 11. Before the attack, he had been a "happy person" who "loved socializing" and "drew people in" with "warmth and openness," especially his "[f]amily and friends" and his then-wife, with whom he "was deeply in love." *Id.* ¶ 14. Upon his return, he "isolated [him]self," and "[e]verything seemed to trigger frustration." *Id.* ¶ 12. "Every night" he "feel[s] vibrations in [his] sleep, as if [he is] reliving the explosion." *Id.* ¶ 16. He is "confined to [his] home because everything outside feels too overwhelming." *Id.* He was eventually diagnosed with PTSD, but felt that therapy "did little to help." *Id.* He has been rated 30% disabled by the VA for PTSD, tinnitus, and ongoing back pain from the attack. *Id.*; *id.*, Ex. F, Fesenbek VA Disability Rating, ECF No. 36-3 at 377.

**22. Terrence David Dammer and Three Family Members**

On June 25, 1996, Terrence David Dammer was a Technical Sergeant in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Terrence David Dammer ("Dammer Decl.") ¶ 5, ECF No. 36-4 at 2. At the time of the attack, he was in the shower, when "the shower wall . . . exploded" blowing him "out of the shower stall, slamming [him] into the sink and toilet[,] before dropping [him] on [his] back." *Id.* ¶ 6. Once he "pulled

[him]self up," he exited the building and saw "[b]lood-soaked people . . . screaming and running around in shock and fear." *Id.* ¶¶ 6-7. When he "realized that Building 131 was totally destroyed," he "could not stop thinking" about his friend Josh, who lived in that building, and "desperately started to search for him" until he was ordered to evacuate. *Id.* ¶ 7. After that, he helped other injured people, "using doors as makeshift stretchers to carry injured people" to triage. *Id.* He "worked nonstop for over 84 hours," helping "search for survivors, assist[] dozens of injured people, and volunteer[] with the FBI investigation," including by "look[ing] for body parts amidst the rubble." *Id.* ¶¶ 8-10. He was "shattered by the news" that Josh had died in the attack. *Id.* ¶ 10. For Dammer's service after the attack, he was awarded an Air Force Achievement Medal, a Certificate of Achievement, an Armed Forces Expeditionary Medal, and the Noncommissioned Officer of the Month Award. *Id.* ¶ 11.

Dammer eventually returned home and "tried to settle back into a regular routine," but noticed that he "avoid[ed] places that might pose any type of risk" and "became suspicious and cautious," "quick to anger," and challenged by "the simplest everyday tasks." *Id.* ¶ 14. His relationships with his mother and brother, once "so close," "deteriorated," and he "withdrew" from his wife, which is "the heaviest heartbreak for [him]." *Id.* ¶ 15. He also suffered from physical injuries, including an injury to his left thumb that "impedes [his] grip" and is "always tender to the touch," "thoracic back pain," and an injury to his right hip. *Id.* ¶ 17. These painful injuries cause "constant agony," because of which he eventually "became addicted to opioids." *Id.* He has been diagnosed with PTSD and panic attacks, and has been rated as 100% disabled by the VA. *See id.* ¶ 18; *id.*, Ex. I, Dammer VA Benefits Letter, ECF No. 36-4 at 40.

Three of Dammer's family members—his wife Anna Louise Dammer, son Christopher Michael Dammer, and twin sister Giray Diane Berger—are also plaintiffs to this case. Anna

Dammer heard about the attack at work, and her "entire body filled with devastation and panic." Decl. of Anna Louise Dammer ("A. Dammer Decl.") ¶ 6, ECF No. 36-4 at 48. Although Anna felt "so happy" to hear that Terrence was okay, and "relief" when he returned home, "it was obvious to [her] that he was different." *Id.* ¶¶ 7-9. Anna "loved Terrence for his strength and the sense of safety he provided," and for the fact that he was "selfless" and had a "sense of humor [that] could light up any room." *Id.* ¶ 10. After he returned, he was "clingy," "nervous," "quiet," "somber," and "hypervigilant." *Id.* ¶ 9. He insisted on "sitting with his back against the wall" and "arm[ing] himself with a firearm on his belt daily." *Id.* Due to Terrence's physical injuries, "[s]imple tasks like tying his shoes and putting on his socks have become [her] responsibility." *Id.* ¶ 13. Anna "grew sad and depressed," in part because they "stopped socializing and going out places." *Id.* ¶¶ 12, 14. The family experienced financial strain because of "extensive expenses" associated with "medical treatment" for Anna's depression, and because Terrence's "extreme needs for security and protection resulted in him purchasing an excessive amount of ammunition." *Id.* ¶ 14. Though Anna "love[s] Terrence and [is] happy to support him," she "miss[es] the way things used to be." *Id.* ¶ 16.

When Christopher Dammer, sixteen years old at the time, heard from his mother that there had been a terrorist attack at his father's housing complex, his "heart instantly dropped." Decl. of Christopher Michael Dammer ("C. Dammer Decl.") ¶ 6, ECF No. 36-4 at 60. When he saw "news footage of the demolished building at Khobar," he became "hysterical, overcome with fear and sorrow." *Id.* Before the attack, Terrence had been Christopher's "entire world," his "hero," and his "best friend." *Id.* ¶ 9. Christopher therefore felt "an immediate sense of relief" when he heard that his father was alive and was "so happy" for him to return home. *Id.* ¶ 7. The changes to his father after the attack, however, caused their relationship to "suffer." *Id.* ¶ 8. He "became distant

and uninterested in doing [their] shared activities," and Christopher "thought that [he] had done something to make [his father] not want to spend time with [him] the way [they] used to." *Id.* ¶ 10. Moreover, Terrence "sought solace and care" from Christopher's mother and paternal grandfather, and "the weight of his needs dominated their time, so [Christopher] no longer felt like a priority to them." *Id.* ¶ 12. Christopher became "depressed and anxious" and "could barely get a restful night of sleep." *Id.* ¶ 10. Eventually, he "began abusing substances and became addicted to opioids," which "consumed 13 years of [his] life," though he has since "successfully overc[o]me [his] addiction." *Id.* ¶ 12. Christopher "just miss[es] [his] father," and "wish[es] [they] could turn back time." *Id.* ¶ 13.

Giray Berger was "overcome with panic" upon hearing about the attack and "imagine[d] the worst," until she "learned that [her brother] was alive but had been injured." Decl. of Giray Diane Berger ("Berger Decl.") ¶ 6, ECF No. 36-5 at 68. She "eagerly awaited his return," but saw that the "changes in him were profound" after the attack. *Id.* ¶ 8. As twins, Giray and Terrence were "very close," "best friends," and "understood each other without needing words." *Id.* ¶ 9. When he came home, "[t]he vibrant, outgoing brother [she] once knew was now introverted and quiet," "hyperaware of his surroundings," and "constantly in pain." *Id.* ¶ 10. They "used to be each other's confidantes," so she has tried to "get him to talk about" the attack and "come[s] up with plans to help him live his best life," but he will discuss his experience "only superficially." *Id.* ¶ 11. Giray "struggle[s] with feeling safe," "developed separation anxiety," and has "depression." *Id.* ¶ 12. She "do[es] not sleep well" and her "relationships with family members have . . . transformed" for the worse after the attack. *Id.* She "cannot help but mourn the life [they] once had," though the experience encouraged her to become an "explosive detection K-9 handler"

and "serve two tours in Iraq and two tours in Afghanistan as a civilian contractor, driven by the need to do something meaningful." *Id.* ¶¶ 13-14.

**23. Craig Thomas Brown and Three Family Members**

On June 25, 1996, Craig Thomas Brown was a Technical Sergeant in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of the Estate of Craig Thomas Brown via Lynnette Ann Brown ("Ly. Brown First Decl.") ¶ 9, ECF No. 36-4 at 79. Craig passed away in 2016 and is represented by his widow, Lynnette Brown, who has been appointed as the personal representative of his estate in Texas. *Id.* ¶¶ 5, 7. Although Craig "never discussed the Attack with [Lynnette] in any detail," *id.* ¶ 19, Brad Donoghue, who served with Craig, attests that after the attack he "came across Craig with injuries to his knees, feet, and hands." *Id.*, Ex. G, Witness Statement of Brad J. Donoghue ¶ 8, ECF No. 36-4 at 100. Though they were both injured, they "sifted through broken glass, concrete," and other debris to assist with rescue efforts, and "provided aid to other injured people," though "[b]lood kept soaking through Craig's bandages." *Id.* ¶¶ 9-10. At some point, another fellow servicemember, Michael Wilson, met up with Craig, and "noticed that [he] had cuts to his knee and feet" and that his hands were "bleeding profusely." Ly. Brown First Decl., Ex. H, Witness Statement of Michael A. Wilson ¶¶ 8-9, ECF No. 36-4 at 103. Craig received a Purple Heart for his injuries. Ly. Brown First Decl. ¶ 21.

When Craig returned home five months after the attack, "something about [him] was different." *Id.* ¶ 14. He "startled" easily, "jumped at loud noises," "could not sleep," and "began abusing alcohol," sometimes at the same time as sleeping pills. *Id.* ¶ 17. He was rated 70% disabled by the VA for diagnoses including sleep apnea and tinnitus. *Id.*; *id.*, Ex. J, C. Brown VA Disability Rating, ECF No. 36-4 at 108. From his wife's perspective, he "seemed to relish being cruel and mean to [her]." Ly. Brown First Decl. ¶ 22. Twenty years after the attack, Lynnette told

him she "wanted a divorce." *Id.* Shortly thereafter, he "approached [her] as [she] was getting ready for work, took off his wedding ring, put it on the table with a note, and . . . walked out the door." *Id.* As Lynnette was reading the note, "which mentioned Khobar," Craig went into the back yard, where he killed himself with a gunshot wound to the head. *Id.*

Three of Brown's family members—his widow Lynnette Ann Brown on her own behalf and daughters Courtney Tate Pleva and Lindsay Ann Brown—are also plaintiffs in this action. Lynnette Brown heard about the attack on the news and was "terrified" for her husband. Decl. of Lynnette Ann Brown ("Ly. Brown Second Decl.") ¶ 10, ECF No. 36-4 at 124. She waited with "[p]anic and anxiety" until she heard from Craig later that night. *Id.* ¶¶ 10, 13. Prior to the attack, they had a "happy[,] content life," "often socialized with friends and played games," and Lynnette felt "proud to be a military spouse." *Id.* ¶ 16. After Craig returned home, he "became an angry, aggressive person," and would "los[e] his temper with [her] and [their] girls," "slam[ming] his hands down as hard as he could on the counter during his rage." *Id.* ¶ 17. He was "very controlling," and when they socialized with others, Craig would "make [her] feel worthless" by "making jokes at [her] expense." *Id.* ¶¶ 17-18. He was also "unfaithful" to her. *Id.* ¶ 18. Lynnette was "shocked, destroyed, [and] devastated" by Craig's suicide, and she "still carr[ies] . . . guilt with [her] over Craig's death and cannot help but blame [her]self at times." *Id.* ¶¶ 22-23. She has been diagnosed with PTSD and "still suffer[s] from low self-esteem due to the way Craig treated [her] for two decades of [their] marriage." *Id.* ¶ 23. Lynnette feels that the Khobar Towers attack "stole [her] husband from [her]" and "stole [her] two daughters' father from them." *Id.* ¶ 24.

Courtney Pleva was only three years old when the attack occurred and "was not told about the Attack" at the time. Decl. of Courtney Tate Pleva ("Pleva Decl.") ¶¶ 6-7, ECF No. 36-4 at 169. She remembers feeling "happy, content, and loved by both of [her] parents" prior to the attack and

that her father "was a joyful man who showered [her] sister and [her] with love and attention." *Id.* ¶ 6. After the attack, he seemed "angry all the time" and was "unusually tough on [her] sister and [her], constantly yelling at [them] over seemingly small things." *Id.* ¶ 7. He "drank alcohol often" and was "overprotective and controlling." *Id.* The "deteriorat[ion]" of the relationship between Courtney's mother and father, including her father's infidelity, caused her "trust issues in her personal relationships," and she has suffered from "depression, anxiety disorder, and insomnia" since she was seven. *Id.* ¶ 9. After Courtney's father killed himself, her family "all became distant and withdrawn from each other's lives," and she feels she "lost [her] entire family." *Id.* ¶ 10.

Lindsay Brown was seven when the attack occurred, and her mom waited until she knew that Craig was safe before telling Lindsay that he had been injured. Decl. of Lindsay Ann Brown ("Li. Brown Decl.") ¶ 6, ECF No. 36-4 at 177. She was still "terrified" that there would be another attack at Khobar Towers and eagerly awaited her father's return, which was delayed for five months. *Id.* Before the attack, Craig was "very affectionate and made [Lindsay] feel loved and cherished. He hugged [her] a lot and told [her] frequently that he loved [her]." *Id.* ¶ 10. After the attack, he was "distant and uninvolved," except that he was "short with [her] and had no patience," "constantly los[ing] his temper and g[etting] angry at the smallest things." *Id.* ¶ 11. Lindsay "thought [she] did something to make him feel that way towards [her]." *Id.* Lindsay was "devastated" by her father's death, compounded by the fact that her "father's side of the family stopped talking to [her] sister and [her] after he died" and that her "relationship with [her] mother deteriorated as well." *Id.* ¶¶ 13-14. She has suffered from "anxiety disorder . . . , separation anxiety, and depression." *Id.* ¶ 15. She "lost everything important to [her]" because of the attack. *Id.* ¶ 16.

**24. Timothy Shane Seeley**

On June 25, 1996, Timothy Shane Seeley was an Airman First Class in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Timothy Shane Seeley ("Seeley Decl.") ¶ 5, ECF No. 36-4 at 186. At the time of the attack, he was relaxing in one of the dormitories when "the force of a blast wave barreled into the room" and glass in all the windows shattered. *Id.* ¶ 6. He ran downstairs to a stairwell "packed with confused and frightened people," and "discovered that the door to the outside was jammed closed," causing "[a]nother layer of panic" until they managed to pry the door open. *Id.* ¶ 7. Once outside he "provide[d] buddy aid to anyone [he] could" and saw "shrapnel gruesomely imbedded in flesh, blood oozing out of people's bodies, and people suffering from life-threatening injuries," "horrors that are forever seared in [his] memory." *Id.* ¶ 8. For his service after the attack, he received Armed Forces Expeditionary Medal, an Air Force Achievement Medal, and a Certificate of Achievement. *Id.* ¶ 10. When new servicemembers arrived on site to help with clean up, Seeley felt they "were unaware that their seemingly innocuous actions," such as slamming doors, "caused [the] survivors great stress," and he "felt segregated from those who had not faced what [he] had." *Id.* ¶ 12.

Prior to the attack, Seeley was an "active," "patient," and "outgoing person" and "loved spending time . . . with friends and family." *Id.* ¶ 15. Upon returning home, he became "reclusive" and "hypervigilant," and developed "compulsive organizational tendencies and habits." *Id.* ¶ 14. He struggles with "simple[,] everyday tasks" and is "hypersensitive to loud noises and bright lights." *Id.* ¶ 16. His "patience, once one of [his] stronger traits, has worn thin," and he "raised [his] kids in an environment marked by strict, military discipline, a reflection of how the trauma has hardened [him]." *Id.* In 2018, while working as a police officer, he was involved in "a hostage

situation . . . in which an explosive breach occurred," after which his "anxiety became unbearable," leading him to seek treatment. *Id.* ¶ 17. He has been diagnosed with tinnitus, PTSD, anxiety, depression, and sleep apnea, and has been rated 100% disabled by the VA. *Id.* ¶ 18; *id.*, Ex. H, Seeley VA Disability Rating, ECF No. 36-4 at 215. In the view of Ronald Rucker, who served with Seeley, Seeley was "exposed to a life-altering, prolonged, and traumatic event" that caused him to go "from a bright, eager, outgoing, energized individual . . . to a withdrawn and detached individual." Seeley Decl., Ex. I, Witness Statement of Ronald D. Rucker ¶¶ 8-9, ECF No. 36-4 at 236.

**25. Jerron Keith Sweazy and Four Family Members**

On June 25, 1996, Jerron Keith Sweazy was an Airman First Class in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Jerron Keith Sweazy ("Sweazy Decl.") ¶ 6, ECF No. 36-4 at 240. At the time of the attack, he was sitting on the couch in his dormitory watching TV, when the glass door in the room "exploded," "peppering [him] with piercing glass shards." *Id.* ¶ 7. He "dragged" himself across the room, and his "arms and legs were shredded and bloodied" in the process. *Id.* He found his roommate in the bathroom with "a large piece of jagged glass lodged in the back of his neck" and "bleeding profusely." *Id.* After removing the glass and finding his other roommate, he moved to exit the building, seeing on his way out a man who "was covered in blood" and who had "glass . . . wedged in each of his eyes," a "horrifying" sight. *Id.* ¶ 8. Sweazy "began kicking in doors" in the building to let people out of their rooms, injuring both ankles and breaking his shoulder. *Id.* After he opened one door, the people trapped inside that room "surged out," the door "collapsed onto [him]" and people "trampled over [him]." *Id.* Shawn Clevenger, who served with Sweazy, attests to both his actions helping people get out of the building and to his injuries. *Id.*, Ex. E, Witness Statement

of Shawn R. Clevenger, ECF No. 36-4 at 255. Once out of the building, Sweazy assisted people to triage and worked for "48 hours straight" with the recovery and investigation. Sweazy Decl. ¶ 10. For his service he received an Air Force Achievement Medal, an Armed Forces Expeditionary Medal, a Certificate of Appreciation, and an Airman of the Month Award. *Id.*

Before the attack, he was a "strong and dependable person," who "loved socializing and spending time with friends and family" and whose "life was full of close relationships." *Id.* ¶ 12. After the attack, he continued to experience issues with his ankles, eventually requiring a painful surgery with a long recovery process. *Id.* ¶ 13. He suffered a "mental breakdown" during a subsequent deployment because he "found it impossible to sleep" and thought frequently of suicide. *Id.* ¶ 14. After that, he was placed at least twice under hospitalized suicide watch. *Id.* ¶¶ 14-15. His relationships with his family members have "deteriorated," and he "can no longer do a great deal of walking" due to his injuries and arthritis. *Id.* ¶ 16. He has been rated 100% disabled by the VA. *Id.* ¶ 16; *id.*, Ex. K, Sweazy VA Disability Rating, ECF No. 36-4 at 283.

Four of Sweazy's family members—his parents Janice Caroll Rice Sweazy and Warren Eugene Sweazy, sister Brenda Jean Sweazy, and brother Michael Wade Sweazy—are also plaintiffs in this lawsuit. Janice Sweazy heard about the attack on the news and was "shaken to [her] core" until she heard, "[s]everal . . . days" later, that her son was safe. Decl. of Janice Caroll Rice Sweazy ("J. Sweazy Decl.") ¶ 6, ECF No. 36-4 at 292. Before the attack, Jerron had "energy and focus" and "a great sense of humor." *Id.* ¶ 9. Janice had a "strong" relationship with her son, and "was proud of the young man he was growing into." *Id.* After he returned, Janice noticed that "[h]is gait was different because of the ankle injuries" and that he was "noticeably jumpy." *Id.* ¶ 10. As a result of the attack's effects on her son, Janice "developed separation anxiety," "depression," and "trouble sleeping," and "felt . . . like a war was looming." *Id.* ¶ 11.

Warren Sweazy heard about the attack from his wife and felt "consumed" by "uncertainty" about whether his son was safe until he heard from Jerron several days later. Decl. of Warren Eugene Sweazy ("W. Sweazy Decl.") ¶ 6, ECF No. 36-4 at 303. When Jerron returned home "several months" after the attack, Warren felt "relieved," but "the psychological toll on [Jerron] was immediately undeniable." *Id.* ¶ 8. Before the attack, his son "always had a smile on his face," and they "shared a special bond." *Id.* ¶ 9. Upon Jerron's return, he was "on edge and jumpy," and a "noticeable distance developed between [them], which was very difficult for [Warren]." *Id.* ¶ 8. Warren "felt like [he] was losing [his] son." *Id.* He "worked for companies that contracted with the Air Force" and worried that "the company was watching [him] more closely, assessing whether [his] performance would be affected by the Attack," which added an "extra layer of stress." *Id.* ¶ 11. He suffered from "separation anxiety, general anxiety, and nightmares." *Id.* The attack "took a piece of [their] lives that [they] can never get back." *Id.* ¶ 13.

Brenda Sweazy heard about the attack on the news and was struck with "fear and horror." Decl. of Brenda Jean Sweazy ("B. Sweazy Decl.") ¶ 6, ECF No. 36-4 at 314. She eventually got a call directly from Jerron, during which he "was heavily sedated," which "terrified" her. *Id.* ¶ 7. When he came home, she felt "relief," which "quickly turned into concern." *Id.* ¶ 8. Growing up, they had been "incredibly close," and they shared "countless moments of laughter and joy." *Id.* ¶ 9. Though their "love for each other never faded," the relationship was "deeply altered by the toll the Attack took." *Id.* ¶ 10. He became "anxious, hyperaware, and nervous," and an "emotional distance" formed between them. *Id.* To cope with the stress of the attack, Brenda went "down a path of self-medication" that "led to a hole in [her] small intestine," which in turn led to "exorbitant" medical costs and a surgery to "remove 12 inches" of her intestine. *Id.* ¶ 12. She also suffers from "depression, anxiety, nightmares, and sleeping issues." *Id.*

Michael Sweazy heard about the attack from his mother, and "fell into panic mode" worrying about his brother. Decl. of Michael Wade Sweazy ("M. Sweazy Decl.") ¶ 6, ECF No. 36-4 at 325. Waiting for news was "agonizing." *Id.* ¶ 7. He felt "relief" when he heard that Jerron was safe and "happy" to have him back home several months later. *Id.* ¶¶ 7-9. They had always had a "special relationship" and were "the best of friends." *Id.* ¶ 10. After the attack, however, Jerron was "unrecognizable" to Michael. *Id.* ¶ 11. He became "serious, reactive, and quick to anger," including by "initiat[ing] physical fights with [Michael]." *Id.* Their closeness "began to fade," and they "hardly spoke." *Id.* ¶ 12. Michael was "very saddened by the skeleton of a brotherhood that remained." *Id.* Michael became "depressed" and "anxious" and "struggled to fulfill [his] personal and professional responsibilities." *Id.* ¶ 14. He also developed "anger issues and hypertension." *Id.*

**26. James Veronal Buckmon, III, and Five Family Members**

On June 25, 1996, James Veronal Buckmon, III, was a Staff Sergeant in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of James Veronal Buckmon, III ("Buckmon Decl.") ¶ 6, ECF No. 36-5 at 2. At the time of the attack, he was asleep in his bed when "the force of the explosion threw [him] out of [his] bed, crashing [him] into the wall locker." *Id.* ¶ 7. As he fled the building, he "realized that [his] feet were bare and that [he] was stepping on shards of glass." *Id.* ¶ 8. Upon exiting the building, he heard "shrieks of fear and pain" and was "paralyzed by shock." *Id.* ¶ 9. After the attack, he "could not sleep," and "the weight of what had happened pressed down on [him]." *Id.* ¶ 10. He was awarded an Air Force Commendation Medal for his assistance after the attack, including helping "clean up" the area. *Id.* ¶ 11.

After returning home, his "life underwent a profound transformation" from before the attack, which had been "filled with joy and connection" and in which "[f]amily was the center of [his] world." *Id.* ¶¶ 12-13. He became "sensitive to loud noises" and "unable to sleep," often awoken by "nightmares" of the attack. *Id.* ¶ 13. He notices that his family "think[s] twice about . . . interactions" with him "just so [he] can feel somewhat safe." *Id.* He struggles with his "temper," and feels "trapped in a cycle of frustration and anxiety." *Id.* ¶ 14. He has scars on his feet that continue to cause "intense" pain, and "post-traumatic stress disorder symptoms," though he "grew frustrated with the Department of Veterans' Affairs" diagnostic process and therefore does not have a formal diagnosis or VA Disability rating. *Id.* ¶ 15.

Five of Buckmon's family members are also plaintiffs to this lawsuit: his wife Patricia Denise Buckmon, his stepson Corey Dwayne Dunlap, and his daughters Jasmin Nichole Logan, Shanice Symone Buckmon, and Shakiyla Chante Buckmon. When Patricia Buckmon heard about the attack from a "friend who know [her] husband was deployed to Saudi Arabia," she "instantly panicked" and "started making calls to anyone at Khobar Towers" she could think of. Decl. of Patricia Denise Buckmon ("P. Buckmon Decl.") ¶ 5, ECF No. 36-5 at 24. When she heard that James was "alive but injured," she "broke down knowing that [her] wonderful husband was injured, and [she] could not do anything to help him." *Id.* "Despite [her] excitement and happiness to have him home" a few months later, "[she] quickly noticed changes in him, both physically and psychologically." *Id.* ¶ 7. Before the attack, he "lit up the room with his outgoing and kind nature" and was "attentive to his family," "a great father," and "close . . . with all his family members and friends." *Id.* ¶ 8. Patricia and James had a marriage "filled with shared laughter, love, and respect," and she was "proud of him" for serving in the military. *Id.* ¶ 9. Following the attack, he was "constantly lost in thought and disconnected," and "[h]is temper was short, often manifesting in

moments of aggression and meanness that felt foreign." *Id.* ¶¶ 7, 10. "He became controlling regarding day-to-day tasks, making [her] feel as though [she] was walking on eggshells," and Patricia feels she "has becomes hardened and filled with hate" and has "considered leaving James several times." *Id.* ¶¶ 10, 12. This has led to her "feel[ing] distance in all [her] relationships" and suffering "from depression, anxiety, . . . sleep issues," and high blood pressure. *Id.* ¶¶ 12-13. She "mourn[s] the loss of the life [she] once knew." *Id.* ¶ 14.

Patricia married James when her son, Corey Dunlap, was five years old, and Corey had a "loving" relationship with his stepfather prior to the attack. Decl. of Corey Dwayne Dunlap ("Dunlap Decl.") ¶¶ 3, 9, ECF No. 36-5 at 35. Corey remembers that, upon hearing about the attack, his mother was "in complete panic," which "terrified" him; once he understood that his stepfather's housing complex had been attacked, he was hit with a "wave of terror" himself. *Id.* ¶ 7. Although Corey was "overwhelmed with relief" when James returned home, he eventually "began to recognize the differences in him." *Id.* ¶ 8. Before the attack, James "never missed any of [Corey's] sporting events" and "knew how to connect with everyone around him." *Id.* ¶ 9. After the attack, however, he became "withdrawn," "irritable," "short-tempered," and "controlling," leaving him "almost unrecognizable" to Corey. *Id.* ¶ 10. "As a result," Corey has "struggled with separation anxiety, sleep issues, and depression," and has "scars that do not show on the surface but are felt every single day." *Id.* ¶¶ 11, 13.

Jasmin Logan's "world flipped upside down" when Patricia told her that her father's housing complex had been attacked. Decl. of Jasmin Nichole Logan ("Logan Decl.") ¶ 6, ECF No. 36-5 at 45. She was ten years old at the time, and when she heard that her dad was alive, she "believ[ed] that because he was alive, everything would be okay." *Id.* Prior to the attack, her father was "always present for [her]" and "made [her] feel special." *Id.* ¶ 8. After he returned

home, Jasmin "could not grasp why he was not the same," in that he was "on edge, jumpy, and tense," which made her feel "sad" and "abandoned" and caused the "loss of [their] relationship." *Id.* ¶¶ 9-10. She "struggle[s] with depression and anxiety" and continues to feel "terrified, confused, and abandoned" to this day. *Id.* ¶ 11.

Though Shanice Buckmon was a "young child" when the attack happened, she "had never felt such distress and fear" as she did when she heard about the attack. Decl. of Shanice Symone Buckmon ("S.S. Buckmon Decl.") ¶ 6, ECF No. 36-5 at 53. "Imagining [her] father trapped and hurt" distressed her. *Id.* ¶ 10. Before the attack, her "relationship with [her] father was full of warmth and joy," and she considered him "an amazing father." *Id.* ¶ 8. When he got home, he was "quiet and withdrawn," and "[a]ny sudden noise or movement trigged a jolting response from him that caused [her] to monitor [her] every move around him" and "walk[] on eggshells." *Id.* ¶ 9. James's "anger and the way he often lashed out" made Shanice feel "suffocated" and contributed to her developing "depression and separation anxiety," along with "insomnia." *Id.* ¶ 11. Shanice feels that "[s]omething inside [her] broke after the Attack." *Id.* ¶ 12.

Shakiyla Buckmon "felt tremendous fear" when she heard that her father's housing complex had been attacked, "assum[ing] the worst" and wondering whether "he was even alive." Decl. of Shakiyla Chante Buckmon ("S.C. Buckmon Decl.") ¶ 6, ECF No. 36-5 at 62. When he got home, she "could finally breathe again." *Id.* ¶ 7. Prior to the attack, her and James's "bond was strong" and "filled with warmth and love." *Id.* ¶ 9. When he returned, he was "jumpy, irritable, and quick to anger," and Shakiyla "felt like [her] father no longer liked [her]" and had "gotten so strict." *Id.* ¶ 8. Their relationship "lacked communication, connection and enjoyment," and she "struggled emotionally with the gap that grew between [them]." *Id.* ¶¶ 10-11. She developed "persistent anxiety, separation anxiety, and depression" and has "nightmares about war

and killing." *Id.* ¶ 11. "The once lively and warm atmosphere of [their] home is now filled with tension." *Id.* ¶ 12.

**27. Edward Earl Whitley and Three Family Members**

On June 25, 1996, Edward Earl Whitley was a Chief Master Seargent in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Edward Earl Whitley ("Whitley Decl.") ¶ 6, ECF No. 36-5 at 71. At the time of the attack, he was sitting on his bed when "a blast wave ripped through the room" and "[t]he window frame blew in from the wall and crashed onto [his] bed," sending "[g]lass shatter[ing] everywhere." *Id.* ¶ 7. He dragged his unconscious roommate out of the building, "helping as many other people as [he] could along the way." *Id.* Once outside, he "gathered everyone from [his] group" and began directing people to safe locations or triage. *Id.* ¶ 8. In the aftermath of the bomb, he was "instructed to look for body parts, which [he] did in fact find," along with "[b]loody footprints and handprints" and "[d]ark and thick pools of blood." *Id.* ¶ 9. Christopher Nagel, who served with Whitley, confirms that he was "pivotal in ensuring not only the safety of his assigned personnel, but all other victims as well" and "cared more about the well-being of other personnel above his own emotional struggles." *Id.*, Ex. D, Witness Statement of Christopher Pius Nagel ¶¶ 7, 9, ECF No. 36-5 at 83. After assisting with the recovery, Whitley returned home, but "[t]he trauma gripped [his] soul, and constantly invaded [his] thoughts." Whitley Decl. ¶ 12.

Before the attack, Whitley "enjoyed being social" and was "open, carefree, and always eager to embrace life's adventures," and had a "beautiful family" and a wife, Mary, who "was the love of [his] life." *Id.* ¶ 13. After the trauma of the attack, he felt "closed off," "distrusting," "guarded," "paranoid," and "hypervigilant," feelings that persist "to this day." *Id.* ¶ 14. His wife "struggled to cope with [his] drastically different demeanor," and while they "remain friends," the

"intimacy and connection [they] once shared disintegrated" and "she eventually left [him]." *Id.* ¶ 15. His "relationship with [his] daughters also suffered." *Id.* Now he "do[es] not want to ever leave" home and struggles with "everyday tasks." *Id.* "Loud noises" and "[n]ightmares" continue to bother him. *Id.* ¶ 17. The VA rated him 50% disabled for injuries stemming from the attack, including tinnitus. *Id.* ¶ 16; *id.*, Ex. E, Whitley VA Disability Rating, ECF No. 36-5 at 87.

Three of Whitley's family members—his ex-wife Mary Clarise Whitley and his daughters Christina Nicole Whitley and Janna Marie-Louise Kentrolis—are also plaintiffs in this case. Mary Whitley was working at a different Air Force base when she heard about the attack on the radio, sending her into "shock and disbelief" as she wondered whether Edward was "safe" or "even alive." Decl. of Mary Clarise Whitley ("M. Whitley Decl.") ¶ 5, ECF No. 36-5 at 93. She sat by the phone with her daughter, "gripped with fear," until he called and told them he was okay. *Id.* ¶¶ 5-6. When he returned home, she felt that "the man who came back to [her] was not the same one who had left." *Id.* ¶ 7. Before the attack, Mary "cherished" that Edward was "caring and protective" and that they "approached life as a team." *Id.* ¶¶ 8-9. After the attack, he "became incredibly distant," and their "conversations were mostly superficial." *Id.* ¶¶ 7, 10. In her view, Edward "left [her] mentally, emotionally and physically, and [they] eventually separated," though the record does not specify when. *Id.* ¶ 10. Mary feels that the "loss" of her "happy life with a loving husband and family" has "manifested physically" in the form of "depression, anxiety, stress," "gastroesophageal reflux disease," and "sleep problems." *Id.* ¶ 11.

Christina Whitley, who was nineteen years old at the time, answered a phone call informing her of the attack but without information about whether her father had been injured. Decl. of Christina Nicole Whitley ("C. Whitley Decl.") ¶ 6, ECF No. 36-5 at 104. She was "beside [herself] with panic" as she waited by the phone for more news, before eventually hearing from her father

late that night. *Id.* ¶ 7. When he returned home, she "noticed some undeniable changes in him." *Id.* ¶ 8. Before the attack, Christina and Edward had a "close-knit, healthy relationship," "filled with fun and laughter." *Id.* ¶ 9. Afterward, he became "hypervigilant," "jumpy," and "overly protective, to the point of being obsessive." *Id.* ¶¶ 8, 10. She "noticed him drinking alcohol often," and he was "unrecognizable . . . in his behavior and attitude." *Id.* ¶ 10. The effects of the attack "shattered [her] family" and left her "constantly concerned for [her] family members' safety" and with "[a]nxiety, depression," "sleepless nights," and "dissociation and obsessive-compulsive tendencies." *Id.* ¶¶ 11-12.

Janna Kentrolis heard about the attack on her twenty-first birthday and was "consumed by fear and heartbreak" until she heard that her father was alive. Decl. of Janna Marie-Louise Kentrolis ("Kentrolis Decl.") ¶¶ 6-7, ECF No. 36-5 at 113. When he returned, "he was a different man." *Id.* ¶ 8. Before the attack, they had a "great relationship" and "made the most of [their] time together." *Id.* ¶ 9. Afterward, "conversations that were once filled with stories, laughter, and warmth became superficial and hollow," and "seeing [her] father struggle is heartbreaking." *Id.* ¶ 10. Additionally, "[t]he memories of that day continue to haunt [her]." *Id.* ¶ 11.

**28. Steven Ray Matteson**

On June 25, 1996, Steven Ray Matteson was a Construction Equipment Repairman in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Steven Ray Matteson ("Matteson Decl.") ¶ 5, ECF No. 36-5 at 121. At the time of the attack, he was in his girlfriend's suite watching TV, when "a flash of light blinded [him]," "[t]he sliding glass doors shattered into the room," and "[o]ne large, jagged fragment of glass impaled the bridge of [his] nose." *Id.* ¶ 6. He "picked up [his] girlfriend" and ran from the building, while "glass shredded the bottoms of [his] feet." *Id.* After he got to the triage area, "dozens of scared

servicemembers began running, thinking the complex was still under attack, and [he] was trampled." *Id.* ¶ 7. He was eventually taken to a hospital, where the doctors "drained the large hematoma that had formed on the top of [his] right foot" and stitched up his feet, arms, legs, face, neck, and nose. *Id.* He received a Purple Heart for his injuries. *Id.*

After he returned home to the United States, he "struggl[ed] to cope with what [he] had experienced . . . , especially the feelings of survivor's guilt." *Id.* ¶ 9. Before the attack, he had been a "social and engaging person" and "enjoyed meeting new people." *Id.* ¶ 10. The attack gave him a "dark and pessimistic outlook on life," and he "continue[s] to struggle trusting people and maintaining meaningful relationships." *Id.* ¶ 11. He also suffers from "nightmares" and "began abusing alcohol," which "made [him] a very angry, aggressive person" and led to him "eventually receiv[ing] a driving under the influence citation" and "to an opiate addiction." *Id.* Though he eventually completed rehabilitation for these difficulties, he still has "nightmares most nights," "suffer[s] from depression," sometimes "cannot get out of bed," and "ha[s] a temper." *Id.* ¶ 12. Most of his relationships have "deteriorat[ed]," including those with his friends, "most of [his] family members," and his wife. *Id.* ¶ 13. He also has ongoing physical ailments from the attack, including "foot, knee, and ankle injuries," "tinnitus," and scars on his face and body. *Id.* ¶ 14. He has been diagnosed with PTSD and has a VA Disability Rating of 80%. *Id.*; *id.*, Ex. F, Matteson VA Disability Rating, ECF No. 36-5 at 148. Ray Wagstaff, who served with Matteson in Dhahran and has remained his friend since the attack attests that Matteson has become "angry, moody, paranoid," "depressed, [and] anxious." Matteson Decl., Ex. G, Witness Statement of Ray A. Wagstaff ¶¶ 9, 12, ECF No. 36-5 at 154.

**29. Ray Antonio Wagstaff**

On June 25, 1996, Ray Antonio Wagstaff was a Corporal in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Ray A. Wagstaff ("Wagstaff Decl.") ¶ 5, ECF No. 36-5 at 158. At the time of the attack, he was sitting on the couch in the common area of his dorm, when "a blast wave overtook [him]" and "dropped [him] to the floor, injuring [his] shoulder." *Id.* ¶ 6. He crawled from the building, "through shards of glass and debris, cutting [his] arms and legs in the process." *Id.* He went to the armory, got a weapon, and "stood guard" outside his building until the morning. *Id.* ¶ 7. Michael Haley, who served with Wagstaff, attests to Wagstaff's experience. *Id.*, Ex. G, Witness Statement of Michael James Haley, ECF No. 36-5 at 191. The attack took such a "heavy toll on [Wagstaff's] mental state" that he was "deemed too mentally injured to remain in that environment" and was sent to Germany, where he was "eventually demoted and sent back to Khobar." Wagstaff Decl. ¶ 9. He remained there for several months, feeling "uneasy, terrified, nervous, scared, and persistently angry." *Id.* ¶ 10.

Prior to the attack, he was "the silly guy" and "did not take life too seriously." *Id.* ¶ 11. He "believed the Army would be [his] entire career until retirement." *Id.* Now, he "cannot be in crowds," "avoid[s] anything unfamiliar," and feels that "[l]ife is . . . too serious for [him] to have the luxury of being light-hearted." *Id.* ¶ 12. He feels angry "for the military demoting [him] instead of supporting [him]." *Id.* He does not see his siblings "due to [his] negative attitude," and his military friends "have said that [he] had lost his mind." *Id.* He has been diagnosed with PTSD, asthma, tension headaches, anxiety, and depression as a result of the attack, and has a 90% VA Disability Rating. *Id.* ¶ 13; *id.*, Ex. E, ECF No. 36-5 at 179.

**30. Timothy Michael Raymond**

On June 25, 1996, Timothy Michael Raymond was an Airman First Class in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Timothy Michael Raymond ("Raymond Decl.") ¶ 5, ECF No. 36-5 at 195. At the time of the attack, he was watching TV in one of the dorm buildings, when the "glass door to [his] left . . . blew inwards spraying glass everywhere," and he was "struck by the flying glass shards and debris." *Id.* ¶ 6. The "pressure from the blast wave blew at [him] so strongly that [he] wrenched [his] neck." *Id.* He crawled from the room, cutting his arms and legs on glass. *Id.* He ran into his commander outside and was instructed to get a weapon, but the gun he got was "filthy" and could not be loaded properly, which he felt was "inefficient[] and unsafe," leaving him "fe[eling] unprotected in the most dangerous moment of [his] life." *Id.* ¶ 7. He "saw covered bodies" and was involved in apprehending a man suspected of being involved in the attack. *Id.* ¶ 8. He was eventually stationed near a field and "was instructed by [his] commanders to shoot at anyone who attempted to go into the field." *Id.* ¶ 9. He was "so young, and [he] was left there alone," where he "felt unsafe." *Id.* He received an Air Force Commendation Medal, a Certificate of Appreciation, and an Armed Forces Expeditionary Medal for his work after the attack. *Id.* ¶ 11.

Before the attack, Raymond was "positive and enjoyed life," and "loved dating and meeting people." *Id.* ¶ 14. Now, he is "withdrawn and just want[s] to be alone," and "feel[s] like all the positives in [his] life are gone." *Id.* ¶ 15. Depression has "led to alcohol abuse," his relationships "have suffered," and he lacks "motivation to go to college or obtain meaningful employment." *Id.* He has "residual neck pain" and has lost a life-long love of music. *Id.* Since the attack, he has "nightmares," "anger issues," and "memory issues," and has been diagnosed with PTSD. *Id.* ¶¶ 16-17. His mother attests that he has become "uncharacteristically very quiet at times, and

quick to anger at other times." *Id.*, Ex. I, Witness Statement of Lynn Blake ¶ 11, ECF No. 36-5 at 222. He has been rated 70% disabled by the VA due to injuries from the attack. *Id.* ¶ 17; *id.*, Ex. H, Raymond VA Disability Rating, ECF No. 36-5 at 219.

**31. Cecil Ben Dills and One Family Member**

On June 25, 1996, Cecil Ben Dills was a Senior Airman in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Cecil Ben Dills ("Dills Decl.") ¶ 6, ECF No. 36-6 at 2. At the time of the attack, he had just gotten into bed, when he "felt a powerful blast wave blow over [him]" at the same time that a "thunderous boom roared" and "the lights went out." *Id.* ¶ 7. His "mouth filled with a horrible taste of smoke and sand, and thick dust coated the room." *Id.* He put on pants and boots, but because he "did not have time to . . . find socks," he "could feel shattered glass from the explosion inside [his] boots," and "glass shards pierced deep[] into his shredded and bloody feet." *Id.* He was afraid that the base was "under a full-blown attack from all angles" and was "terrified and defenseless," so he "hid in a dark corner for about 15 minutes" outside of his dormitory. *Id.* ¶ 8. He eventually made his way to the triage center, where he "helped carry injured people on stretchers and load them into ambulances." *Id.* ¶ 9. "It was painfully difficult to see [his] fellow airmen suffering and bleeding in agony." *Id.* He received an Air Force Achievement Medal, and Armed Forces Expeditionary Medal, and an Air Force Certificate of Appreciation for his assistance to the injured after the attack, as well as a Purple Heart for his injuries. *Id.* ¶¶ 9, 11. He later learned that "a close friend of [his] was killed in the Attack." *Id.* ¶ 16. Dills's account of his experiences during the attack is corroborated by a declaration from his roommate at Khobar Towers, Richard Fesenbek. *See id.*, Ex. H, Witness Statement of Richard K. Fesenbek, ECF No. 36-6 at 22.

Immediately after the attack, Dills "could not sleep" because "images of chaos, destruction, and blood-soaked people circulated through [his] mind on repeat," and because his lungs and feet were "in so much pain." *Id.* ¶ 11. As time passed after the attack, though he had previously been a "very social person," he became "quiet and reclusive," "could not tolerate being around large groups of people," and "do[es] not socialize at all anymore." *Id.* ¶¶ 13-14, 16. He "suffer[s] from intense nightmares that vividly replay that awful night," a problem that "persist[s] to this day." *Id.* ¶ 14. He has also become an "nervous and anxious person," especially in "situation[s] [he] cannot control," and "must take medication" to manage these situations. *Id.* ¶ 15. "Because of [his] anxiety, and its overarching impact on [his] daily functioning, [he] lost an opportunity to work at SpaceX." *Id.* He has been diagnosed with PTSD and tinnitus, because of which injuries he has a VA Disability Rating of 70%. *Id.* ¶ 17; *see id.*, Ex. J, Dills VA Benefit Letter, ECF No. 36-6 at 35.

Dills's sister, Jeannie Marie Meek, is also a plaintiff in this lawsuit. Prior to the attack, she and Dills had a "great sibling relationship," where Meek "looked up to Cecil as a role model and . . . admired him very much." Decl. of Jeannie Marie Meek ("Meek Decl.") ¶ 7, ECF No. 36-6 at 39. Dills "never got annoyed with [her]" and was "outgoing," "social," and "most importantly, kind." *Id.* Meek heard of the attack from their mother, but at the time she "did not have any more information about Cecil" and "fear[ed] the worst." *Id.* ¶ 6. Eventually, Dills called their mother, and Meek felt a "rush of relief . . . when [she] learned Cecil was alive." *Id.* After the attack, however, Cecil became "reserved," "distant," and "on-edge," and "[h]is temper was easily triggered by seemingly innocuous things," leading him to "yell[]" and "g[e]t so angry with [her]" over "trivial" things. *Id.* ¶ 8. Though Meek "did [her] best to have a good relationship with him," he "pull[ed] away" and "[f]or about 20 years, [they] only spoke four times," which caused Meek to "develop depression" and "have separation anxiety and trust issues in [her] own relationships."

*Id.* ¶ 9. After their father's death, Dills and Meek "reunited" and "regularly stay in touch now," but Meek remains "sad that [they] missed out on so many years together" and still feels that the attack "caused [her] the irreplaceable loss of [her] older brother and [her] role model." *Id.* ¶¶ 10-11.

**32. Curtis Lee Van Meter and Four Family Members**

On June 25, 1996, Curtis Lee Van Meter was an Aircraft Electrician in the U.S. Airforce deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Curtis Lee Van Meter ("Van Meter Decl.") ¶ 6, ECF No. 36-6 at 49. At the time of the attack, he was about to go to sleep, when "an explosion launched [him] from [his] bed and slammed [him] headfirst into a wall," "knock[ing] [him] unconscious instantly." *Id.* ¶ 7. He was "dragged out of the building," "disoriented and confused," and was treated for "deep cuts across [his] face from shards of glass," a "severe concussion," and "traumatic brain injury," which caused "headaches . . . so excruciating that nausea and vomiting consumed [him]." *Id.* ¶¶ 7-9. He was awarded a Purple Heart and a Certificate of Appreciation for his injuries and service. *Id.* ¶¶ 8, 11.

Before the attack, Van Meter was "a great father and had a wonderful, loving relationship with [his] children," whom he "loved to take . . . on adventures." *Id.* ¶ 12. He also had "many great friends," with whom he spent "a lot of time." *Id.* After the attack, however, he was "often angry and constantly on edge," "avoided crowds," "struggled to connect with others," and had "vivid and terrifying nightmares." *Id.* ¶¶ 13-14. He "could not maintain employment because [he] avoided people and leaving [his] house," and has consequently "struggled to make ends meet for many years." *Id.* ¶ 13. "[E]ventually," his wife and children "left [him] because they could not tolerate the escalation of [his] negative behaviors." *Id.* ¶ 14. His daughters "stopped speaking to [him] altogether." *Id.* He has been diagnosed with PTSD, a traumatic brain injury caused by a

bone chip "lodged into [his] brain stem," "a crushed disc in [his] back, degenerative disc disease, and nerve damage in both [his] hands and feet." *Id.* ¶ 15. Additionally, he "struggle[s] with sleep apnea." *Id.* He has a 90% VA Disability Rating. *Id.* ¶ 16; *id.*, Ex. G, Van Meter VA Benefit Letter, ECF No. 36-6 at 85. Overall, he feels that he is a "shadow of the person [he] once was," *id.* ¶ 11, and that the "vibrant future [he] had envisioned has been replaced by a struggle to simply cope with each day's challenges," *id.* ¶ 17.

Four of Van Meter's children are also plaintiffs in this case: his son Pierce Nathaniel Van Meter, his daughters Jordan Marlene Van Meter and Jessica Nicole Swift, and his stepson Erin David Howard. Pierce Van Meter was just under one year old when the attack occurred. *See* Decl. of Pierce Nathaniel Van Meter ("P. Van Meter Decl.") ¶ 6, ECF No. 36-6 at 90. Although Pierce did not learn the details of the attack until he was 14, he noticed that he had an "atypical father-son relationship" with his dad, *id.*, in that his father "mostly kept to himself" and was "quick to anger, anti-social, and hypervigilant," *id.* ¶ 7. "Arguments" and his father's "unwillingness to engage with [him]" "led to a rift between [them]" that "left lasting scars" on Pierce. *Id.* ¶ 8. This has contributed to Pierce developing "generalized anxiety, social anxiety, . . . separation anxiety, . . . [and] sleep issues," for which he has seen a psychologist since he was 16 years old (*i.e.*, for approximately the last 14 years). *Id.* ¶ 9.

Jordan Van Meter was three years old at the time of the attack but remembers "everyone's obvious panic and concern" at the time, though "no one told [her] anything." Decl. of Jordan Marlene Van Meter ("J. Van Meter Decl.") ¶ 6, ECF No. 36-6 at 98. Prior to the attack, Jordan and her father were "very close" and he "frequently play[ed] with [her] and spen[t] time with [her]." *Id.* ¶ 7. When he returned home after the attack, he was "volatile," "stern," and "angry," and "random explosions of anger" and "verbal abuse" became "an unfortunate part of [their]

interactions," which made Jordan feel "confused" and "neglected." *Id.* ¶¶ 8, 11. Jordan did not know the details of the attack until she was a teenager, so she "thought [she] had done something" that caused her father to "become so different." *Id.* ¶ 9. Jordan has been diagnosed with "depression, generalized anxiety, social anxiety, separation anxiety, anger issues, and sleeping problems, including nightmares," and feels that "chaos . . . has thus far defined [her] life." *Id.* ¶ 13.

Jessica Swift was nine years old at the time of the attack and remembers that when her mother told her that "terrorists had attacked the place where [her] father was living," the "words hit [her] like a truck" because she "did [not] know if [her] father was dead or alive." Decl. of Jessica Nicole Swift ("Swift Decl.") ¶ 6, ECF No. 36-6 at 106. Prior to the attack, she had a "healthy and fulfilling" relationship with her father, with whom she spent "summers and holidays" and exchanged "constant . . . phone calls and letters" because her mother lived in a different state. *Id.* ¶ 8. When he returned, he was "angry and grumpy," and she "began to see him much less and [their] phone calls became less frequent." *Id.* ¶¶ 7, 9. Since "he only shared a few details about his injuries and the Attack with [her], . . . [she] was . . . confused and concerned about what [she] did to make him lose interest in [her]." *Id.* ¶ 9. Their relationship "completely disintegrated," and her father has "never met" her daughter. *Id.* Jessica has "depression," "anxiety," "[f]requent nightmares," and "anger issues," and is "left with a sense of loss" regarding her relationship with her dad. *Id.* ¶¶ 10-11.

Erin Howard's mother married Van Meter when Erin was "around three years old," and Erin was eight when the attack occurred. Decl. of Erin David Howard ("Howard Decl.") ¶¶ 6, 8, ECF No. 36-6 at 114. Before the attack, Erin felt "comfortable and secure around [Van Meter]," who was a "positive father-figure and a steady presence" and created "wonderful childhood

memories." *Id.* ¶ 8. Upon hearing about the attack, he remembers feeling "frozen" and "terrif[ied] to see [his] mother so broken and shaken," and "incredibly upset" that he "had no idea what [his stepfather] was going through and how badly he had been injured." *Id.* ¶ 6. Upon his stepfather's return, Erin felt like he "was walking on eggshells" because Van Meter was "stern and constantly angry." *Id.* ¶ 9. Erin "avoided being home as much as possible" to avoid "being on the receiving end of [his stepfather's] angry outbursts," and felt "fear every time he walked into the house." *Id.* ¶¶ 9-10. Although Erin and his stepfather have since "reconnected," Erin believes that this experience has "permeated into [his] life as a father [him]self," and that he must "work very hard to control [him]self and not let the anger take over" with his own children. *Id.* ¶ 11. Overall, the attack "shattered the foundation of [his] family" and left him with lasting "emotional wounds." *Id.* ¶ 12.

**33. Bennie Lee Umstead, Jr.**

On June 25, 1996, Bennie Lee Umstead, Jr., was a Major and Executive Officer to the Commander of the Joint Task Force in the U.S. Airforce, and was temporarily in Dhahran, Saudi Arabia, housed at the Khobar Towers complex, for a change-of-command ceremony. Decl. of Bennie Lee Umstead, Jr. ("Umstead Decl.") ¶ 5, ECF No. 36-6 at 125. He was in the common area of his dormitory when he "heard the loudest, most terrifying blast, then glass shattering" and was "blown across the room." *Id.* ¶ 6. He "felt excruciating pain in [his] back, knees, and hip," his "face, arms and legs were bloody from lacerations caused by glass," and his "ears were ringing." *Id.* As he crawled out of the building, he "helped others down the stairs as best as [he] could." *Id.* After he was out of the building, he "heard screaming and crying," and saw "[b]adly injured and bloodied people" and "destruction and debris in every direction" and smelled "death and the burning of wood, steel, and flesh." *Id.* ¶ 7. He "assist[ed] with accountability and damage

investigation" during the "long and brutal night" following the attack and was awarded a Purple Heart for his injuries and an Armed Forces Expeditionary Medal and Certificate of Appreciation for his efforts to assist others. *Id.* ¶¶ 8-9.

Prior to the attack, Umstead was a "happy man with a close, religious family life," who had "graduated at the top of [his] class" and "had lots of friends." *Id.* ¶ 11. After returning home, however, he "became introverted," "quick to anger," and "aggressive," and felt that he was "overall a negative person." *Id.* ¶ 12. He had "poor job performance" and "developed a fear of loud noises," leading to his "quality of life . . . significantly disintegrat[ing]." *Id.* He has been diagnosed with PTSD with symptoms of "panic attacks, night terrors, flashbacks, anxiety, depression, survivor's guilt, and chronic sleep issues," as well as with "tinnitus, degenerative disc disease," and osteoarthritis in both knees. *Id.* ¶ 13. He has been given a 100% VA Disability Rating due to injuries stemming from the attack. *Id.*; *id.*, Ex. H, Umstead VA Benefits Letter, ECF No. 36-6 at 154.

**34. Paul Anthony Sadatis, Jr.**

On June 25, 1996, Paul Anthony Sadatis, Jr., was a Senior Airman in the U.S. Airforce, deployed to Dhahran, Saudi Arabia, and housed at the Khobar Towers complex. Decl. of Paul Anthony Sadatis, Jr. ("Sadatis Decl.") ¶ 5, ECF No. 36-6 at 162. He was ironing his clothes in his dormitory room when "an ear-piercing blast shook the building," and he was "knocked off balance and thrown onto [his] bed." *Id.* ¶ 6. His "ears were ringing," but he went to the suite across the hallway from his where he "could hear people yelling for help" and found that "[t]he airmen in that room had sustained serious, blunt force trauma and major glass injuries," including one man whose "legs were completely impaled with glass and [whose] head was bleeding." *Id.* ¶ 7. Sadatis and his suitemates carried that man downstairs and took him to triage. *Id.* ¶¶ 7-8. Sadatis went to

get "gear and weapons," as instructed, but "was not wearing shoes, so [his] shredded, bloodied feet were starting to throb in pain." *Id.* ¶ 8. He "remove[d] multiple larger pieces of glass from [his] feet" and then went to assist others, where he saw "many [people] blood-soaked with serious injuries and . . . burn marks," including some who were "unconscious or disabled from injury." *Id.* ¶¶ 8-9. He "helped evacuate people" and secure the "chaotic, stressful scene." *Id.* ¶¶ 9-10. After working through the night, he "did not want to take medical services away from those who needed it more," so he "self-treated" his feet. *Id.* ¶ 11. For his service after the attack, he received an Air Force Commendation Medal, Armed Forces Expeditionary Medal, and Certificate of Appreciation. *Id.* ¶ 12.

After the attack, he was "pulling out small glass pieces for months." *Id.* ¶ 17. He has memories from the attack that "still make[] [him] shiver," including of the "smell of burnt flesh." *Id.* ¶¶ 14, 17. Prior to the attack, he had been "outgoing and social" and was "close" with his family. *Id.* ¶ 18. After the attack, he became "anxiety riddled" and "quick to anger, and sometimes even rage." *Id.* ¶ 19. He "get[s] anxious around large groups" and "startled by loud noises." *Id.* His "relationship with [his] wife suffered the most" when he "started drifting away from her and all [his] family," "had trouble sleeping, which caused [him] to snap easily," and "developed depression." *Id.* After his wife encouraged him to "open up and talk about" his experience," he was diagnosed with PTSD and tinnitus, for which he has a VA Disability Rating of 70%. *Id.* ¶ 21; *id.*, Ex. H, Sadatis VA Benefits Letter, ECF No. 36-6 at 190.

**35. One Immediate Family Member of *Schooley* Plaintiff Salvatore Capaccio**

Nancy DiMarco's stepson, Salvatore Capaccio, is a servicemember who was injured in the Khobar Towers bombing and was a plaintiff in *Schooley*, 2019 WL 2717888, at *50, 75, in which litigation he received an award of $7,000,000 based, *inter alia*, on his 100% VA Disability Rating.

Decl. of Nancy DiMarco ("DiMarco Decl.") ¶ 3, ECF No. 36-6 at 195. DiMarco has known Salvatore ("Sal") since he was 12 years old and lived with him from age 13 onward, at first in the summers and on weekends, and eventually full time. *Id.* ¶ 6. Prior to the attack, DiMarco and Sal had a "close connection." *Id.* ¶ 11. DiMarco "gave birth to Sal's sisters" and Sal "relished in his role as a big brother." *Id.* DiMarco "love[s] Sal as [her] own son." *Id.* When DiMarco saw the "awful images" of the attack on TV, she "went into shock," and "[a]ll [she] could think about was Sal and whether he was safe, or even if he was alive." *Id.* ¶¶ 7-8. She felt "relief and joy" to learn that he had survived, but when he returned home, she "noticed significant changes in his demeanor." *Id.* ¶¶ 9, 13. He was "reserved and withdrawn" and did "not leave the house often." *Id.* ¶ 13. DiMarco's husband, Sal's father, "began to pull away from [DiMarco] due to [his] stress" following the attack, eventually leaving him "unable to work" and putting the "burden of financially supporting [the] family" on DiMarco's shoulders alone, which led to DiMarco and Sal's father separating. *Id.* ¶ 15. DiMarco suffered from "insomnia, depression, and separation anxiety" as a result. *Id.* Sal and DiMarco have "maintained [their] relationship over the years," even after DiMarco and Sal's father separated, but DiMarco "cannot overlook the pain and harm the Attack inflicted on [her] family." *Id.* ¶ 16.

**36. Five Family Members of *Gration* Plaintiff Scott Patrick Hill**

Scott Patrick Hill is a servicemember who was injured in the Khobar Towers bombing and was a plaintiff in *Gration*, in which litigation he received an award of $7,000,000 based, *inter alia*, on his 100% VA Disability Rating. 2023 WL 5221955, at *18, 31. Five of his family members—his son Nathaniel Wayne Hill, his parents Eleanor Cathleen Hill through her estate and Wayne Earl Hill, his brother Brandon Michael Hill, and his sister Heather Marie Miller—are plaintiffs in this case.

Nathaniel Hill was a baby when the attack occurred, and "do[es] not have a memory" of the attack; instead, "[t]he only father [he] ha[s] known is the one shaped by the trauma he carried." Decl. of Nathaniel Wayne Hill ("N. Hill Decl.") ¶ 6, ECF No. 36-6 at 209. Later, his father shared many details and pictures of the attack and its aftermath with Nathaniel, which "haunted [Nathaniel] then and remain with [him] to this day," leading him to "develop[] irrational fears" such as "avoid[ing] . . . sliding doors at home, afraid that glass would cut [him] the way it had injured so many in those photos." *Id.* ¶¶ 8, 13. His father was "always angry, on edge, and afraid," and eventually he began to "unravel[]," leading to the loss of his job and the "family car and home." *Id.* ¶ 11. "[His] father's depression and anxiety consumed all of [the family]." *Id.* ¶ 12. Nathaniel feels that "the impact of the Attack on hi[s] [father] has shaped every part of who [he is]." *Id.* ¶ 15.

Eleanor Hill passed away in 2021, and her daughter, Heather Miller, has been appointed in Oregon as the personal representative of Eleanor's estate. Declaration of Estate of Eleanor Cathleen Hill via Heather Marie Miller ("Miller First Decl.") ¶¶ 5-6, ECF No. 36-6 at 218. Eleanor "could not shake the fear of another possible Attack" on her son after hearing of the attack, and "could not sleep until Scott was home." *Id.* ¶ 10. After Scott returned, Eleanor "worried incessantly about him," "worsening her own mental state." *Id.* ¶ 14. "She slept less, smoked more, and had high blood pressure," and she eventually faced "unrelenting" health challenges, including kidney failure, lung cancer, and multiple strokes. *Id.* The "impact of Scott's experience and his injuries compounded [Eleanor's] already fragile health." *Id.* ¶ 15.

Wayne Hill's "heart dropped" when he heard about the attack on the radio. Declaration of Wayne Earl Hill ("W. Hill Decl.") ¶ 6, ECF No. 36-6 at 233. Although he felt a "wave of relief" upon hearing his son had survived, *id.*, after Scott returned home "it became clear that the son [he]

knew and loved had been profoundly changed," *id.* ¶ 7. Prior to the attack, Wayne and Scott "spen[t] a lot of quality time together," and Wayne was "filled with excitement and pride" when Scott enlisted in the Air Force. *Id.* ¶¶ 9-10. After the attack, Wayne observed that Scott "struggled to keep a job" and initially "scolded [Scott] for being lazy," before realizing that "he was silently battling psychological injuries from the Attack." *Id.* ¶ 11. This "misunderstanding strained [their] relationship for years." *Id.* Wayne has "lived every day with the worry of how Scott will survive when he cannot function normally." *Id.* ¶ 15.

Brandon Hill "had just returned from [his] own deployment to Saudi Arabia" when he heard about the attack, which "felt like a shockwave tearing through [him]," leaving him "consumed by disbelief and fear." Decl. of Brandon Michael Hill ("B. Hill Decl.") ¶ 6, ECF No. 36-6 at 244. Prior to the attack, Scott and Brandon had a "solid, close relationship" and Brandon "looked up to" Scott as his older brother. *Id.* ¶ 8. When Scott returned home, "it was painfully clear . . . that the Attack had left deep marks on him." *Id.* ¶ 9. He was "quiet, reserved, and cautious," and Brandon "felt like [he] was walking on eggshells around him" to avoid "unintentionally offend[ing] him." *Id.* ¶¶ 9-10. Brandon "feel[s] like [he] missed out on having a brother for the past 25 years." *Id.* ¶ 11.

Heather Miller "learned about the Attack from [her] father," and felt "trapped in a fog of confusion and dread." Decl. of Heather Marie Miller ("Miller Second Decl.") ¶ 8, ECF No. 36-6 at 255. She felt "relief . . . [at] having him safe and sound" after he returned home, *id.* ¶ 11, but "[l]ife since the Attack has been a relentless, exhausting journey," *id.* ¶ 16. Before the attack, Scott had "looked after [her] brother and [her] with dedication" and "support[ed] [them] in every way he could," *id.* ¶ 12, but after returning home "Scott distanced himself" and was unable to help care for their sick mother. *Id.* ¶ 13. This experience was "heartbreaking" for Heather. *Id.*

### D. Procedural History

Plaintiffs filed this lawsuit on August 11, 2023, Compl., ECF 1, as related to *Christie v. Islamic Republic of Iran*, No. 19-cv-1289 (D.D.C.), at which time the case was assigned to another Judge of this Court. On September 13, 2023, plaintiffs filed an amended complaint, adding three plaintiffs—two servicemembers and the estate of one family member. *See* FAC at 5. After filing the Amended Complaint, plaintiffs restarted efforts to serve defendants and, as discussed *infra* in Part III.B, properly served the Amended Complaint under the FSIA on June 11, 2024. *See* Return of Service/Aff., ECF No. 27. Two months later, after defendants failed to file an answer or enter an appearance, plaintiffs moved for and the Clerk entered default. Aff. for Entry of Def., ECF No. 28; Clerk's Entry of Def. as to Iran; Clerk's Entry of Def. as to MOIS; Clerk's Entry of Def. as to IRGC.

In December 2024, plaintiffs moved for default judgment as to liability. Pl.'s Mot. to Take Judicial Not. of Evidence in Related Prior Cases, Mot. for Entry of Def. J. as to Liability, & Mot. for Leave to File Documentary Evidence Under Seal ("Pls.' First Def. J. Mot."), ECF No. 32. In April 2025, plaintiffs moved for expedited consideration of their motion for default judgment as to liability and indicated that they were prepared immediately to file a motion for default judgment as to damages if they prevailed as to liability, because the U.S. Victims of State Sponsored Terrorism Fund ("USVSST Fund") set a June 1, 2025, deadline for holders of judgments against state sponsors of terrorism to submit applications for a round of disbursements from that fund. Pls.' Mot. to Expedite Consideration, ECF No. 33. The court instead directed that plaintiffs submit a single combined motion for default judgment as to liability and damages by June 2025 and any evidence supporting requested damages by August 2025. Minute Order (Apr. 23, 2025). A few days later, plaintiffs filed a combined motion for default judgment as to liability and damages, Pls.'

Mot. for Default J. as to Liability & Damages ("Pls.' Second Mot. Def. J."), ECF No. 35, accompanied by sealed copies of declarations and evidence to support their damages allegations, Pls.' Sealed Evidence in Supp. of Mot. for Default J. as to Liability & Damages ("Pls.' Sealed Declarations"), Attachs. 1-6, ECF No. 36, and a week later, redacted copies of the same on the public docket, Pls.' Redacted Declarations, ECF No. 37. In light of plaintiffs' filing of the combined motion for default judgment as to damages and liability, plaintiffs' first motion for default judgment only as to liability was denied as moot by the Judge previously assigned to this case. Minute Order (June 3, 2025) (denying as moot Pls.' First Default J. Mot., ECF No. 32).

In October 2025, this case was transferred the undersigned as related to other cases regarding the attack on the Khobar Towers, with plaintiff's default judgment motion as to liability and damages still pending. *See* Case Reassignment, ECF No. 38. Plaintiffs refiled both their Motion for Default Judgment as to Liability, ECF No. 40, originally docketed at ECF No. 32, and their Motion for Default Judgment as to Liability and Damages, ECF No. 42, originally docketed at ECF No. 35. The former had been denied as moot by the Judge previously assigned to this case, but plaintiffs appear to have refiled the motion to include the aspect of the motion requesting that the Court take judicial notice of prior related cases. The latter is the operative Motion for Default Judgment, seeking adjudication of both liability and damages, and is now ripe for resolution, as is plaintiffs' motion to take judicial notice of prior related cases.

## II. LEGAL STANDARD

"Rule 55(a) [of the Federal Rules of Civil Procedure] requires the Clerk to enter a default when a defendant 'has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise,'" and, "[o]nce the Clerk does so, the plaintiff may 'apply to the court for a default judgment' under Rule 55(b)." *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1023 (D.C.

Cir. 2020) (quoting FED. R. CIV. P. 55(a), (b)(2)). Rule 55(b)(2) thus permits a court to consider entering a default judgment when a party applies for that relief. *See* FED. R. CIV. P. 55(b)(2). Since "strong policies favor resolution of disputes on their merits[,] '[t]he default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party.'" *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)). At the same time, the procedural posture of a default does not relieve a federal court of its typical obligations, including its "affirmative obligation" to determine whether the court has subject-matter jurisdiction over the action. *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996). Additionally, "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Consequently, "entry of a default judgment is not automatic." *Id.* at 6 (footnote omitted).

While the "FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide," courts must be mindful that Congress enacted § 1605A, the FSIA's state-sponsored terrorism exception, and § 1608(e) with the "aim[] to prevent state sponsors of terrorism—entities particularly unlikely to submit to this country's laws—from escaping liability for their sins." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047-48 (D.C. Cir. 2014); *see also Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1114 (D.C. Cir. 2019). To this end, the D.C. Circuit has instructed that "courts have the authority—indeed, we think, the obligation—to 'adjust evidentiary requirements to . . . differing situations.'" *Han Kim*, 774 F.3d at 1048 (alterations accepted and omission in original) (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)); *see also Klapprott v. United States*, 335 U.S. 601,

611 (1949) (observing that "statutes and rules have largely left for judicial determination the type of cases in which hearings and proof should precede default judgments").

Generally, courts in FSIA default actions must draw their "findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence." *Han Kim*, 774 F.3d at 1049 (quoting *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 21 n.1 (D.D.C. 2001)). Uncontroverted factual allegations that are supported by admissible evidence are taken as true. FED. R. CIV. P. 56(e)(2) (authorizing court to "consider the fact undisputed for purposes of the motion" when the adverse party "fails to properly address another party's assertion of fact"); *see also Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) ("Courts may rely on uncontroverted factual allegations that are supported by affidavits." (citing *Rimkus II*, 750 F. Supp. 2d at 171)).

The D.C. Circuit's "review of findings underlying a default judgment in a FSIA case of this sort is 'lenient,'" *Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 356 (D.C. Cir. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017)), as "the courts are granted broad discretion to determine what degree and kind of evidence is satisfactory," *Maalouf*, 923 F.3d at 1114 (citing *Han Kim*, 774 F.3d at 1047; *Owens*, 864 F.3d at 785). In particular, "[i]n a FSIA default proceeding, a factual finding is not deemed clearly erroneous if 'there is an adequate basis in the record for inferring that the district court . . . was satisfied with the evidence submitted.'" *Owens*, 864 F.3d at 785 (omission in original) (quoting *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

## III. DISCUSSION

A default judgment may be entered when (1) the court has subject-matter jurisdiction over the claims, (2) personal jurisdiction is properly exercised over the defendant, (3) the plaintiffs have

presented satisfactory evidence to establish their claims against the defendant, and (4) the plaintiffs have satisfactorily proven that they are entitled to the monetary damages they seek. These requirements are addressed *seriatim*.

**A. Subject-Matter Jurisdiction under the FSIA**

"The district courts . . . have original jurisdiction" over "any nonjury civil action against a foreign state" seeking "relief *in personam* with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title." 28 U.S.C. § 1330(a). In this case, plaintiffs seek *in personam* relief, so the question is whether defendants, Iran and two arms of the Iranian government, are entitled to immunity.[7]

"[T]he FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts," *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015) (citing 28 U.S.C. § 1604), but "that grant of immunity is subject to a number of exceptions," *id.* at 13-14; *see also Doe v. Taliban*, 101 F.4th 1, 5 (D.C. Cir. 2024). In the instant case, plaintiffs assert jurisdiction based on the FSIA's terrorism exception, 28 U.S.C. § 1605A, *see* FAC ¶ 1, which provision was enacted "[i]n 1996, [when] Congress withdrew foreign sovereign immunity for lawsuits that seek money damages for personal injury or death from a state sponsor of terrorism that has engaged in an 'act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,'" *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053, 1057 (D.C. Cir. 2024) (quoting the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 221, 110 Stat. 1214, 1241); *see also Mark v.*

---

[7] This suit falls beyond the ten-year statute of limitations for actions brought under the FSIA's terrorism exception, *see* 28 U.S.C. § 1605A(b), but the "limitation period in § 1605A(b) is not jurisdictional," and defendant has "forfeited its affirmative defense . . . by failing to raise it" here, *Owens*, 864 F.3d at 804; *see also Maalouf*, 923 F.3d at 1114-15 (holding that a district court may not *sua sponte* raise a forfeited statute of limitations defense under 28 U.S.C. § 1605A(b)).

*Republic of Sudan*, 77 F.4th 892, 895 (D.C. Cir. 2023). As the quoted text indicates, this exception also requires that "the foreign country was designated a 'state sponsor of terrorism at the time of the act,'" *Mohammadi*, 782 F.3d at 14 (quoting 28 U.S.C. § 1605A(a)(2)(A)(i)(I)), and also at that time of the act, "the 'claimant or the victim was' a 'national of the United States,'" *id.* (quoting 28 U.S.C. § 1605A(a)(2)(A)(ii)(I)), or was a member of the armed forces, 28 U.S.C. § 1605A(a)(2)(A)(ii)(II).[8]

Plaintiffs have satisfactorily proven the applicable elements here. As already stated, Iran has been designated a state sponsor of terrorism since 1984, over a decade before the 1996 Khobar Towers bombing, and the MOIS and IRGC are arms of the Iranian state. Moreover, all plaintiffs have averred in sworn declarations that they were United States citizens or members of the armed forces at the time of the attack.[9] Finally, plaintiffs seek damages "for personal injury . . . that was

---

[8] Finally, the provision requires proof that, "in a case in which the act occurred in the foreign state against which the claim has been brought, the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C. § 1605A(a)(2)(A)(iii). Since the Khobar Towers attack took place in Saudi Arabia and not Iran, this requirement does not apply in this case.

[9] *See* St. John Decl. ¶ 3 (attesting to the declarant's United States citizenship); Young Decl. ¶ 3 (same); R. Kegan Second Decl. ¶ 2 (attesting to the declarant's own citizenship); R. Kegan First Decl. ¶ 8 (attesting to armed services membership of declarant's father, James Elliot Kegan, whose estate declarant represents); J. Kegan Decl. ¶ 2 (attesting to declarant's United States citizenship); Cline Decl. ¶ 2 (same); Hunt Decl. ¶ 2 (same); Rafaiani Decl. ¶ 3 (same); F. Rafaiani Decl. ¶ 2 (same); L. Rafaiani Decl. ¶ 2 (same); Core Decl. ¶ 2 (same); N. Brown Decl. ¶ 3 (same); Jobson Decl. ¶ 3 (same); V. Jobson Decl. ¶ 2 (same); Schofield Decl. ¶ 2 (same); Dixon Decl. ¶ 3 (same); Castleman Decl. ¶ 3 (same); Sample Decl. ¶ 3 (same); K. Sample Decl. ¶ 2 (same); Umberger Decl. ¶ 3 (same); C. Umberger Decl. ¶ 2 (same); Manibusan Decl. ¶ 3 (same); J. Manibusan ¶ 2 (same); E. Belcher First Decl. ¶ 3 (same); Y. Mazzara Decl. ¶ 2 (same); M. Mazzara Decl. ¶ 2 (same); Jones Decl. ¶ 2 (same); E. Belcher Second Decl. ¶ 10 (testifying to the membership in the U.S. armed forces of the decedent, declarant's husband); O'Connor Decl. ¶ 3 (attesting to declarant's United States citizenship); R. O'Connor Decl. ¶ 2 (same); Kirkpatrick Decl. ¶ 3 (same); Willis Decl. ¶ 3 (same); S. Willis Decl. ¶ 2 (same); Haywood Decl. ¶ 3 (same); D. Anderson Decl. ¶ 2 (same); T. Anderson Decl. ¶ 2 (same); Valencia Decl. ¶ 3 (same); Butikofer Decl. ¶ 3 (same); Wilson Decl. ¶ 2 (same); K. Butikofer Decl. ¶ 2 (same); Morgan Decl. ¶ 2 (same); R. Jensen Decl. ¶ 2 (same); Sterling Decl. ¶ 2 (same); B. Butikofer Decl. ¶ 2 (same); T. Butikofer Decl. ¶ 2 (same); T. Jensen Decl. ¶ 2 (same); Sikes Decl. ¶ 3 (same); Lopez Decl. ¶ 2 (same); M. Sikes Decl. ¶ 2 (same); R. Sikes Decl. ¶ 2 (same); J. Sikes Decl. ¶ 2 (same); L. Sikes Decl. ¶ 2 (same); Fesenbek Decl. ¶ 3 (same); Dammer Decl. ¶ 3 (same); A. Dammer Decl. ¶ 2 (same); C. Dammer Decl. ¶ 2 (same); Berger Decl. ¶ 2 (same); Ly. Brown First Decl. ¶ 9 (testifying to the membership in the U.S. armed forces of the decedent, declarant's husband); Ly. Brown Second Decl. ¶ 2 (attesting to declarant's own U.S. citizenship); Pleva Decl. ¶ 2 (same); Li. Brown Decl. ¶ 2 (same); Seeley Decl. ¶ 3 (same); Sweazy Decl. ¶ 3 (same); J. Sweazy Decl. ¶ 2 (same); W. Sweazy Decl. ¶ 2 (same); B. Sweazy Decl. ¶ 2 (same); M. Sweazy Decl. ¶ 2 (same); Buckmon Decl. ¶ 3 (same); P. Buckmon Decl. ¶ 2 (same); Dunlap Decl. ¶ 2 (same); Logan Decl. ¶ 2 (same); S.S. Buckmon Decl. ¶ 2 (same); S.C. Buckmon Decl. ¶ 2 (same); Whitley Decl. ¶ 3 (same); M. Whitley Decl. ¶ 2 (same); C. Whitley Decl. ¶ 2 (same); Kentrolis Decl. ¶ 2

caused by an . . . extrajudicial killing" for which defendant provided "material support or resources." 28 U.S.C. § 1605A(a)(1); *see also Owens*, 864 F.3d at 778 ("[T]he plain meaning of § 1605A(a) grants . . . jurisdiction over claims against designated state sponsors of terrorism that materially support extrajudicial killings committed by nonstate actors.").

More specifically, the truck bombing that plaintiffs allege caused their injuries was manifestly an "extrajudicial killing" that resulted in the deaths of nineteen American military personnel. *See, e.g.*, *Rimkus II*, 750 F. Supp. 2d at 182 ("The actions of defendants constituted both an extrajudicial killing and the provision of material support in satisfaction of the first element of liability."); *Akins*, 332 F. Supp. 3d at 33-34 (concluding the same); *Aceto*, 2020 WL 619925, at *13 (same). For the purposes of the FSIA terrorism exception, the term "extrajudicial killing" has the "meaning given" in "the Torture Victim Protection Act of 1991," 28 U.S.C. § 1605A(h)(7), which statute defines the term as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples," Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992) (codified at 28 U.S.C. § 1350 note § 3(a)).

The Court additionally takes judicial notice of the evidence presented in *Blais* and *Heiser I* demonstrating that Iran, IRGC, and MOIS provided "material support or resources" for the extrajudicial killing carried out in the Khobar Towers bombing. As is clear from the evidence in those cases, described *supra* in Parts I.A-.B, defendants planned, supported, and "approved" the attack. *Heiser I*, 466 F. Supp. 2d at 252. The evidence also shows that Iran played a key role in

(same); Matteson Decl. ¶ 3 (same); Wagstaff Decl. ¶ 3 (same); Raymond Decl. ¶ 3 (same); Dills Decl. ¶ 3 (same); Meek Decl. ¶ 2 (same); Van Meter Decl. ¶ 3 (same); P. Van Meter Decl. ¶ 2 (same); J. Van Meter Decl. ¶ 2 (same); Swift Decl. ¶ 2 (same); Howard Decl. ¶ 2 (same); Umstead Decl. ¶ 3 (same); Sadatis Decl. ¶ 3 (same); DiMarco Decl. ¶ 2 (same); N. Hill Decl. ¶ 2 (same); Miller First Decl. ¶ 5 (attesting to U.S. citizenship of decedent, whose estate declarant represents); W. Hill Decl. ¶ 2 (attesting to declarant's own U.S. citizenship); B. Hill Decl. ¶ 2 (same); Miller Second Decl. ¶ 2 (same).

helping to recruit, train, fund, supply, and direct Saudi Hezbollah, including in specific preparation for the attack on the Khobar Towers, *id.* at 262, establishing that Iran's actions were "a 'substantial factor' in the sequence of events that led to . . . plaintiff[s'] injur[ies]" and that the injuries were "'reasonably foreseeable or anticipated as a natural consequence' of [Iran]'s conduct," *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)) (explaining that the jurisdictional standard for causation under the FSIA's terrorism exception is proximate cause).

Therefore, under 28 U.S.C. § 1605A, defendants are not immune from this suit, meaning that subject-matter jurisdiction may be properly exercised. *See* 28 U.S.C. § 1330(a).

### B. Personal Jurisdiction Under the FSIA

"Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction . . . where service has been made under section 1608 of [the FSIA]." 28 U.S.C. § 1330(b). This section prescribes two methods by which service shall ordinarily be made, *see* 28 U.S.C. § 1608(a)(1)-(2), but these methods were "not available" to plaintiffs in this action, *Holladay v. Islamic Republic of Iran*, 406 F. Supp. 3d 55, 61 (D.D.C. 2019); *see also Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 49 (D.D.C. 2019), because "defendants have neither made a special arrangement for service with the plaintiffs nor entered into any international convention governing service," *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017).

For this reason, plaintiffs attempted to effectuate service of the Amended Complaint under § 1608(a)(3) by sending one copy of the summons and complaint, along with a translation of each document in Iran's official language, to Iran's Ministry of Foreign Affairs. *See* Pls.' Aff. Requesting Foreign Mailing, ECF No. 13; Pls.' Request, ECF No. 19; Certificate of Clerk, ECF No. 20. When this method of service was unsuccessful, plaintiffs, following § 1608(a)(4),

transmitted the summons, original complaint, and notice of suit, along with translations of each document, to the U.S. Department of State, *see* Pls.' Aff. Requesting Foreign Mailing, ECF No. 22; Pl.s' Request, ECF No. 23; Certificate of Clerk, ECF No. 24, for service "through diplomatic channels," 28 U.S.C. § 1608(a)(4) (allowing resort to this method "if service cannot be made within 30 days under paragraph (3)"). On June 11, 2024, the U.S. Department of State certified that the requirements for diplomatic service under Section 1608(a)(4) had been satisfied. Return of Service/Aff., ECF No. 27.

Plaintiffs' executed service under 28 U.S.C. § 1608(a)(4) authorizes the exercise of personal jurisdiction over Iran. *See* 28 U.S.C. § 1330(b); *CC/Devas (Mauritius) Ltd. v. Antrix Corp. Ltd.*, 605 U.S. 223, 232 (2025) ("[T]he most natural reading of § 1330(b) is that personal jurisdiction over a foreign sovereign is 'automatic' whenever (1) 'an exception to immunity applies' and (2) 'service of process has been accomplished.'" (citation omitted)).

**C. Iran's Liability**

Plaintiffs seek relief under Section 1605A(c) of the FSIA, which creates a private right of action for "personal injury or death" and provides that, "[i]n any such action, damages may include economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c); *see also* FAC at 54-60 (citing § 1605A(c) in five of the six counts in the Second Amended Complaint); *id.* ¶ 2 (clarifying that 1605A(c) is the cause of action for all six counts). All plaintiffs bring a claim under 28 U.S.C. § 1605A(c) for intentional infliction of emotional distress ("IIED"). *See* FAC ¶¶ 176-183 (bringing, in Count III, an IIED claim for the surviving injured servicemember plaintiffs); *id.* ¶¶ 184-191 (bringing, in Count IV, an IIED claim for the family member plaintiffs). In addition, the thirty-four servicemember plaintiffs bring claims for assault and battery, *id.* ¶¶ 170-175 (Count II), seeking compensatory damages for "physical injury and

harm, and fear and apprehension of imminent harm," which resulted in "extreme mental anguish, physical injury, and pain and suffering," *id.* ¶¶ 172, 174; the sixty-one family member plaintiffs bring claims for loss of solatium, *id.* ¶¶ 192-196 (Count V); and all ninety-five plaintiffs seek "punitive damages," *id.* ¶¶ 197-201 (Count VI). All plaintiffs also include a general damages allegation. *Id.* ¶¶ 159-169 (Count I).

Despite creating a private right of action that allows for the recovery of "economic damages, solatium, pain and suffering, and punitive damages," 28 U.S.C. § 1605A(c), Section 1605A(c) contains no guidance on the substantive bases for liability to determine plaintiffs' entitlement to damages. As a result, courts evaluating such claims "may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises, in determining damages under § 1605A(c)." *Fraenkel*, 892 F.3d at 353; *see also Est. of Heiser v. Islamic Republic of Iran* ("*Heiser II*"), 659 F. Supp. 2d 20, 24 (D.D.C. 2009) (applying "general principles of tort law," such as the Restatement (Second) of Torts, to determine liability). The availability of these claims for each plaintiff is discussed below.

**1. Servicemember Plaintiffs**

The thirty-four servicemember plaintiffs were members of the Armed Services at the time of the attack and, therefore, are expressly covered by, and entitled to bring claims under, Section 1605A(c)(2). After discussion of the eligibility of deceased servicemember plaintiffs' estates to bring claims on plaintiffs' behalf, each basis for liability—assault, battery, and IIED—as to the servicemember plaintiffs is discussed.

*a. Deceased Plaintiffs*

Three servicemember plaintiffs—James Kegan, John Belcher, and Craig Brown—are deceased and are represented by their estates. *See* R. Kegan First Decl. ¶ 7 (averring that Ralph

Kegan, James Kegan's son, has been appointed under Florida law as the personal representative of his estate); *id.*, Ex. D, Order of the Okaloosa Cnty., Fla., Circuit Court, No. 2022-cp-783, ECF No. 36-1 at 78 (showing Ralph Kegan as the appointed representative under Florida law for James Kegan's estate in Florida); E. Belcher Second Decl. ¶ 9 (averring that Erica Belcher, John Belcher's widow, has been appointed under Colorado law as the personal representative of his estate); *id.*, Ex. E, Letters of Administration for John Belcher's Estate, ECF No. 36-2 at 273 (showing Erica Belcher as personal representative under Colorado law for John Belcher's estate in Colorado); L. Brown First Decl. ¶ 7 (averring that Lynnette Brown, Craig Brown's widow, has been appointed under Texas law as executor of his estate); *id.*, Ex. E, Letters Testamentary for Craig Brown, ECF No. 36-4 at 96 (showing Lynnette Brown as "independent executor" under Texas law of Craig Brown's estate in Texas).

Courts in this district have previously awarded damages to the estates of deceased servicemembers and the estates of deceased relatives of victims of terrorist attacks. *See, e.g.*, *Est. of Johnson*, 2024 WL 3225954, at *14; *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 38 (D.D.C. 2020). "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action, the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'" *Barry*, 437 F. Supp. 3d at 36 (alterations in original) (quoting *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017)). Standing of an estate is governed by the law of the state which governed the creation of the estate. *Id.* (citing *Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014)). Yet, plaintiffs' briefing is silent as to the standing of any estate representative, under the law of the states in which the estates are established, to assert claims here on behalf of the estate. *See generally*, Pls.' Mem. at 40, 73, 111. In this circumstance, the claims of the estate representatives have in other cases been dismissed

without prejudice. *See, e.g.*, *Strauss v. Islamic Republic of Iran*, No. 22-cv-52 (RCL), 2024 WL 2499922, *2 (D.D.C. Mar. 28, 2024) (noting that when plaintiffs have not "presented any evidence as to what the applicable [state] law says about the availability of damages for pain and suffering," the court "need not divine this information nor scour through foreign treatises").

Nonetheless, the law is sufficiently clear that Florida and Texas allow the personal representative or executor of an estate to initiate or maintain personal injury claims on behalf of the decedent's estate, *see* FLA. STAT. § 46.021 (2025); TEX. CIV. PRAC. & REM. CODE ANN. § 71.021 (West 2026). Thus, consideration of the claims of the estates of James Kegan and Craig Brown may proceed.

In contrast, Colorado, where John Belcher's estate is established, requires that "in tort actions based upon personal injury, the damages recoverable after the death of the person in whose favor such action has accrued . . . shall not include damages for pain, suffering, or disfigurement." COLO. REV. STAT. § 13-20-101(1) (2024). Plaintiffs' briefing fails to address whether this limitation bars damages for statutory causes of action. *See generally* Pls.' Mem. at 73. In examining this issue, both the Colorado Supreme Court and the U.S. District Court for the District of Colorado appear to look to whether the cause of action substantively "amount[s] to [a] personal-injury . . . claim[]." *US Fax L. Ctr., Inc. v. iHire, Inc.*, 362 F. Supp. 2d 1248, 1252 (D. Colo. 2005); *see also Guarantee Tr. Life Ins. Co. v. Est. of Casper by & through Casper*, 418 P.3d 1163, 1169-170 (Co. 2018). For instance, "Section 1983 violations are not 'tort actions based upon personal injury,'" because they are based on "constitutional" injuries, and are therefore not subject to the limitation imposed on damages therein. *Sanchez v. Marquez*, 457 F. Supp. 359, 362 (D. Colo. 1978). On the other hand, one case in the District of Colorado held that violations of the federal Telephone Consumer Protection Act, which prohibits, *inter alia*, the sending of certain unsolicited

communications, are subject to the damages limitation because the statute sounds in standard tort privacy protections. *US Fax L. Ctr.*, 362 F. Supp. 2d at 1252-53.

Section 1605A(c) of the FSIA is a federal cause of action to pursue tort claims "for personal injury" stemming from certain terrorist attacks. *See* 28 U.S.C. § 1605A(c) (creating a cause of action for "personal injury or death," for which a plaintiff can recover, *inter alia*, "pain and suffering" damages); *Heiser II*, 659 F. Supp. 2d at 24 ("principles of tort law" govern liability under § 1605A(c)). Similar state-law limitations on an estate's ability to seek damages have been found by other Judges on this Court to bar recovery under the FSIA's private cause of action. *See Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs," and citing CAL. CODE CIV. P. § 377.34, which disallows estates from seeking "damages for pain, suffering, or disfigurement"); *Strauss*, 2024 WL 2499922, at *2 (noting that courts must determine what the estate state's "law says about the availability of damages for pain and suffering"). Thus, although Erica Belcher as the personal representative of John Belcher's estate has standing to pursue certain legal claims on his behalf, the estate lacks standing to pursue damages for "pain, suffering, or disfigurement." These are all the compensatory damages sought by John Belcher's estate, *see* Pls.' Mem. at 73, and as discussed *infra* in Part III.D.4, punitive damages are directly pegged to the amount of compensatory damages. Nor does John Belcher seek declaratory relief or any other form of relief other than damages. *See* FAC at 60-61 (Prayer for Relief). The estate of John Belcher's claims must therefore be dismissed because he does not seek any redress that may be granted. The other two estates of deceased servicemembers may seek damages, as allowed by their states' estate laws.

*b. Assault and Battery*

Battery requires an act "intending to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and that such a contact in fact "directly or indirectly results." Restatement (Second) of Torts § 13 (A.L.I. 1965). "Harmful contact" causes a "physical impairment of the condition of another's body, or physical pain or illness." *Id.* § 15; *see also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 76-77 (D.D.C. 2010) (defining these terms). Defendants acted with the intent to cause harmful contact with the residents of the Khobar Towers when they materially supported the truck bombing. *See, e.g.*, *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 102 (D.D.C. 2017) (defining material support for terrorist attacks as an act intending to cause harm). Twenty-nine of the thirty-three remaining servicemember plaintiffs (excluding the estate of John Belcher) in this case aver that some harmful physical contact resulted from the explosion of the bomb, which evidence is sufficient to prove that defendant is liable to these plaintiffs for battery.[10] Servicemember plaintiffs Patrick O'Connor, Mario Valencia, Timothy Seeley, and Edward Whitley, on the other hand, have provided no evidence that any of

[10] *See* St. John Decl. ¶ 6 (describing lacerations to his face caused by pieces of a metal window screen); Young Decl. ¶ 6 (describing cuts from glass on his feet); R. Kegan First Decl. ¶ 11 (describing glass and shrapnel cutting decedent's aorta and genitals); Rafaiani Decl. ¶ 7 (describing being slammed into the ground and cut by glass); Brown Decl. ¶ 6 (describing being knocked unconscious and cut by glass); Jobson Decl. ¶¶ 7, 10 (describing being blasted 12 feet and having an object lodged in his shoulder); Dixon Decl. ¶ 6 (describing being knocked to the ground and his ears ringing); Castleman Decl. ¶¶ 6-7 (describing being knocked unconscious and injuring his back); Sample Decl. ¶ 7 (describing cuts from glass); Umberger Dec. ¶ 7 (describing being cut by shrapnel); Manibusan Decl. ¶ 7 (describing being knocked to the ground); E. Belcher First Decl. ¶ 11 (describing being knocked to the ground); Kirkpatrick Decl. ¶ 6 (describing cuts from glass); Willis Decl. ¶ 10 (describing cuts from glass); Haywood Decl. ¶ 7 (describing being slammed into a wall head-first); Butikofer Decl. ¶¶ 7-8 (describing being knocked unconscious and cut by glass); Sikes Decl. ¶ 7 (describing cuts from glass); Fesenbek Decl. ¶ 6 (describing cuts from glass); Dammer Decl. ¶ 6 (describing being thrown against a sink and toilet and injuring his back); Ly. Brown First Decl. ¶ 19 (describing injuries to the hands, feet, and knees of decedent); Sweazy Decl. ¶ 7 (describing cuts from glass); Buckmon Decl. ¶¶ 7-8 (describing being thrown against a wall and cuts from glass); Matteson Decl. ¶ 6 (describing cuts from glass); Wagstaff Decl. ¶ 6 (describing being knocked to the ground and injuring his shoulder); Raymond Decl. ¶ 6 (describing cuts from glass and neck injury from the blast); Dills Decl. ¶ 7 (describing cuts from glass); Van Meter Decl. ¶ 7 (describing being knocked unconscious); Umstead Decl. ¶ 6 (describing being thrown across the room and cuts from glass); Sadatis Decl. ¶ 8 (describing cuts from glass).

them suffered a harmful or offensive contact against themselves from the bombing to support a battery claim. *See generally* O'Connor Decl.; Valencia Decl.; Seeley Decl.; Whitley Decl.

Assault, meanwhile, occurs when a defendant "acts intending to cause a harmful or offensive contact with the person of the other . . . or an imminent apprehension of such a contact, and . . . the other is thereby put in such imminent apprehension." Restatement (Second) of Torts § 21(1). "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," so where plaintiffs averred "that they did, in fact, fear such harm because of the attack," defendant may be held liable for assault. *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010); *see also Valore*, 700 F. Supp. 2d at 76 (same). Imminence is defined as being "so close to striking distance that [one] can reach the other almost at once." Restatement (Second) of Torts § 29 cmt. b. All thirty-three remaining servicemember plaintiffs, including those four who did not produce evidence of harmful physical contact, were at Khobar Towers at the time of the bombing, which was clearly within striking distance, given the impacts of the bomb on the whole Khobar Towers complex, and thus "were in imminent apprehension of harm," meaning that Iran is liable to all servicemember plaintiffs for assault. *Aceto*, 2020 WL 619925, at *15.

*c. IIED*

"[O]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to" a plaintiff is liable for intentional infliction of emotional distress. Restatement (Second) of Torts § 46(1); *see also Heiser II*, 659 F. Supp. 2d at 26. "Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 77 (same). Here, all thirty-three remaining servicemember plaintiffs

have demonstrated that they suffered severe emotional and psychological distress as a result of the Khobar Towers attack and may recover for IIED.[11]

**2. Family Member Plaintiffs**

The remaining sixty-one plaintiffs seek damages as family members of servicemembers present in Dhahran, Saudi Arabia, for the Khobar Towers bombing. Fifty-five of these plaintiffs—Ralph Kegan, James Kegan, Carolyn Cline, Katherine Hunt, Frances Rafaiani, Lawrence Rafaiani, Leslie Core, Virginia Jobson, Krystofer Schofield, Kathrine Sample, Christopher Umberger, Jennifer Manibusan, Yolanda Mazzara, Michael Mazzara, Susan Jones, Ryan O'Connor, Shelly Willis, Donald Anderson, Trina Anderson, Sylvia Wilson, Keith Butikofer, Denice Morgan, Bryan Butikofer, Tyler Butikofer, Rebecca Jensen, Megan Sterling, Tyrel Jensen, Monica Lopez, Micah Sikes, Ronald Sikes, Lowell Sikes, Jerry Sikes, Anna Dammer, Christopher Dammer, Giray Berger, Lynnette Brown, Courtney Pleva, Lindsay Brown, Janice Sweazy, Warren Sweazy, Brenda Sweazy, Michael Sweazy, Patricia Buckmon, Corey Dunlap, Jasmin Logan, Shanice Buckmon, Shakiyla Buckmon, Mary Whitley, Christina Whitley, Janna Kentrolis, Jeannie Meek, Erin Howard, Jessica Swift, Jordan VanMeter, and Pierce Van Meter—are family members of servicemember plaintiffs in this suit. Five of the family member plaintiffs—Nathaniel Hill, the

[11] St. John Decl. ¶ 18 (PTSD); Young Decl. ¶ 13 (same); R. Kegan First Decl. ¶¶ 16-17 (describing the severe psychological toll of fatal physical injuries); Rafaiani Decl. ¶ 15 (major depressive disorder); Brown Decl. ¶ 15 (PTSD, anxiety, and depression); Jobson Decl. ¶¶ 16, 20 (bipolar disorder and alcohol abuse); Dixon Decl. ¶ 17 (PTSD); Castleman Decl. ¶ 15 (PTSD); Sample Decl. ¶¶ 13, 15 (PTSD and alcohol abuse); Umberger Decl. ¶ 12 (anxiety depressive disorder and PTSD); Manibusan Decl. ¶ 16 (PTSD); E. Belcher First Decl. ¶ 29 (PTSD); O'Connor Decl. ¶ 15 (PTSD); Kirkpatrick Decl. ¶ 15 (PTSD and anxiety); Willis Decl. ¶ 17 (PTSD, anxiety, and depression); Haywood Decl. ¶¶ 13, 15, 17 (nightmares, hypervigilance, and alcohol abuse); Valencia Decl. ¶ 20 (PTSD); Butikofer Decl. ¶ 21 (anxiety and hypervigilance); Sikes Decl. ¶¶ 14-16 (alcohol abuse and nightmares); Fesenbek Decl. ¶ 16 (PTSD and anxiety); Dammer Decl. ¶ 18 (PTSD and panic attacks); Ly. Brown First Decl. ¶¶ 17, 22 (describing decedent's alcohol abuse and suicide); Seeley Decl. ¶ 18 (PTSD, depression, and anxiety); Sweazy Decl. ¶ 14 ("mental breakdown" and placement on hospital's suicide watchlist); Buckmon Decl. ¶¶ 14-15 (nightmares and lethargy); Whitley Decl. ¶ 17 (nightmares); Matteson Decl. ¶¶ 11, 14 (alcohol and opiate abuse and PTSD); Wagstaff Decl. ¶ 13 (PTSD, anxiety, and depression); Raymond Decl. ¶¶ 15-17 (depression, PTSD, and alcohol abuse); Dills Decl. ¶¶ 14-15 (nightmares and anxiety); Van Meter Decl. ¶¶ 14-15 (PTSD and nightmares); Umstead Decl. ¶ 13 (PTSD); Sadatis Decl. ¶ 21 (PTSD).

estate of Eleanor Hill, Wayne Hill, Brandon Hill, and Heather Miller—are family members of a servicemember awarded compensatory damages in *Gration*. One additional family member plaintiff—Nancy DiMarco—is a family member of a servicemember awarded compensatory damages in *Schooley*.

The family members rest their claim of liability on IIED, via the private right of action afforded in 28 U.S.C. § 1605A(c). *See* FAC ¶¶ 184-191 (Count IV). The Restatement permits recovery for those who were not a direct target of a defendant's conduct if (1) "the defendants' conduct is sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] is not present" and (2) the claimant is a member of a victim's immediate family, *Heiser II*, 659 F. Supp. 2d at 26-27 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307 (2000)), or the functional equivalent of an immediate family member, *see Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003) (extending liability under the FSIA for IIED to "members of the victim's household" who were "viewed as the functional equivalent of immediate family members"); *see also* Restatement (Second) of Torts § 46, cmt. l (leaving "open the possibility of situations in which presence . . . may not be required").

Whether all family members are "immediate family members" or the functional equivalent is discussed first, followed by discussion of the standing of Eleanor Hill's estate, and discussion of defendants' liability for IIED.

*a. Functional Equivalents of Family Members*

Forty-seven of the plaintiffs in this case are plainly immediate family members—parents, siblings, spouses, and children—of servicemember victims injured in the Khobar Towers attack. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (observing that the "strict meaning" of immediate family is "one's spouse, parents, siblings, and children" (quoting

*Heiser II*, 659 F. Supp. 2d at 28)). Fourteen of the plaintiffs—Tyrel Jensen, Megan Sterling, Rebecca Jensen, Tyler Butikofer, Bryan Butikofer, Trina Anderson, Donald Anderson, Erin Howard, Corey Dunlap, Ronald Sikes, Carolyn Cline, Katherine Hunt, Nancy DiMarco, and Jennifer Manibusan—do not fall neatly into these traditional categories, but nonetheless each is the functional equivalent of an immediate family member and may therefore maintain a claim for IIED.

Tyrel Jensen, Megan Sterling, Rebecca Jensen, Tyler Butikofer, Bryan Butikofer, Trina Anderson, and Donald Anderson, as half-siblings of injured servicemember plaintiffs, *see* Pls.' Mem. at 20, "are presumed to recover" as full siblings would, *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007), and the evidence here supports application of that presumption: all seven attest to their close relationship with their half siblings. *See* T. Jensen Decl. ¶ 9 (explaining that he "idolized" his half-brother, Travis Butikofer, "could rely on [him] for anything, and "always felt very close to him"); Sterling Decl. ¶ 9 (explaining that she and her half-brother, Travis Butikofer, were "very close," and that he was "the kind of big brother every kid wants"); R. Jensen Decl. ¶ 10 (explaining that her half-brother, Travis Butikofer, was "more than just a brother, he was [her] role model," whom she "followed . . . everywhere" and "adored" and who was her "favorite" of her five brothers); T. Butikofer Decl. ¶ 9 (describing his half-brother, Travis Butikofer, as his "protector and hero," with whom he shared an "unspoken bond" and was "close"); B. Butikofer Decl. ¶ 11 (describing his half-brother, Travis Butikofer, as his "role model and friend" who "always made time for [him]" and of whom he "thought the world"); T. Anderson Decl. ¶ 9 (describing her half-brother, Terry Haywood, as her "protective big brother" who she "looked up to" and who "looked out for [her]"); D. Anderson Decl. ¶ 9 (describing his half-brother, Terry Haywood, as his "mentor," who he "looked up to" and "idolized").

In addition to these half-siblings, six family member plaintiffs are the stepchildren or stepparents of injured servicemembers. Each of them are the "functional equivalent[]" of a child or parent, respectively, and may recover for IIED as a child or parent would. *See Bettis*, 315 F.3d at 337. Erin Howard's mother married servicemember Curtis Van Meter when Erin was "around three years old," and Erin describes Van Meter as his "positive father-figure" with whom he shared "wonderful childhood memories" and "the routines of family life." Howard Decl. ¶ 8. Corey Dunlap's mother married servicemember James Buckmon when Corey was five years old, and he lived with Buckmon from that time until he was approximately 18 years old, during which time Buckmon "never missed any of [his] sporting events" and shared parental responsibilities for Corey. Dunlap Decl. ¶¶ 3, 9. Carolyn Cline lived with her stepfather, servicemember James Kegan, beginning when she was nine years old until she was seventeen, and during that time James "took great care of" and "provided for" her, and they developed a "family bond." Cline Decl. ¶¶ 3, 8. Katherine Hunt lived with her stepfather, servicemember James Kegan, from when she was eight until she was 20, and "referred to him as [her] father," who "raised [her] with care" and was "involved in [her] life." Hunt Decl. ¶¶ 3, 7. Each of these individuals was the functional equivalent of the servicemember's child.

Ronald Sikes married the mother of servicemember James Sikes when James was two months old and attested that "being James'[s] father was one of [his] favorite responsibilities in [his] life." R. Sikes Decl. ¶¶ 3, 9. Nancy DiMarco met her stepson, *Schooley* plaintiff Salvatore Capaccio, when Salvatore was 12 years old, and for a couple of years, Salvatore spend summers and weekends with his father and DiMarco, before living with them full-time in high school. DiMarco Decl. ¶ 11. She saw them as a "true family," particularly after she "gave birth to Sal's sisters . . . and Sal relished in his role as a big brother." *Id.* DiMarco "took Sal to his doctor's

appointments, nursed him when he was sick," and "drove him to every [football] game and practice." *Id.* Even after DiMarco and Salvatore's father separated, DiMarco and Salvatore "maintain [their] relationship." *Id.* ¶ 16. Both of these individuals were the functional equivalent of the servicemember's parent.

Finally, at the time of the attack Jennifer Manibusan was engaged to be married to servicemember Michael Manibusan. J. Manibusan Decl. ¶ 6. Although they did not legally marry until after the attack, *id.*, they shared bank accounts at the time of the attack and their families considered them to be the functional equivalent of spouses. *See* T. Manibusan Witness Statement ¶¶ 10-11 (Michael's brother attesting to these facts). They had shared life plans, including that Michael "planned to support [Jennifer] through college and save money for [their] future together." J. Manibusan Decl. ¶ 10. Jennifer "quit [her] job to take care of Michael" after the attack. *Id.* ¶ 13. Jennifer Manibusan has thus put forth sufficient evidence that she was the functional equivalent of Michael's spouse.

All of these family members are thus the functional equivalents of the injured servicemembers' family members, and may recover as typical family members would.

*b. Deceased Family Member Plaintiff*

One immediate family member, Eleanor Hill, is deceased and is represented by her estate, of which her daughter, Heather Miller, is the personal representative. *See* Miller Second Decl. ¶ 6 (averring that Heather Miller was appointed under Oregon law as the representative of Eleanor Hill's estate); *id.*, Ex. E, Letters of Administration for Eleanor Hill, ECF No. 36-6 at 231 (showing Heather Miller as the personal representative of Eleanor Hill's estate in Oregon). Oregon law allows the personal representative of an estate to bring all legal claims available to the decedent

before deal. OR. REV. STAT. § 30.075 (2025). Eleanor Hill's estate may thus recover all damages to which Eleanor herself would have been entitled.

* * *

Defendant is thus liable for IIED to the sixty-one family-member plaintiffs. Defendant's conduct in materially supporting Saudi Hezbollah was "sufficiently outrageous and intended to inflict severe emotional harm upon a person [who] [wa]s not present," such that a victim's immediate family members need not have been at the bombing to recover for their emotional distress. *Heiser II*, 659 F. Supp. 2d at 27 (quoting DOBBS, *supra*, § 307); *see Schooley*, 2019 WL 2717888, at *73 (concluding the same); *Akins*, 332 F. Supp. 3d at 37-38 (same). Finally, the family member plaintiffs have shown, through their uncontested declarations, that they suffered significant emotional consequences from the attack, both in the days spent waiting for news of their loved ones and in the years after the attack.[12]

Thirty-three of the thirty-four servicemember plaintiffs and the sixty-one family member plaintiffs have established defendants' liability under the federal private right of action against state sponsors of terrorism, 28 U.S.C. § 1605A(c), for the torts of assault, battery, and intentional infliction of emotional distress, as outlined above.

---

[12] *See* R. Kegan Second Decl. ¶¶ 9-10, 17; J. Kegan Decl. ¶¶ 6-7, 9, 11; Cline Decl. ¶¶ 5, 10-11; Hunt Decl. ¶¶ 5, 9-11; F. Rafaiani Decl. ¶¶ 6, 15; L. Rafaiani Decl. ¶¶ 6, 12; Core Decl. ¶¶ 7, 12; V. Jobson Decl. ¶¶ 8, 11; Schofield Decl. ¶¶ 8, 13; K. Sample Decl. ¶¶ 8, 10; C. Umberger Decl. ¶¶ 6, 14; J. Manibusan Decl. ¶¶ 7, 14; Y. Mazzara Decl. ¶¶ 6-7, 15; M. Mazzara Decl. ¶¶ 6, 14; Jones Decl. ¶¶ 7, 14; R. O'Connor Decl. ¶¶ 6, 14-15; S. Willis Decl. ¶¶ 8, 16-17; D. Anderson Decl. ¶¶ 6, 10; T. Anderson Decl. ¶¶ 6, 12-13; Wilson Decl. ¶¶ 6, 11, 17-18; K. Butikofer Decl. ¶¶ 6, 16-17; Morgan Decl. ¶¶ 6, 12; B. Butikofer Decl. ¶¶ 6, 13; T. Butikofer Decl. ¶¶ 6, 11-12; R. Jensen Decl. ¶¶ 6, 15-16; Sterling Decl. ¶¶ 6, 11-12; T. Jensen Decl. ¶¶ 6, 11; Lopez Decl. ¶¶ 6, 12; M. Sikes Decl. ¶¶ 6, 10; R. Sikes Decl. ¶¶ 6, 12; L. Sikes Decl. ¶¶ 6, 12-13; J. Sikes Decl. ¶¶ 6, 13; A. Dammer Decl. ¶¶ 6, 16; C. Dammer Decl. ¶¶ 6, 13; Berger Decl. ¶¶ 6, 12-13; Ly. Brown Second Decl. ¶¶ 10, 23; Pleva Decl. ¶¶ 9-10; Li. Brown Decl. ¶¶ 6, 15; J. Sweazy Decl. ¶¶ 6, 11; W. Sweazy Decl. ¶¶ 6, 11; B. Sweazy Decl. ¶¶ 6, 12; M. Sweazy Decl. ¶¶ 6, 14-15; P. Buckmon Decl. ¶¶ 5, 12-13; Dunlap Decl. ¶¶ 7, 11, 13; Logan Decl. ¶¶ 6, 11; S.S. Buckmon Decl. ¶¶ 6, 11; S.C. Buckmon Decl. ¶¶ 6, 11; M. Whitley Decl. ¶¶ 5, 11; C. Whitley Decl. ¶¶ 6, 12; Kentrolis Decl. ¶¶ 6, 10; Meek Decl. ¶¶ 6, 9; Howard Decl. ¶¶ 6, 11-12; Swift Decl. ¶¶ 6, 10; J. Van Meter Decl. ¶¶ 6, 13; P. Van Meter Decl. ¶¶ 8-9; N. Hill Decl. ¶¶ 13-14; Miller First Decl. ¶¶ 10, 14; W. Hill Decl. ¶¶ 6, 15; B. Hill Decl. ¶¶ 6, 11-12; Miller Second Decl. ¶¶ 8, 15; DiMarco Decl. ¶¶ 7, 15.

**D. Damages**

Turning to the allowable damages, plaintiffs seek to recover pain and suffering, solatium, and punitive damages. Pls.' Mem. at 15 (requesting these three types of damages). The damage awards to which each plaintiff is entitled are described below.

**1. Legal Standard for Damages under Section 1605A(c)**

In actions brought under the FSIA's terrorism exception, foreign states may be liable for money damages, including "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). To recover, the plaintiffs "must prove that the consequences of the foreign state's conduct were reasonably certain (*i.e.*, more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (internal quotation marks omitted) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115-16 (D.D.C. 2005)); *see also Fraenkel*, 892 F.3d at 353 (stating the same). Courts may look to expert testimony and prior awards in determining whether the amount of damages has been proven by a reasonable estimate. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008). The D.C. Circuit "review[s] the District Court's FSIA damages awards for abuse of discretion." *Fraenkel*, 892 F.3d at 356.

The evidence presented in *Blais* and *Heiser I*, of which this Court has taken judicial notice and reviewed above, has satisfactorily shown that the plaintiffs' injuries were reasonably certain and were the intended consequences of the defendants' material support of Saudi Hezbollah. *See Est. of Johnson*, 2024 WL 3225954, at *13 (concluding the same); *Schooley*, 2019 WL 2717888, at *74 (same); *Akins*, 332 F. Supp. 3d at 39 (same). Having concluded this, whether plaintiffs have

shown the amount of pain and suffering and solatium damages by a reasonable estimate will be considered next.

**2. Pain and Suffering**

As previously discussed, *see supra* Part III.C, defendant is liable to thirty-three of the servicemember plaintiffs for a combination of battery, assault, and intentional infliction of emotional distress, but the bar on multiple recoveries allows these plaintiffs to recover only under one theory, for the single underlying harm. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 77 ("The Court notes that these plaintiffs who have claimed assault, battery, and IIED may recover under only one of any such theories, as multiple recovery is prohibited."). Within this single-recovery framework, the "baseline assumption" applied in previous cases under the FSIA's terrorism exception is that "'persons suffering injuries in terrorist attacks are entitled to $5 million in damages.'" *Kaplan v. Hezbollah*, 213 F. Supp. 3d 27, 35 (D.D.C. 2016) (quoting *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 12 (D.D.C. 2012)). This baseline, in turn, may be adjusted either upward or downward, based on individual circumstances. An upward departure would be warranted "in the presence of 'severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, . . . or were mistaken for dead.'" *Id.* at 35-36 (quoting *Valore*, 700 F. Supp. 2d at 84). A downward departure would be warranted "in the face of 'minor shrapnel injuries or minor injury from small-arms fire.'" *Id.* at 36 (quoting *Valore*, 700 F. Supp. 2d at 84).

Pain and suffering damages are by their nature difficult to quantify. In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each service member plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained

by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *cf. Khaliq v. Republic of Sudan*, 33 F. Supp. 3d 29, 33 (D.D.C. 2014) ("When calculating damages amounts, 'the Court must take pains to ensure that individuals with similar injuries receive similar awards.'" (quoting *Peterson*, 515 F. Supp. 2d at 54)). *Schooley*'s basic rubric is adopted in this case for the thirty-one remaining servicemember plaintiffs with relevant VA disability ratings. Under this rubric, servicemember plaintiffs rated by the VA up to 30% disabled due to their service injuries stemming from the Khobar Towers attack receive a baseline award of $5,000,000; plaintiffs rated 40 to 60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70 to 100% disabled by the VA will receive a further upward departure, for a total of $7,000,000. *See, e.g.*, *Schooley*, 2019 WL 2717888, at *75; *Est. of Johnson*, 2024 WL 3225954, at *14 (using this approach); *Thole*, 2024 WL 2208208, at *14 (same); *Gration*, 2023 WL 5221955, at *30 (same); *Ackley*, 2022 WL 3354720, at *51 (same); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same). The servicemember plaintiffs who have not provided a VA disability rating will be awarded damages based on the descriptive and documentary evidence presented about their injuries. *See Schooley*, 2019 WL 2717888, at *75 (adopting the same approach); *Akins*, 332 F. Supp. 3d at 40-41 (same).

Twenty-five servicemember plaintiffs—Young, the estate of Kegan, Rafaiani, the estate of Craig Brown, Dixon, Castleman, Sample, Umberger, Manibusan, Willis, Haywood, Valencia, Butikofer, Sikes, Dammer, Norman Brown, Seeley, Sweazy, Matteson, Wagstaff, Raymond, Dills,

Van Meter, Umstead, and Sadatis—can recover in the 70-100% disabled category. *See supra* Part I.C (describing plaintiffs' disability ratings). Each of these 25 plaintiffs will therefore receive an award of $7,000,000. Five servicemember plaintiffs—St. John, Erica Belcher, O'Connor, Kirkpatrick, and Whitley—can recover in the 40-60% disabled category. *See id.* Each of these plaintiffs will receive an award of $6,000,000. One additional servicemember plaintiff—Fesenbek—has a VA disability rating of 30% and will receive an award of $5,000,000. *Id.*

Two remaining plaintiffs—Jobson and Buckmon—did not obtain VA disability ratings, but review of the affidavits and supporting evidence submitted by them demonstrate that they are each entitled to the baseline award of $5,000,000. Jobson attests that in addition to the physical impacts of being thrown "twelve feet" onto the ground by the blast and having an object "removed . . . from [his] left shoulder," Jobson Decl. ¶¶ 7, 10, he suffered particularly severe psychological effects from the attack—upon returning home, he could not "balanc[e] [his] checkbook" or "feed[] [him]self regularly," and eventually became "totally irrational" and began "abusing alcohol," leading to him "abandon[ing] [his] wife and son," *id.* ¶¶ 14, 16. Though he has since reconnected with his family, they "lost . . . years together," and Jobson continues to struggle with "bipolar disorder" and flashbacks. *Id.* ¶¶ 18-20. These injuries make a baseline award of $5,000,000 appropriate. James Buckmon was thrown out of bed by the explosion, "crashing [him] into the wall locker" in his room, and as he escaped the building, his "feet were sliced by sharp and jagged glass," leaving scars that still cause "intense" pain to this day. *Id.* ¶¶ 7-8, 15. Psychologically, he "live[s] in fear" and feels "profound emptiness" about the loss of relationships and connection he once had. *Id.* ¶¶ 15-16. These injuries also make a baseline award of $5,000,000 appropriate.

**3. Solatium**

"Under the FSIA, a claim for solatium is nearly indistinguishable from a claim for IIED." *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015); *see also Fraenkel*, 892 F.3d at 357. Damages recoverable on the family members' claims of IIED thus will be discussed as claims for solatium.

The sixty-one family member plaintiffs seek solatium damages to compensate for the emotional distress they experienced as family members of servicemember victims. *See* FAC ¶¶ 192-196. "[S]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society." *Fraenkel*, 892 F.3d at 356 (quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29 (D.D.C. 1998)). The D.C. Circuit has explained that solatium "began as a remedy for the loss of a spouse or a parent. It has since expanded to include the loss of a child[,] . . . [a]nd in some circumstances, it can include the loss of a sibling." *K.E.F.V. by & through Vickers v. Islamic Republic of Iran*, 135 F.4th 988, 991-92 (D.C. Cir. 2025) (quoting *Fraenkel,* 892 F.3d at 356 (quoting *Flatow*, 999 F. Supp. at 29)). Two factors are considered in calculating solatium: "The first is the injury to the feelings of a family member caused by the circumstances of the decedent's death," and "[t]he second is the loss of the decedent's comfort and society." *Id.* (internal quotations and citations omitted). "Mental anguish, bereavement and grief resulting from" an immediate family member's death or injury "constitutes the preponderant element of a claim for solatium." *Fraenkel*, 892 F.3d at 356-57 (alteration adopted) (quoting *Flatow*, 999 F. Supp. at 30). In determining the appropriate amount to compensate victims' family members for emotional distress, "the Court may look to prior decisions awarding damages . . . for solatium." *Acosta*, 574 F. Supp. 2d at 29.

The *Heiser I* framework for solatium damages has been a generally used guide in this Court, *Heiser I*, 466 F. Supp. 2d at 269; *see Roth*, 78 F. Supp. 3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror" (citing *Valore*, 700 F. Supp. 2d at 85)), for purposes of consistency, though this framework is not at all mandatory, *see Fraenkel*, 892 F.3d at 361 ("There is no statutory basis for concluding that district courts *must* award solatium damages in the amounts that *Heiser* found commonly granted."). Indeed, "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damages awards." *Id.* at 362 (quoting *Fraenkel v. Islamic Republic of Iran*, 258 F. Supp. 3d 77, 82 (D.D.C. 2017)). "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case . . . ." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011).

Blunt application of the *Heiser* framework can fail "to assess each plaintiff's injuries individually." *Cabrera v. Islamic Republic of Iran*, Nos. 19-cv-3835, 18-cv-2065 (JDB), 2022 WL 2817730, at *43 (D.D.C. July 19, 2022). Ensuring that "individuals with similar injuries receive similar awards," *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 70 (D.D.C. 2015) (quoting *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 48 (D.D.C. 2012)), requires adjustments so that awards reflect differences in the degree of injury. For example, servicemembers directly injured in terrorist attacks should receive substantially more than their own spouses, who suffer none of the physical injuries and whose emotional injuries—while often undoubtedly severe—are generally less acute. *See Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 28 (D.D.C. 2014); *Davis v. Islamic Republic of Iran*, 882 F. Supp. 2d 7, 15-16 (D.D.C. 2012). Even outside of a single-family unit, family members of surviving servicemembers should generally not receive

more than other servicemember victims injured in the same attack. To the extent deviations from the *Heiser* framework are needed to accomplish commonsense proportionality between awards, such deviations promote courts' "primary consideration" of overall consistency and common sense. *Moradi*, 77 F. Supp. 3d at 70.

The damages awards for plaintiff-spouses are addressed first, followed by parents and children, and then siblings.

*a. Spouses*

Nine of the family member plaintiffs were spouses, or, in Jennifer Manibusan's case, the functional equivalent of a spouse, of servicemember plaintiffs at the time of the bombing: Virginia Jobson, Kathrine Sample, Jennifer Manibusan, Shelly Willis, Monica Sanchez Lopez, Anna Dammer, Lynnette Brown, Patricia Buckmon, and Mary Whitley. Each spouse has described fear for his or her spouse's physical well-being in the immediate aftermath of the bombing, as well as the toll that the impacts of the bombing have taken in the years since. *See* V. Jobson Decl. ¶¶ 6, 8; K. Sample Decl. ¶¶ 8, 10-12; J. Manibusan Decl. ¶¶ 7, 14; S. Willis Decl. ¶¶ 8-9, 11-14; Lopez Decl. ¶¶ 6, 12-13; A. Dammer Decl. ¶¶ 6, 16; Ly. Brown Second Decl. ¶¶ 10, 23; P. Buckmon Decl. ¶¶ 5, 12-13; M. Whitley Decl. ¶¶ 5, 11.

Although the *Heiser* framework would award a baseline of $4,000,000 to each of these spouses, deviations are appropriate to make their awards proportional to the injuries and associated awards of their spouses. As a baseline, each spouse will receive half the award that their servicemember spouse received, to ensure that people whose servicemember spouses returned grievously injured or entirely disabled receive a larger award than those whose spouses, while injured in the Khobar towers attack, continued to be able to function afterward. *See Breezee*, 2025 WL 2719250, at *31.

Some of these individuals have since been divorced from their injured servicemember spouses: Monica Sanchez Lopez and James Sikes divorced less than four years after the attack. *See* Lopez Decl., Ex. D, Sanchez-Sikes Divorce Decree, ECF No. 36-3 at 300 (noting date of divorce as May 26, 2000). Edward and Mary Whitley "eventually" divorced, *see* M. Whitley Decl. ¶ 10, but they adduce no evidence of when they divorced other than stating in plaintiffs' brief that they "remained married for years," Pls.' Mot. at 132. Vincent and Virginia Jobson separated after the attack when Vincent "abandoned his wife and son," and they "divorced," though the evidence does not specify when. Jobson Decl. ¶ 16. In 2018, Virgina and Vincent reconnected and remarried each other, *see* V. Jobson Decl., Ex. C, Jobson Marriage Certificates, ECF No. 36-1 at 318, and they now "work together to address and manage his emotions and the day-to-day challenges he faces due to the residual psychological injuries he sustained in the Attack," V. Jobson Decl. ¶ 11. Downward deviations from the baseline may be appropriate when "attenuation in the relationship has occurred," and the family member no longer deals with the servicemember's injuries on a day-to-day basis. *See, e.g.*, *Gration*, 2023 WL 5221955, at *34; *Aceto*, 2020 WL 619925, at *21 (similar). Such a downward deviation is appropriate for Monica Sanchez Lopez and Mary Whitley, who have not shown evidence of an ongoing relationship with their injured spouses. On the other hand, Virginia Jobson is now remarried to Vincent and continues to deal with his injuries, so no downward deviation is warranted for her, despite the gap in their marriage.

After adjusting for the specific injuries of these plaintiffs' injured servicemember spouses and for downward deviations for divorce, Kathrine Sample, Jennifer Manibusan, Shelly Willis, Anna Dammer, and Lynnette Brown will each receive $3,500,000 (half of their spouses' $7,000,000 awards); Monica Sanchez Lopez will receive $2,500,000 (half of her spouse's $7,000,000 award, adjusted downward to account for their divorce); Mary Whitley will receive

$2,000,000 (half of her spouse's $6,000,000 award, adjusted downward to account for their divorce); and Virginia Jobson and Patricia Denise Buckmon will each receive $2,500,000 (half of their spouses' $5,000,000 awards).

*b. Parents*

Eleven of the family member plaintiffs will receive awards as parents of servicemembers who were injured at the Khobar Towers attack: Frances Rafaiani, Lawrence Rafaiani, Yolanda Mazzara, Sylvia Wilson, Keith Butikofer, Janice Sweazy, Warren Sweazy, the estate of Eleanor Hill, Wayne Hill, Ronald Sikes, and Nancy DiMarco. These parents have attested to their panic upon learning about the attack and in the days and years following as they struggled with increased anxiety over their children's safety and witnessing their children deal with the psychological after-effects of the attack.[13] These harms are consistent with those suffered by many parents of victims of terrorism. *See Valencia*, 774 F. Supp. 2d at 16.

The parents of the injured and surviving servicemembers are each entitled to a baseline award of $2,500,000, and that baseline is appropriate here. *See Akins*, 332 F. Supp. 3d at 44 (awarding $2,500,000 to the parents of injured servicemembers).

*c. Children*

Twenty of the family member plaintiffs are children of servicemembers injured in the Khobar Towers bombing: Ralph Kegan, James Kegan, Krystopher Schofield, Micah Sikes, Christopher Dammer, Courtney Pleva, Lindsay Brown, Jasmin Logan, Shanice Buckmon, Shakiyla Buckmon, Christina Whitley, Janna Kentrolis, Pierce Van Meter, Jordan Van Meter, Jessica Swift, Nathaniel Hill, Carolyn Cline, Katherine Hunt, Corey Dunlap, and Erin Howard.

---

[13] *See* F. Rafaiani Decl. ¶¶ 6, 15; L. Rafaiani Decl. ¶¶ 6, 12; Y. Mazzara Decl. ¶¶ 6-7, 15; S. Wilson Decl. ¶¶ 6, 11, 17-18; K. Butikofer Decl. ¶¶ 6, 16-17; J. Sweazy Decl. ¶¶ 6, 13; W. Sweazy Decl. ¶¶ 6-7, 13; R. Sikes Decl. ¶¶ 6, 12; Miller First Decl. ¶¶ 10, 14; W. Hill Decl. ¶¶ 6, 15; DiMarco Decl. ¶¶ 7, 15.

These plaintiffs describe confusion or fear in the immediate aftermath of the bombing and difficulties in their relationships with their servicemember parents that they attribute at least in part to the impacts of the bombing.[14] Although Krystopher Schofield, Courtney Pleva, Pierce Van Meter, and Nathaniel Hill were too young at the time of the bombing to remember the events firsthand, *see* Schofield Decl. ¶ 7; Pleva Decl. ¶ 7; P. Van Meter Decl. ¶ 6; N. Hill Decl. ¶ 6, this lack of awareness does not lessen the distress they experienced from growing up with a parent suffering from psychological symptoms from the attack, *see* Schofield Decl. ¶ 8; Pleva Decl. ¶¶ 9-10; P. Van Meter Decl. ¶¶ 8-9; N. Hill Decl. ¶¶ 12-14; *see also, e.g.*, *Schooley*, 2019 WL 2717888, at *78 (holding the same); *Aceto*, 2020 WL 619925, at *22 (same); *K.E.F.V.*, 135 F.4th at 992 (allowing child who "was not yet born when Iran helped the Taliban kill her father" to "recover solatium for the loss of her father's comfort and society").

"Children of a surviving victim receive $1.5 million on average" under the *Heiser* framework, and that baseline amount is appropriate here, *Spencer*, 71 F. Supp. 3d at 28, since each servicemember parent was awarded at least $5,000,000, meaning that no downward departure for proportionality is required.

*d. Siblings*

Finally, twenty-one of the family member plaintiffs are siblings or half-siblings of servicemember plaintiffs: Leslie Core, Christopher Umberger, Michael Mazzara, Susan Jones, Ryan O'Connor, Donald Anderson, Trina Anderson, Denice Morgan, Bryan Butikofer, Tyler Butikofer, Rebecca Jensen, Megan Sterling, Tyrel Jensen, Lowell Sikes, Jerry Sikes, Giray Berger,

---

[14] *See* R. Kegan Second Decl. ¶¶ 9-10, 17; J. Kegan Decl. ¶¶ 6-7, 9, 11; Cline Decl. ¶¶ 5, 9-11; Hunt Decl. ¶¶ 5, 9-11; Schofield Decl. ¶ 8; M. Sikes Decl. ¶¶ 6, 9-10; C. Dammer Decl. ¶¶ 6, 10, 13; Pleva Decl. ¶¶ 9-10; Li. Brown Decl. ¶¶ 6, 11, 15; Dunlap Decl. ¶¶ 7, 11, 13; Logan Decl. ¶¶ 6, 9, 11; S.S. Buckmon Decl. ¶¶ 6, 9, 11; S.C. Buckmon Decl. ¶¶ 6, 10-11; C. Whitley Decl. ¶¶ 6, 10-12; Howard Decl. ¶¶ 6, 9, 11-12; Swift Decl. ¶¶ 6, 9-10; J. Van Meter Decl. ¶¶ 6, 13; P. Van Meter Decl. ¶¶ 8-9; N. Hill Decl. ¶¶ 12-14; Kentrolis Decl. ¶¶ 6, 10.

Brenda Sweazy, Michael Sweazy, Jeannie Meek, Brandon Hill, and Heather Miller. Each has described distress upon learning about the bombing and has suffered from the ongoing effects of the attack on their respective siblings and families.[15] These harms are consistent with those suffered by many siblings of victims of terrorism. *See Akins*, 332 F. Supp. 3d at 45. Within the *Heiser* framework, these siblings of injured servicemembers are each entitled to an award of $1,250,000. *See id.* at 45 (awarding a baseline amount of $1,250,000 to siblings of injured service members).

**4. Punitive Damages**

In addition to compensatory damages, plaintiffs seek punitive damages under 28 U.S.C. § 1605A(c). *See* FAC ¶¶ 197-201 (Count VI); Pls.' Mem. at 33-35. The Supreme Court has laid out three "guideposts" for "reviewing punitive damages" awards: "(1) the degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). Weighing this precedent, *Christie* awarded "[p]unitive damages equal to compensatory damages" in light of the "identified flaws in [other] methods" for determining punitive damages. 2020 WL 3606273, at *27. Specifically, *Christie* determined that this method avoided the pitfalls of "a singular focus on deterrence," "elevat[ing] superficial similarities over meaningful ones," and "skim[ming] over analysis of the plaintiffs'

[15] *See* Core Decl. ¶¶ 7, 12; C. Umberger Decl. ¶¶ 6, 14; M. Mazzara Decl. ¶¶ 6, 14; Jones Decl. ¶¶ 7, 14; R. O'Connor Decl. ¶¶ 6, 14-15; D. Anderson Decl. ¶¶ 6, 10; T. Anderson Decl. ¶¶ 6, 12-13; Morgan Decl. ¶¶ 6, 12; B. Butikofer Decl. ¶¶ 6, 13; T. Butikofer Decl. ¶¶ 6, 11-12; R. Jensen Decl. ¶¶ 6, 15-16; Sterling Decl. ¶¶ 6, 11-12; T. Jensen Decl. ¶¶ 6, 11; L. Sikes Decl. ¶¶ 6, 12-13; J. Sikes Decl. ¶¶ 6, 13; Berger Decl. ¶¶ 6, 12; B. Sweazy Decl. ¶¶ 6, 12; M. Sweazy Decl. ¶¶ 6, 11; Meek Decl. ¶¶ 6, 9; B. Hill Decl. ¶¶ 6, 11-12; Miller Second Decl. ¶¶ 8, 15.

precise harms," and does not "yield an excessive award." *Id.* at *28. Awarding punitive damages equal to compensatory damages, *Christie* concluded, was most appropriate because "plaintiffs [were] already receiving substantial compensatory awards," *id.*, "'the compensatory damages for the injury suffered' . . . [were] 'based on a component which' would be 'duplicated in the punitive award,'" *id.* (quoting *State Farm*, 538 U.S. at 426), and "[a]dding hundreds of millions of dollars to [the] amount [of outstanding court judgments already owed by Iran] . . . [was] not likely to have a meaningful deterrent effect," *id.* at *29.

Given that *Christie* reached this conclusion based on the same event at issue in the present case, and that plaintiffs urge the Court to adopt this calculation, Pls.' Mem. at 34-35, the *Christie* punitive damages approach, which has likewise been applied in other cases in this Court, *see, e.g.*, *Blank*, 2021 WL 3021450, at *13; *Ackley*, 2022 WL 3354720, at *60; *Gration*, 2023 WL 5221955, at *36; *Thole*, 2024 WL 2208208, at *17; *Est. of Johnson*, 2024 WL 3225954, at *16, will also be applied here. Accordingly, a punitive damages award equal to the compensatory damages awarded in this case is most appropriate.

Plaintiffs are therefore entitled to a total punitive damages award of $330,750,000, to be apportioned among plaintiffs according to their compensatory damages.

**E. Prejudgment Interest**

Plaintiffs next seek prejudgment interest, FAC at 61 (Prayer for Relief); *see also* Pls.' Mem. at 29-31, as to their pain and suffering and solatium awards, Pls.' Mem. at 32. As has repeatedly been recognized, whether to award prejudgment interest "is a question that rests within this Court's discretion, subject to equitable considerations." *Oveissi*, 879 F. Supp. 2d at 58; *see also, e.g.*, *Oldham v. Korean Air Lines Co., Ltd.*, 127 F.3d 43, 54 (D.C. Cir. 1997); *Akins*, 332 F. Supp. 3d at 45-46; *Thole*, 2024 WL 2208208, at *17. In FSIA cases, most Judges on this Court who have

considered this issue have concluded—as this Court did in *Akins*—that "pain and suffering and solatium damages are both designed to be fully compensatory" and prejudgment interest is therefore unwarranted as to those categories of damages. *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 60 (D.D.C. 2020) (Contreras, J.) (quoting *Wyatt v. Syrian Arab Republic*, 908 F. Supp. 2d 216, 232 (D.D.C. 2012) (Lamberth, J.)); *see Doe A-1 v. Democratic People's Republic of Korea*, No. 18-cv-252 (DLF), 2021 WL 723257, at *9 (D.D.C. Feb. 24, 2021) (Friedrich, J.) (denying prejudgment interests because the award "in *today's dollars* fully compensates the crew members and their estates for their time spent in captivity" (emphasis in original)); *Bathiard v. Islamic Republic of Iran*, Nos. 16-cv-1549, 17-cv-2006 (CRC), 2020 WL 1975672, at *8 (D.D.C. Apr. 24, 2020) (Cooper, J.) (holding that "prejudgment interest is not appropriate for nonpecuniary damages already designed to provide complete compensation"); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-cv-1214 (JEB), 2019 WL 3037868, at *10 (D.D.C. July 11, 2019) (Boasberg, J.) (denying prejudgment interest because "direct-injury and solatium awards [are] to be fully compensatory" already); *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 79, 94, 99 (D.D.C. 2019) (Spec. Master Report), adopted by *Maupin v. Syrian Arab Republic*, 405 F. Supp. 3d 75, 79 (D.D.C. 2019) (Kollar-Kotelly, J.); *Thuneibat*, 167 F. Supp. 3d at 54-55 (Howell, J.). Thus, the overarching tide of persuasive precedent in this District weighs against awarding prejudgment interest for pain and suffering and solatium damages. Such an award is even less warranted for punitive damages, since prejudgment interest "does not apply to punitive damages because 'prejudgment interest is an element of complete compensation' and punitive damages are non-compensatory." *Thuneibat*, 167 F. Supp. 3d at 55 (quoting *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 42 (D.D.C. 2012)).

For these reasons, and consistent with the weight of this persuasive precedent, plaintiffs are not entitled to prejudgment interest on their pain and suffering and solatium damages. As has previously been explained"[i]n adopting the *Heiser* framework, this Court determined that the values set by that scale represent the appropriate level of compensation, *regardless of the timing of the attack*." *Oveissi*, 768 F. Supp. 2d at 30 n.12 (emphasis supplied); *see also Maupin*, 405 F. Supp. 3d at 94; *Thuneibat*, 167 F. Supp. 3d at 54. Indeed, nonpecuniary damages for pain and suffering and solatium "do not typically require prejudgment interest because they are 'designed to be fully compensatory.'" *Thuneibat*, 167 F. Supp. 3d at 54 (quoting *Wyatt*, 908 F. Supp. 2d at 232). Plaintiffs here "have not provided any reason why awards under [the *Heiser*] framework are insufficient to provide 'complete compensation,'" *Akins*, 332 F. Supp. 3d at 46 (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)); *see also, e.g.*, *Oveissi*, 768 F. Supp. 2d at 30 n.12 (finding "no reason to deviate from [the Court's] standard practice" of awarding damages based on the values set by the *Heiser* framework, which "represent the appropriate level of compensation," to award prejudgment interest). Accordingly, plaintiffs are awarded monetary damages in the amounts established above without prejudgment interest.

**F. Post-Judgment Interest**

Finally, plaintiffs seek the award of post-judgment interest. FAC at 61 (Prayer for Relief); *see also* Pls.' Mem. at 32-33. Post-judgment interest may be awarded against a foreign sovereign when the FSIA provides jurisdiction. *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, 404 F. Supp. 2d 261, 324 (D.D.C. 2005); *Lanny J. Davis & Assocs. LLC v. Republic of Equatorial Guinea*, 962 F. Supp. 2d 152, 165 (D.D.C. 2013); *Schooley*, 2019 WL 2717888, at *79. Under federal law, "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court," and "[s]uch interest shall be calculated from the date of the entry of judgment." 28 U.S.C. §

1961(a). When post-judgment interest is sought, application of Section 1961(a) is mandatory, not discretionary. *See, e.g.*, *Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 850 F. Supp. 2d 277, 287 (D.D.C. 2012); *Lanny J. Davis & Assocs. LLC*, 962 F. Supp. 2d at 165; *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 78 (D.D.C. 2021). Plaintiffs will therefore be awarded post-judgment interest at the statutory rate set out in 28 U.S.C. § 1961.

## IV. CONCLUSION

Plaintiffs' motion for default judgment as to liability and damages, ECF No. 42, is denied with respect to the estate of John Thomas Belcher, and granted with respect to the remaining ninety-four plaintiffs. Iran, the IRGC, and the MOIS are jointly and severally liable for the pain and suffering inflicted on the remaining thirty-three servicemember plaintiffs and for the emotional distress inflicted on the sixty-one family member plaintiffs.

Monetary damages are awarded to plaintiffs in the following amounts, with post-judgment interest at the rate set out in 28 U.S.C. § 1961:

- Servicemember plaintiffs Mario Jaime Valencia, Timothy Shane Seeley, John Charles Young II, the estate of James Elliott Kegan, Todd Scott Rafaiani, Norman Edward Brown, Leonard Dixon Jr., Bobby Gene Castleman Jr., Christopher Dale Sample, Jason Alexander Umberger, Michael Roy Manibusan, Terry Fitzgerald Haywood, Travis Keith Butikofer, James Dan Sikes, Terrence David Dammer, the estate of Craig Thomas Brown, Jerron Keith Sweazy, Steven Ray Matteson, Ray Antonio Wagstaff, Timothy Michael Raymond, Cecil Ben Dills, Curtis Lee Van Meter, Bennie Lee Umstead Jr., Michael Brent Willis, and Paul Anthony Sadatis Jr. are each awarded $7,000,000 in pain and suffering damages and $7,000,000 in punitive damages, totaling $14,000,000 each;

- Servicemember plaintiffs Edward Earl Whitley, Patrick William O'Connor Jr., Kevin Bryan St. John, Erica Marie Belcher, and Shawn Berdell Kirkpatrick are each awarded $6,000,000 in pain and suffering damages and $6,000,000 in punitive damages, totaling $12,000,000 each;
- Servicemember plaintiffs Vincent Bruce Jobson, Richard Kevin Fesenbek, and James Veronal Buckmon III are each awarded $5,000,000 in pain and suffering damages and $5,000,000 in punitive damages, totaling $10,000,000 each;
- Plaintiff-spouses Kathrine Elizabeth Sample, Jennifer Carreon Manibusan, Shelly Ray Willis, Anna Louise Dammer, and Lynnette Ann Brown are each awarded $3,500,000 in solatium damages and $3,500,000 in punitive damages, totaling $7,000,000 each;
- Plaintiff-spouses Virginia Houde Jobson, Monica Sanchez Lopez, and Patricia Denise Buckmon are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, totaling $5,000,000 each;
- Plaintiff-spouse Mary Clarise Whitley is awarded $2,000,000 in solatium damages and $2,000,000 in punitive damages, totaling $4,000,000;
- Plaintiff-parents Frances Kay Rafaiani, Lawrence Eugene Rafaiani, Yolanda Mazzara, Sylvia Marie Wilson, Keith Rey Butikofer, Ronald Duane Sikes, Janice Caroll Rice Sweazy, Warren Eugene Sweazy, Nancy Patricia DiMarco, the estate of Eleanor Cathleen Hill, and Wayne Earl Hill are each awarded $2,500,000 in solatium damages and $2,500,000 in punitive damages, totaling $5,000,000 each;
- Plaintiff-children Lindsay Ann Brown, Ralph Michael Kegan, James Paul Kegan, Carolyn Louise Cline, Katherine Ann Hunt, Krystofer Houde Schofield, Micah Drew Sikes, Christopher Michael Dammer, Courtney Tate Pleva, Jasmin Nichole Logan, Shanice Symone Buckmon, Shakiyla Chante Buckmon, Corey Dwayne Dunlap, Christina Nicole Whitley, Janna

Marie-Louise Kentrolis, Pierce Nathaniel Van Meter, Jordan Marlene Van Meter, Jessica Nicole Swift, Erin David Howard, and Nathaniel Wayne Hill are each awarded $1,500,000 in solatium damages and $1,500,000 in punitive damages, totaling $3,000,000 each;

- Plaintiff-siblings and half-siblings Leslie Marie Core, Christopher Malcolm Umberger, Michael Joseph Mazzara, Susan Angela Jones, Ryan Charles O'Connor, Donald Ardrain Anderson, Trina Denise Anderson, Denice Marie Morgan, Rebecca Lyn Jensen, Megan Marie Sterling, Bryan Keith Butikofer, Tyler Rey Butikofer, Tyrel Zachary Jensen, Jerry Lynn Sikes, Lowell Jeffrey Sikes, Giray Diane Berger, Brenda Jean Sweazy, Michael Wade Sweazy, Jeannie Marie Meek, Brandon Michael Hill, and Heather Marie Miller are each awarded $1,250,000 in solatium damages and $1,250,000 in punitive damages, totaling $2,500,000 each.

Thus, the total compensatory damages award is $330,750,000 and the total punitive damages award is $330,750,000, for a total damages award against Iran of $661,500,000.

Plaintiffs' request for prejudgment interest is DENIED.

The relief sought in plaintiff's Motion to Take Judicial Notice, for Entry of Default Judgment as to Liability and to Submit Documentary Evidence Under Seal and to File a Redacted Version on the Public Docket, ECF No. 40, is GRANTED IN PART insofar is the motion seeks judicial notice of certain prior proceedings, as described above, and DENIED IN PART AS MOOT as to the other relief sought therein, which has either already been granted or was also sought in plaintiffs' Motion for Default Judgment as to Liability and Damages, ECF No. 42.

Plaintiffs' Motion for Expedited Consideration, ECF No. 43, is GRANTED, in that plaintiffs' Motion for Default Judgment as to Liability and Damages, ECF No. 40, is decided today, well in advance of the June 1, 2026, deadline requested by plaintiffs.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: April 6, 2026

**BERYL A. HOWELL**
United States District Judge